# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CV No. 07-1144 |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) **PLAINTIFF UNITED STATES'** |
| | ) **MOTION FOR LEAVE TO FILE** |
| TOYOBO CO., LTD., and TOYOBO | ) **ERRATA AND REVISED COMPLAINT** |
| AMERICA, INC., | ) **BY PAPER** |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff United States of America respectfully moves the Court for leave to file its Errata and revised Complaint by paper, pursuant to LcvR 5.4(b)(6) ("An attorney or pro se party who obtains a CM/ECF password consents to electronic service of all documents, subsequent to the original complaint, . . .") (emphasis added).  Paper filing of the Errata and revised Complaint is appropriate in this instance because the Errata revises the original complaint, which must itself be filed by paper, and also because the procedural error has heretofore prevented the United States from accessing the CM/ECF electronic filing system for this case.

Dated: June 28, 2007                    Respectfully submitted,


                                        PETER D. KEISLER
                                        ASSISTANT ATTORNEY GENERAL


                                        By:
                                        MICHAEL D. GRANSTON
                                        ALAN E. KLEINBURD
                                        ALICIA J. BENTLEY

CALLIE R. OWEN
A. THOMAS MORRIS
MICHAEL J. FRIEDMAN
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel:    202-616-9854
Fax:    202-305-7797

**Certificate of Service**

I hereby certify that on this 28th day of June 2007, a copy of the foregoing was served by first class mail, postage prepaid, as indicated below upon:

TOYOBO CO., LTD.,
2-8 Dojima-Hama 2-chrome,
Kita-ku, Osaka 530-8230, Japan

TOYOBO AMERICA, INC.,
950 Third Avenue, 17th Floor,
New York, NY 10022

and a courtesy copy to counsel for defendants in the related case

Konrad L. Cailteux, Esq.
Weil Gotschal & Manges LLP
767 Fifth Avenue
New York, New York   10153

_____
Alicia J. Bentley

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CV No. 07-1144 |
| | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | **ERRATA** |
| | ) | |
| TOYOBO CO., LTD., and TOYOBO | ) | |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This Errata is filed to submit a version of the United States' Complaint that provides in the caption the name and address of the filing party, pursuant to LcvR 5.1(e).  The copy of the Complaint that was submitted should be substituted with the attached version.

Dated: June 28, 2007

Respectfully submitted,

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

By:

MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
CALLIE R. OWEN
A. THOMAS MORRIS
MICHAEL J. FRIEDMAN
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station

Washington, D.C. 20044
Tel:    202-616-9854
Fax:    202-305-7797

## Certificate of Service

I hereby certify that on this 29th day of June 2007, a copy of the foregoing was served by first class mail, postage prepaid, as indicated below upon:

TOYOBO CO., LTD.,
2-8 Dojima-Hama 2-chrome,
Kita-ku, Osaka 530-8230, Japan

TOYOBO AMERICA, INC.,
950 Third Avenue, 17th Floor,
New York, NY 10022

and a courtesy copy to counsel for defendants in the related case

Konrad L. Cailteux, Esq.
Weil Gotschal & Manges LLP
767 Fifth Avenue
New York, New York   10153

Alicia J. Bentley

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>c/o United States Department of Justice<br>Commercial Litigation Branch<br>P.O. Box 261, Ben Franklin Station<br>Washington, D.C. 20044,<br><br>Plaintiff.<br><br>v.<br><br>TOYOBO CO., LTD.,<br>2-8 Dojima-Hama 2-chrome,<br>Kita-ku, Osaka 530-8230, Japan; and<br><br>TOYOBO AMERICA, INC.,<br>950 Third Avenue, 17th Floor,<br>New York, NY 10022<br><br>Defendants. | CV No. 07-1144 RWR<br><br>COMPLAINT OF THE UNITED STATES<br>OF AMERICA<br><br>1.  VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C. §<br>     3729(a)(1);<br>2.  VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C. §<br>     3729(a)(2);<br>3.  VIOLATIONS OF THE FALSE<br>     CLAIMS ACT, 31 U.S.C. §<br>     3729(a)(3);<br>4.  COMMON LAW FRAUD; AND<br>5.  UNJUST ENRICHMENT<br><br>RELATED CASE: CV NO. 04-0280 (Judge Roberts) |

Plaintiff, the United States of America, alleges as follows:

## OVERVIEW

1.      This is an action brought by the United States to recover damages and civil

penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover damages for

common law fraud and unjust enrichment. All of these claims are premised upon the conduct of

the Defendants Toyobo Co. Ltd. and Toyobo America, Inc. (collectively Toyobo) in causing to be

submitted false claims for payment and false statements in connection with the sale of defective

Zylon body armor, primarily ballistic "bullet-proof" vests, to the United States and to state, local and tribal law enforcement agencies funded in part by federal funds.  These defective Zylon vests were sold to the United States and state, local and tribal authorities by Armor Holdings, Inc. and its subsidiaries, American Body Armor, Inc., Safariland, Inc., and Pro-Tech (collectively Armor Holdings), DHB, Inc. and its subsidiaries, Point Blank Body Armor, Inc. and Protective Apparel Corporation of America, Inc. (PACA) (collectively Point Blank), First Choice Armor, Inc. (First Choice), Gator Hawk, Inc., and Protective Products International, Inc. (PPI).[1]  (This lawsuit expressly excludes any claims for defective Zylon body armor sold to the United States and to state, local, and tribal law enforcement agencies by Second Chance Body Armor, Inc., which are the subject of a separate False Claims Act *qui tam* lawsuit entitled <u>United States ex rel. Westrick v. Second Chance Body Armor, Inc., et al.</u> (D.D.C. No. 04-0280).)  Any reference to Zylon vests and/or vest manufacturers herein expressly excludes Second Chance Body Armor and its products.)  The United States alleges that Toyobo knew, within the meaning of the FCA, that the Zylon fiber it sold for use in Zylon body armor was defective and degraded more quickly than Toyobo and the Zylon Vest Manufacturers represented.  As a result of Toyobo's conduct and representations, the United States paid for defective Zylon body armor.

## JURISDICTION

2.	This Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1345 and 1331.  The Defendants are doing and/or previously did business within this District.  Specifically, a minimum of 907 Zylon bullet-proof vests were delivered to and/or invoiced to federal agencies and/or offices within this District, including 502 Zylon vests manufactured by Point Blank, 388

---

[1]	Armor Holdings, Point Blank, First Choice, Gator Hawk and PPI are collectively referred to herein as the Zylon Vest Manufacturers.

Zylon vests manufactured by Armor Holdings, Inc., and 17 Zylon vests manufactured by Gator Hawk. Additionally, the claims for payment for all Zylon vests – over 46,000 Zylon vests – purchased under the Bullet Proof Vest Grant Partnership Act (BPVGPA) were submitted to the Office of Justice Programs (OJP) of the Department of Justice which is located within this District. (These amounts do not include any Zylon vests manufactured by Second Chance that were delivered to or invoiced to any federal agency or invoiced to the BPVGPA.)

3.       Venue is proper within this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). The Defendants are doing and/or previously did business within this District.

## PARTIES

### The United States of America

4.       The plaintiff is the United States of America. The United States brings this lawsuit on behalf of its agencies, including, but not limited to, the Department of Justice (DOJ), the General Services Administration (GSA), the Department of Defense (DoD), the Treasury Department, the Department of Homeland Security (DHS), and any other federal agencies or divisions which purchased, or provided funds for the purchase of, ballistic vests made in whole or in part with Zylon manufactured by Toyobo.

### The Defendants

5.       Defendant Toyobo Co. Ltd. (Toyobo Japan) is a Japanese corporation doing business in this District. Toyobo Japan's last known business address is 2-8 Dojima-Hama 2-chrome, Kita-ku, Osaka 530-8230, Japan.

6.       Defendant Toyobo America, Inc. (Toyobo America) is a New York corporation doing business in this District. On information and belief, the United States alleges that Toyobo America is a wholly owned subsidiary of Toyobo Japan. Toyobo America's last known business

address is 950 Third Avenue, 17th Floor, New York, NY 10022. Defendants Toyobo Japan and

Toyobo America will be collectively referred to as Toyobo.

### Alter Ego Relationship

7.      At all times relevant to the allegations herein, Defendants Toyobo Japan and

Toyobo America were acting as alter egos of each other and are jointly and severally liable in this

action for each other's conduct. The United States anticipates that a reasonable opportunity for

further investigation and discovery will establish that the purpose of this separate corporation

was to insulate Toyobo, and its principals, officers, and shareholders from any scrutiny of its

business decisions and conduct.

8.      On information and belief, the United States alleges that Defendant Toyobo Japan

created a separate corporate entity, Toyobo America, whereby Toyobo Japan ultimately provided

Zylon to the trading companies, the weavers, and the body armor manufacturers, while Toyobo

Japan ultimately dominated and controlled Toyobo America, operated Toyobo Japan and Toyobo

America in an integrated manner, and disregarded Toyobo America's corporate form. On

information and belief, the United States alleges that Toyobo Japan and Toyobo America shared

common ownership, board membership, and management, as well as corporate, group,

divisional, and employee resources to perform operational, administrative, manufacturing,

research and financial functions. On information and belief, the United States alleges that

Toyobo Japan precluded Toyobo America from conducting business other than which was

directed by and in the interest of the ultimate owner, Toyobo Japan. On information and belief,

the United States alleges that Toyobo Japan operated Toyobo America as a mere shell

corporation through which corporate directives flowed to Toyobo America and profits and other

revenue flowed to Toyobo Japan.

-4-

# BACKGROUND

**A.    The False Claims Act**

9.    The FCA provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

\* \* \*

is liable to the United States Government . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

**B.    The GSA Program**

10.    The General Services Administration (GSA) is an agency of the federal government with the responsibility for administration of the Multiple Award Schedule (MAS) contracting program (also known as the Federal Supply Schedule (FSS)).

11.    Under the MAS program, GSA negotiates contracts for commonly used commercial off-the-shelf items with contractors.  Federal agencies can then purchase products under MAS contracts directly from contractors at pre-negotiated prices, terms and conditions. Products are grouped under pre-designated Special Item Numbers (SINs) which connote broad

categories of commercial products or services.

12.    The GSA Schedule included Zylon bullet-proof vests from Armor Holdings, American Body Armor, Safariland, DHB, Point Blank, PACA, First Choice, Gator Hawk, and PPI.  From approximately 1999 to 2005, the United States Government purchased over 59,000 total Zylon bullet-proof vests from Armor Holdings, Inc., American Body Armor, Inc., Safariland, Inc., Protech, Inc., DHB, Inc., Point Blank Body Armor, Inc., Protective Apparel Corporation of America, Inc. (PACA), First Choice Armor, Inc., Gator Hawk, Inc., and Protective Products International, Inc. (PPI) (Zylon Vest Manufacturers), including at least 21,000 Zylon vests from Armor Holdings, Inc. and its subsidiaries, American Body Armor, Inc. and Safariland, Inc., at least 36,000 Zylon vests from DHB, Inc. and its subsidiaries, Point Blank and PACA, at least 9 Zylon vests from First Choice, at least 65 Zylon vests from Gator Hawk, and at least 336 Zylon vests from PPI pursuant to the supply schedule.  The United States paid over $30 million for these Zylon vests purchased from the GSA schedule.  All of these vests carried a five-year warranty.  The claims for payment for each and every Zylon vest sold to the United States under the GSA schedule by the Zylon Vest Manufacturers were false claims in that the Zylon in those vests was defective and degraded substantially and quickly and, thus, did not meet their five-year warranty.  By the actions set forth in Paragraphs 17-126 of this Complaint, Toyobo knew that the Zylon in these vests was defective and degraded substantially and quickly and did not comply with their five-year warranty.  For these reasons, Toyobo knowingly caused false claims to be presented to the federal government.

**C.    The Bullet Proof Vest Grant Partnership Act Program**

13.    In late 1997, after two state troopers were killed, Congress created a grant program called the Bullet Proof Vest Grant Partnership Act (BPVGPA), 42 U.S.C. § 3796ll, *et*

*seq.* Under the BPVGPA, the United States reimburses eligible state, local and tribal authorities

for up to fifty percent of the cost of ballistic vests. The exact amount state, local and tribal law

enforcement agencies are reimbursed for any specific vest depends on the entitlement cap for

each such agency for that fiscal year. The BPVGPA grant program is administered by the Office

of Justice Programs, a division of the DOJ.

14.     Purchasers under the BPVGPA grant program cannot be reimbursed until they

certify to OJP that they have paid for and received the vests. State, local and tribal authorities do

not receive funds from the BPVGPA in advance of their purchases or in advance of their receipt

of the vests.

15.     From fiscal year 1999 to fiscal year 2004, Armor Holdings, Point Blank, First

Choice, Gator Hawk, and PPI combined sold a minimum of 46,000 Zylon vests to state, local,

and tribal law enforcement entities under the BPVGPA. The federal government reimbursed

these state, local, and tribal law enforcement agencies at least $9.8 million for these Zylon vests

under the BPVGPA. The claims for payment for each and every Zylon vest presented to the

United States by state, local and tribal law enforcement agencies pursuant to the BPVGPA were

false claims in that the Zylon in those vests was defective and degraded substantially and quickly

and, thus, did not meet their five-year warranty. By the actions set forth in Paragraphs 17-126 of

this Complaint, Toyobo knew that the Zylon in these vests was defective and degraded

substantially and quickly and did not comply with their five-year warranty. For these reasons,

Toyobo knowingly caused false claims to be presented to the federal government.

**D.     Other Federal Purchases**

16.     Other federal agencies purchased Zylon bullet-proof vests directly from Armor

Holdings, American Body Armor, Safariland, DHB, Point Blank, PACA, First Choice, Gator

Hawk, and PPI or from their distributors pursuant to federal contracts, other than through the

GSA Schedule. From approximately 1998 on, the federal government purchased approximately

9,700 Zylon bullet-proof vests from these manufacturers. The United States paid at least $4.6

million for these Zylon vests that were purchased directly by federal agencies. The claims for

payment for each and every Zylon vest sold to the United States under federal contracts by the

Zylon Vest Manufacturers were false claims in that the Zylon in those vests was defective and

degraded substantially and quickly and, thus, did not meet their five-year warranty. By the

actions set forth in Paragraphs 17-126 of this Complaint, Toyobo knew that the Zylon in these

vests was defective and degraded substantially and quickly and did not comply with their five-

year warranty. For these reasons, Toyobo knowingly caused false claims to be presented to the

federal government.

<div align="center">**TOYOBO'S SCHEME**</div>

**A.    Testing, Manufacturing and Marketing of Zylon for Ballistic Applications**

17.    In or about the mid-1990s, Dow Chemical Company licensed its rights in

synthetic PBO (Poly p-phenylene-2 6-benzobisoxazole) fiber to Toyobo. Zylon is manufactured

as a continuous filament yarn which is converted into fabric by weaving or into resin by layering.

As part of the Zylon manufacturing process, Zylon yarn, which is manufactured in phosphoric

acid, must be neutralized in alkali. Toyobo manufactured two types of Zylon – Zylon As Spun

(AS) and Zylon High Modulus (HM). The bulk of the ballistic vests at issue in this case

contained Zylon AS.

18.    Toyobo set about to commercialize PBO Fiber under the name Zylon. On

information and belief, the United States alleges that because of Zylon's high tensile strength

(approximately 42 grams/denier), Toyobo actively pursued the American ballistic vest market as

a market for Zylon.

19.    Beginning in or about February 1995, Toyobo began a test weaving program using a Japanese weaver for Zylon. During its initial testing, Toyobo learned that during weaving, the damage to Zylon warp thread (cross-wise thread) was great. In or about November 1995, Toyobo began ballistic testing of woven Zylon.

20.    By mid-1996, Toyobo began marketing Zylon to American bullet-proof vest manufacturers. While much of Toyobo's efforts focused on its initial partnership with Second Chance (which is the subject of the United States' complaint in Case No. 04-0280 in this Court), Toyobo also sought to sell Zylon to other bullet-proof vest manufacturers. In or about September 1996, Tadeo Kuroki of Toyobo wrote to Safariland stating that Zylon had double the strength of Kevlar 29 and stating, "[w]e believe that PBO Fiber is a promising material for ballistic protection."

21.    During 1996 and 1997, Toyobo selected the body armor manufacturers who would be given access to Zylon, selected the weavers who would be authorized to purchase Zylon and to weave it into ballistic fabric, and the trading companies that would import it into the United States. Toyobo kept complete control over access to and use of Zylon for ballistic applications.

22.    In or about April 1997, Toyobo's own research determined that there was severe damage to Zylon during the weaving process, which resulted in the lowering of the strength of the Zylon fiber. Toyobo's researchers considered the major possible cause to be bending fatigue which occurred during the weaving process.

23.    Toyobo contracted with two trading companies, Itochu International, Inc. and Teijin Shoji, both Japanese corporations, to import Zylon yarn into the United States to distribute

to the weavers. Itochu supplied the Zylon yarn to Hexcel Corp., and two Canadian weavers, Barrday Corp., and Lincoln Fabrics, and Teijin Shoji also supplied Zylon yarn to Barrday and Lincoln. On information and belief, the United States alleges that Toyobo used these trading companies in an attempt to insulate itself from products liability suits in the United States. As early as 1995, Toyobo was working with Teijin Shoji to develop the United States ballistic market for Zylon. Itochu and Teijin Shoji served as conduits between Toyobo, and the weavers and the body armor manufacturers by forwarding Toyobo's technical information to the weavers and the body armor manufacturers. Toyobo controlled all pricing on Zylon.

24. In or about June 1998, Toyobo began discussions with Point Blank Body Armor about the manufacture and marketing of a Zylon vest. Representatives of Toyobo met with Allen Price, then an employee of Point Blank. The United States alleges on information and belief that, at the same time, Toyobo had an exclusivity agreement to sell Zylon to Second Chance.

25. In or about August 1998, Toyobo prepared an internal research report for the period July 1997 to August 1998, which analyzed a reduction in strength that Toyobo had noticed in the weaving process in order to understand the relationship with ballistic characteristics of Zylon. Thus, as of at least August 1998, before the first Zylon vest was sold in the United States, Toyobo was aware that the weaving process was causing a reduction of Zylon's strength and ballistic performance.

26. In September 1998, Lincoln Fabrics, Ltd. (Lincoln) contacted Toyobo and expressed its interest in becoming a Zylon weaver. Toyobo met with Lincoln and its Vice President and Consultant, Chung-Lie Ting, during the International Association of Chiefs of Police (IACP) meeting in Salt Lake City, Utah in October 1998. During the meeting, Toyobo suggested that Lincoln must weave a different version of Zylon than that woven by Hexcel.

During the IACP meeting, Toyobo, Second Chance, and Hexcel announced their partnership to manufacture and sell Zylon vests.

27.    In or about October 1998, Toyobo announced the commercialization of Zylon fiber for use in body armor at Toyobo's new multi-million dollar facility in Tsuruga, Japan.

28.    On or about October 17, 1998, Second Chance launched its first Zylon bullet-proof vest in America. Soon thereafter, the other American body armor manufacturers entered the Zylon vest market – Armor Holdings , American Body Armor, and Safariland in or about 1999, DHB, Point Blank, and PACA in or about 1999, First Choice in or about 2000, Gator Hawk in or about 2002, and PPI in or about 2001.

29.    In or about November 1998, Toyobo met with Price and others from Point Blank Body Armor about selling Zylon to Point Blank. During this meeting, Toyobo discussed marketing strategies, including placing Point Blank Zylon body armor on the GSA Schedule.

**B.    Zylon Degradation, Manufacturing Problems, and Weakened Red Thread Zylon**

**(1)    Early Knowledge**

30.    By at least November 1998, Toyobo was aware that any light could damage Zylon. In or about November 11, 1998, Toyobo notified a German customer that any visible light can damage Zylon.

31.    On or about December 18, 1998, just after the launch of the first Zylon ballistic proof vest in the United States, Toyobo notified Barrday that Zylon loses strength under fluorescent light.

32.    In or about February 1999, Toyobo met with Point Blank in Washington, D.C. to discuss the use of Zylon in Point Blank's vests.

33.    In or about March 1999, Hexcel returned nine bobbins of Zylon to Toyobo and

Itochu because they had "red streaks" in them.

34.    In or about April 1999, Masakazu Saito of Toyobo was contacted by PPI, another body armor manufacturer seeking to purchase Zylon for use in its ballistic vests.

35.    In or about May and June, 1999, Toyobo continued to market Zylon to Price of Point Blank.

36.    In or about April 1999, Toyobo received ballistic test results on Zylon cloth that showed 2 of 6 copper-jacketed round-nosed bullets penetrated the Zylon. Moreover, backface deformation of one of the non-penetrating shots exceeded 25 mm. The test was stopped before it was completed. On information and belief, the United States alleges that backface deformation is the effect of a non-penetrating projectile on the rear face of a strike plate. This is used to gauge the impact of the projectile on the internal organs of the ballistic armor wearer.

37.    Beginning in at least May 1999, Toyobo was aware that Red Thread was occurring in its Zylon fiber. On information and belief, the United States alleges that Red Thread is a reddish, discolored section of Zylon fiber which has a reduced tensile strength. On information and belief, the United States further alleges that Red Thread was caused by over-neutralization, a chemical condition occurring during the Zylon manufacturing process, when too much neutralizer is left on the Zylon fiber and weakened it.

38.    In or about 1999, Toyobo entered into an agreement with Honeywell to sell Zylon to Honeywell to be used in a patented shield technology process to make Z-Shield, a non-woven unidirectional composite cross-plied and sandwiched in thermoplastic to form a laminate. Initially, Honeywell's Z-Shield was manufactured with Dutch State Mines (DSM), a Dutch company. DSM called its laminate "Zylon Shield." Z-Shield was introduced in the marketplace in 2000.

39.    In or about September 1999, Toyobo executives Koygo, Shiga and Ichirya met to discuss Zylon.  On information and belief, the United States alleges that during that meeting, Koygo stated that he did not think that Toyobo could make things right with Zylon and the attendees at the meeting discussed how Toyobo should not give out too much know-how about Zylon.

40.    In or about February 2000, Teijin Shoji, at Toyobo's direction, prepared to sell Zylon to Gator Hawk, another body armor company.

41.    On or about February 28, 2000, Toyobo executives, Messrs. Nasai, Kawamura, Sekida and Yoshikazu Tanaka prepared a "Confidential" report discussing the implementation of Zylon Red Thread Countermeasures.  In the report, Toyobo noted that Red Thread had occurred on a number of occasions and because the Red Thread had an accompanying lowering of strength, urgent countermeasures were necessary.  Over three years later, in May 2003, Toyobo falsely told Hexcel, as well as the American body armor manufacturers, that Toyobo had first manufactured Zylon containing Red Thread in October 2002.

42.    On or about March 21, 2000, Toyobo prepared another technical report on Red Thread marked "TOP SECRET," which was entitled "Part 1: Explanation of 'Red Thread' Occurrence Mechanism."  The report states in part that the cause was neutralization of the Zylon fiber with caustic soda.  On information and belief, the United States alleges that the report stated that "with Red Thread, not only is the color of the thread red, but also the fact that the strength is low is a problem, and it ends up as AA grade product handling.  Immediate countermeasures are necessary."  On information and belief, the United States alleges that this "TOP SECRET" report stated that Red Thread was first identified on or aboutMay 10, 1999 to October 1, 1999.

43.    On or about April 13, 2000, despite the implementation of countermeasures in

-13-

early 2000, Toyobo employees noticed Red Thread on 12 to 14 spindles of Zylon fiber.

44.    In or about June 2000, Toyobo employees prepared another TOP SECRET technical report detailing the problems with Red Thread.

45.    By August 29, 2000, Toyobo prepared a technical report, also marked "TOP SECRET," which covered the period June 3, 2000 to August 29, 2000.  The report indicated that the occurrence of Red Thread had been reduced by the Zylon Red Thread Countermeasures.  However, the Red Thread problem re-occurred continually during Toyobo's manufacture of Zylon.

46.    In or about December 2000, Toyobo began selling Zylon to another American armor company, First Choice Armor.

**(2)    Hydrolysis and Vest Failure**

47.    On or about January 31, 2001, Toyobo began to test Zylon fiber for strength retention after exposure to $80^{\circ}$C ($176^{\circ}$F) and 80% relative humidity for seven days.

48.    On or about February 17, 2001, a Toyobo employee, Yoshioka Ozeki, told a European customer of Zylon, Security Sicherheistechnick GmbH, that the performance of Zylon Shield was better than the performance of Zylon fabric.

49.    On information and belief, the United States alleges by, at least May 2001, Toyobo had performed V-50 testing on Zylon which showed a 25% drop in ballistic performance (from 1900 feet per second to 1425 feet per second) after 50 days accelerated aging at $176^{\circ}$F and 80% relative humidity.

50.    By at least April 2000, on information and belief, the United States alleges that three United States body armor manufacturers, Second Chance, Point Blank and Armor Holdings, were using Zylon Shield (a/k/a Z-Shield) in their body armor.  The Z-Shield was made

by DSM and Honeywell Corp. Zylon Shield was another form of Zylon used in ballistic vests

sold in the United States. Toyobo supplied the Zylon that DSM and Honeywell used to

manufacture Zylon Shield.

51.    On or about June 21, 2001, Toyobo's internal research revealed that hydrolysis

countermeasures for Zylon were very poor. On information and belief, the United States alleges

that hydrolysis is chemical decomposition in which a compound is split into other compounds by

reacting with water.

52.    In or about July 2001, a bullet-proof vest made of DSM's Zylon Shield and

manufactured by Mehler failed during ballistic testing. Toyobo supplied the Zylon in the failed

Zylon Shield vest.

53.    On July 5, 2001, Frank Schaap of DSM HPF wrote to Messrs. Nojima, Saito and

Kuroki at Toyobo in a facsimile letter entitled "URGENT, URGENT, URGENT, URGENT."

DSM stated that it had "serious indications that the use of Zylon in bullet resistant vests may not

be justified." DSM suggested that Toyobo take all necessary precautions to avoid further

potential risk of distribution of unjustified Zylon. DSM put on hold its market introduction of

Zylon Shield.

54.    After the failure of the DSM vest in July 2001, other participants in the Zylon

manufacturing process with Toyobo knew that all Zylon vests were at risk and the entire Zylon

fabric business was at risk. Hexcel was concerned that the DSM failure "in the worst case could

mean the total loss of our Zylon business."

55.    On or about July 6, 2001, Mr. Saito of Toyobo informed Second Chance, Point

Blank, Armor Holdings, First Choice, Hexcel, Lincoln, and Barrday that DSM had put the

introduction of Zylon Shield on hold. Toyobo assured the body armor manufacturers and the

weavers that it had not found any serious indication of Zylon strength degradation from its aging

tests using Zylon fiber, but stated that it assumed no liability for any use of Zylon fiber.

56.     On information and belief, the United States alleges that these Toyobo

representations were misleading, as Toyobo knew that its Zylon manufacturing process was

causing a loss of strength in Zylon.  Toyobo knew of this problem in 1998, before the first Zylon

vest was sold.  Additionally, Toyobo knew that exposure to light resulted in a loss of strength in

Zylon.

57.     Following the Zylon Shield failure, in the Fall of 2001, Price, then an employee of

Point Blank, called the National Law Enforcement and Corrections Technology Center

(NLECTC) and informed an NLECTC employee that the failure of the Zylon Shield vest in

Germany was not "a real failure" and was the result of a business dispute between DSM and

Honeywell-Allied Signal.  On information and belief, the United States alleges that Price knew

that this statement was misleading and was designed to mislead the United States Government

about the seriousness of the Zylon Shield failure.

58.     On information and belief, the United States alleges that Toyobo was deeply

concerned with DSM's announcement but tried to hide its concerns.

59.     On or about July 5, 2001, in light of the DSM Zylon Shield failure, Honeywell

temporarily stopped shipping Z-Shield to Armor Holdings.  However, on information and belief,

the United States alleges that, based on Toyobo representations that it had not found any "serious

indications" from Toyobo's internal testing of Zylon, Honeywell chose to take no further action.

60.     By letter dated July 5, 2001, Toyobo informed the body armor manufacturers that

its internal testing of Zylon fibers indicated that there was a strength decrease of Zylon at

elevated temperature and humidity.  Toyobo recommended that the body armor manufacturers

confirm product designs to insure that they met customer requirements and to determine product lifetime. While Toyobo released this data, Toyobo failed to release other data regarding Zylon that was in its possession that would have shown the extent to which Zylon degraded and the fact that Toyobo's manufacturing process was functioning improperly.

61.    On or about July 19, 2001, Toyobo released additional data that estimated a loss of less than 5% strength by Zylon over ten years at ambient temperatures and humidity and a loss of less than 10% strength of Zylon at $40^{\circ}$C and 80% relative humidity. This data conflicted with the evidence in Toyobo's possession concerning the degradation of Zylon when exposed to light and humidity.

62.    On or about July 30, 2001, a report was prepared at Toyobo which discussed the particularly low strength of the over-neutralized Zylon, also known as Red Thread, and questioned whether such fiber was not at a greater risk of degradation when exposed to heat and humidity.

63.    On or about August 21, 2001, Toyobo prepared an experiment plan to determine the cause for the lowering of strength due to residual acid (hydrolysis). The chart attached to the plan showed a 40% strength loss when the fiber was exposed to $40^{\circ}$C and 80% relative humidity over 100 days.

64.    On or about August 22, 2001, Toyobo prepared a report to Toyobo executives Tooru Kitagawa, M.L. Abe, Mr. Matsuoka, Kohei Kiriyama, and Hiroki Murase which discussed the low strength retention of both under-neutralized and over-neutralized Zylon thread.

65.    On or about August 24, 2001, Toyobo was informed that DSM had stated that the Zylon vest lost 20 percent of its strength under certain conditions when exposed to heat and humidity.

66.    On or about August 28, 2001, Toyobo reported to Zylon vest manufacturers test data that showed a significant degradation in Zylon strength in less than 100 days at high temperatures and humidity.  Toyobo stated that this result was a "little bigger strength drop than we expected."

67.    On or about September 14, 2001, Toyobo published a technical bulletin describing Zylon properties under extreme conditions and announcing that there was a strength decrease of up to 65% after six months in sunlight.  Toyobo also announced that there was a 25-35% loss of Zylon strength when Zylon was exposed to fluorescent lamps for several weeks, but failed to state that this 25-35% loss of Zylon strength had not occurred under extreme conditions.

68.    On or about September 18, 2001, Toyobo reported to Kohei Kiriyama that Zylon's heat and humidity performance varied depending on spinning conditions; however, Toyobo concluded that it needed an additional six months to be able to control the performance of Zylon.

69.    On or about September 11, 2001, DSM reported that its testing on aging Zylon shield showed a strength loss of 22%.

70.    After September 11, 2001, an employee of Point Blank reviewed Toyobo's degradation data and became concerned that Zylon degraded under normal conditions.  On information and belief, the United States alleges that at the instruction of Sandra Hatfield, the then-President of Point Blank, a Point Blank Zylon vest was sent to a test laboratory for ballistic testing.  The Point Blank Zylon vest failed.  When the Point Blank employee informed Hatfield, she told him that the test result was an anomaly and dismissed the results.

71.    On or about October 9, 2001, Yoshinari Ohira of Toyobo informed Honeywell, the manufacturer of Zylon Shield that, in conditions of $80\,^{\circ}C$ and 80% relative humidity, Zylon AS lost 23% of its strength in 30 days and Zylon HM lost 18% of its strength in 30 days.

72.     On or about October 19, 2001, during its monthly meeting, the Toyobo research Center prepared a confidential experimental plan to search for a method to suppress hydrolysis. While Toyobo confirmed that there was a reaction in the Zylon due to hydrolysis, control of the reaction in the Zylon manufacturing process was difficult.

73.     Prior to November 7, 2001, Toyobo informed Teijin Shoji that Toyobo recognized that the degradation issue was attributed to Zylon's particular composition. Moreover, Toyobo informed Teijin Shoji that it was running more tests of the fiber at $40^{\circ}$C, which were close to the human body temperature, and which were expected to be completed by December 2001.

74.     On or about November 16, 2001, Kuroki contacted a European manufacturer of body armor and a customer of Zylon to discuss the customer's concerns about the long-term stability of Zylon fiber. Kuroki admitted that the most serious concern was the data arising from testing done at conditions of $40^{\circ}$C and 80% relative humidity, which he admitted would be similar to the temperature of a police officer who was running.

(3)     **Worsening Degradation Data and The Zylon Cover-Up**

75.     In November 26, 2001, Toyobo released accelerated aging data in the form of a graph that showed a dramatic drop in Zylon fiber strength. This strength drop did not follow a logarithmic (or predictable) plot. Toyobo admitted that the mechanism of the change was not clear. This data showed at least a 15% strength loss at 150 days and the last three data points on the graph showed an additional 8% loss in 50 days.

76.     Following Toyobo's announcement of the November 26, 2001 degradation data, Hexcel sought indemnification from Toyobo for its Zylon fiber. On information and belief, the United States alleges that Hexcel had not sought indemnification from any other manufacturer for any other fiber. Additionally, Hexcel sought a refund in the event that its customers stopped

using Zylon.  On or about December 28, 2001, Toyobo and Itochu, the trading company that served as the liaison between Toyobo and Hexcel, agreed to a refund in the event that Hexcel's customers stopped using Zylon but declined to provide Hexcel with the requested indemnification.

77.     On or about December 4, 2001, Barrday announced that it would suspend direct sales of Zylon to ballistic vest manufacturers based on the November 26, 2001 Zylon degradation data from Toyobo.  Barrday informed Toyobo that Toyobo should "be aware that we are concerned that the tests indicate that your product is no longer suitable for use in ballistic applications."

78.     On or about December 13, 2001, Second Chance and Toyobo met in Los Angeles for a  "Toyobo & Second Chance Zylon Crisis Management Meeting" to discuss the accelerated degradation of Zylon fiber.  Following this meeting between Toyobo and Second Chance, Toyobo offered Second Chance a rebate program worth $6 million to solve the Zylon problem. Approximately two weeks after this meeting with Second Chance, Toyobo withdrew its November 26, 2001 Zylon degradation data.

79.     On information and belief, the United States alleges that on or about December 19, 2001, Toyobo informed Itochu that Toyobo's release of the November 26, 2001 data was "thoughtless" and asked Itochu to tell Zylon customers to wait for new data.

80.     In a Toyobo report from Yukihiro Nomura, dated December 14, 2001, Toyobo determined that at $40^\circ$C and 80% relative humidity Zylon's strength dropped 13% "and as usual shows no signs of stopping."

81.     On or about December 26, 2001, Toru Matsumoto of Toyobo met with Kinboshi Corp., a Japanese Zylon customer.  Kinboshi asked Matsumoto for the latest data on deterioration

by heat and humidity. On information and belief, the United States alleges that in his trip report, Matsumoto noted "we can no longer keep quiet like this."

82.    On or about December 27, 2001, Toyobo prepared a ZKP Interim Report about the problems with the stability of Zylon fiber. The report states that the lowering of strength occurs over several weeks in normal storage and the lowering of strength occurs in a relatively short time during high temperature and humidity.

83.    On December 28, 2001, Toyobo notified its "important customers" that it would withdraw its November 2001 degradation data on the grounds that it was "statistically not correct and not reliable." In January 2002, Toyobo retracted its November, 2001 data showing a dramatic drop in Zylon fiber strength and replaced it with data that had the bad data points removed.

84.    In late 2001 or early 2002, in order to get Barrday to resume weaving Zylon, Toyobo arranged to have Teijin Shoji retain title to the Zylon after it was delivered to Barrday and to have Teijin Shoji sell it directly to the body armor manufacturers. Later, Teijin Shoji performed the same role with Lincoln Fabrics.

85.    On or about February 2, 2002, Yoshinari Ohira from Toyobo met with Barrday and Ohira falsely represented to Barrday that Toyobo was confused by the Zylon degradation data.

86.    In or about February 20, 2002, Ohira from Toyobo met with Gator Hawk to discuss Zylon degradation issues. On information and belief, the United States alleges that in or about February 2002, Gator Hawk Armor asked Toyobo to perform ballistic testing on used Zylon vests. On information and belief, the United States alleges that Toyobo declined to do so.

87.    During 2002 and 2003, Toyobo provided the bullet proof vest manufacturers with

quarterly updates on its Zylon research that confirmed Zylon fiber lost its tensile strength when exposed to heat and moisture. However, Toyobo did not provide other "confidential" and "top secret" Toyobo internal documents concerning Zylon research in its possession to the body armor manufacturers.

88.    On or about January 15, 2003, Toyobo prepared an internal research report that linked Zylon's strength loss under high temperature and high humidity to hydrolysis. On information and belief, the United States alleges that the report notes that after deterioration by heat and humidity, Zylon was slightly reddish brown.

89.    In or about February 2003, Toyobo modified its Zylon manufacturing process to change the tension used to manufacture fiber back to the levels of 2002. On information and belief, the United States alleges that the tension had been raised in order to improve manufacturing speed of the Zylon.

90.    On or about February 27, 2003, Toyobo, Itochu and Lincoln Fabrics met to discuss Zylon. During the meeting, Chung-Lie Ting of Lincoln Fabrics told Toyobo that Lincoln Fabrics had bet on Zylon as a workable fabric but was having a hard time getting answers from Toyobo.

C.    **Officer Shootings and the "Discovery" of Zylon Red Thread**

91.    On or about March 5, 2003, Toyobo prepared another TOP SECRET report about Red Thread. On information and belief, the United States alleges that the report stated that in July 2002, in order to resolve the deterioration of Zylon in heat and humidity, Toyobo intentionally increased the amount of caustic application and reduced the amount of water in the neutralization process. The report concluded that this change, apparently designed to address the heat and humidity degradation problems, also known as hydrolysis, with Zylon, resulted in an

increase in Red Thread.

92.    In or about April 2003, Masakazu Saito of Toyobo announced to the body armor manufacturers that Toyobo's accelerated aging tests of Zylon showed that Zylon degraded at an abnormally high rate when exposed to heat and humidity.

93.    In or about April or May 2003, weavers at Hexcel observed red streaks in the Zylon fiber.  Hexcel tested the tensile strength of the Red Thread Zylon and determined it was 20% below the Zylon specification.  Hexcel contacted Itochu and Toyobo and informed them that "because this fabric [Zylon] is used in ballistic vest[s] and the tensile strength is below our customer's specification, we cannot use this fabric."

94.    In or about May 2003, Teijin Shoji informed Point Blank that Toyobo had accelerated aging data for testing on Zylon fabric (and not just yarn).

95.    On or about June 6, 2003, as the Red Thread problem at Hexcel proliferated, Hexcel shut down all Zylon weaving "until Toyobo can assure us in writing that the yarn/fabric in question is suitable for ballistic application."

96.    On or about June 9, 2003, Itochu (acting on behalf of Toyobo) informed Hexcel that Toyobo acknowledged that the Red Thread was 10% weaker than the specification and that Itochu could not guarantee that Hexcel's Toyobo Zylon inventory did not have Red Thread. Itochu provided information to Hexcel from Toyobo that it had been receiving Red Thread from Toyobo that had been manufactured between October 2002 and February 2003.  This information was false because Toyobo knew that the Red Thread problem existed long before October 2002.

97.    On or about June 13, 2003, Officer Zeppetella, of the Oceanside, CA police force, was shot through his Second Chance Zylon vest and killed during a traffic stop.  This vest was under one year old.

98.    On or about June 16, 2003, Hexcel again tested the Red Thread and found it was 15-20% below the strength of normal Zylon.  The tensile strength of the Red Thread Zylon was below the specification.

99.    On or about June 18, 2003, representatives of Toyobo met with representatives of Hexcel to discuss Red Thread.  Toyobo admitted that Red Thread was caused by over-neutralization of the Zylon.  Toyobo also admitted that it did not have control over its Zylon neutralization process.  Toyobo admitted that the problem of red ends had been present in Zylon since the first Zylon production.  Toyobo admitted that it had seen a strength loss in the Red Thread Zylon between 5-10% and that it could be as high as 20%.  Hexcel informed Toyobo that even a 10% strength loss took the Zylon outside of the specification.  Hexcel asked Toyobo if the red ends would degrade more than standard Zylon yarn when exposed to the environment.  Toyobo did not answer the question.

100.    Toyobo's internal notes of the meeting between Hexcel and Toru Matsumoto and Yoshihiko Teramoto of Toyobo indicated that neutralization of Zylon was poor and preventative measures were not going well.

101.    On or about June 20, 2003, Toyobo told Hexcel that the Red Thread problem was unavoidable and that, if the Red Thread was controlled and short and small in number, they would not harm the Zylon properties or its quality.  At the time Toyobo made this statement, it knew this statement was false and misleading because it could not control the red ends and that they were neither short nor small in number.

102.    On June 20, 2003, Masakazu Saito of Toyobo admitted that it had to settle with Hexcel in order to restart production and hasten the shipping of Zylon to ballistic vest manufacturers.

-24-

103.    Ten days later, on June 23, 2003, Officer Ed Limbacher of Forest Hills, PA was shot in the stomach wearing a Second Chance Zylon vest made less than one year before.

104.    On the same day as the Limbacher shooting, on June 23, 2003, Toyobo agreed to provide Hexcel with $130,000 in replacement Zylon fiber, $240,000 to reimburse Hexcel for Zylon fabric rejected by a bullet proof vest manufacturer, and an agreement to reimburse Hexcel for any future Zylon cancellations.

105.    On or about June 25, 2003, Toyobo, Teijin Shoji and Point Blank met and Toyobo assumed it was to discuss Red Thread.  However, on information and belief, the United States alleges that Point Blank apparently was not aware of the Red Thread and the Toyobo representative did not warn Point Blank about the Red Thread, stating "naturally there was no mention [of Red Thread] at all from me."

106.    On or about June 26, 2003, Hexcel, Toyobo and Itochu met to discuss Red Thread.  Hexcel informed Toyobo that the defect could relate to the entire Zylon production from Toyobo.  Toyobo admitted that it was concerned by the length and the frequency of the present Red Thread occurrence.  Hexcel and Toyobo discussed the possibility of a recall of all Zylon vests at that time.  Toyobo wanted to avoid a recall and wanted to resume shipment of Zylon to customers.  Hexcel told Toyobo that this was "questionable fabric" that was already in some vests.  Hexcel's employees stated that they found Toyobo's explanation of the Red Thread problem "amazing" and stated that they did not believe the Toyobo employees.

107.    On or about July 5, 2003, Ting of Lincoln Fabrics told Itochu that the Red Thread in the Lincoln Fabric's Zylon was not that red and that he may decide to ship it, despite the defect, to a ballistic armor manufacturer.  Itochu's handwritten notes on the email stated "red – 30% weaker."

108.     On or about July 11, 2003, Second Chance stopped selling certain vests that contained Zylon.  No other manufacturer stopped selling any Zylon vests at that time.

109.     On information and belief, the United States alleges that on or about July 16, 2003, an employee of Itochu reported to his supervisor that he believed Toyobo was being "tricky and unclear" about the Red Thread problem.

110.     On or about July 21, 2003, Toyobo met with Itochu and Lincoln Fabrics about Red Thread.  Ting of Lincoln told Toyobo that the worst Red Thread had a 30% strength loss. Additionally, Ting encouraged Toyobo not to tell the smaller manufacturers about the Red Thread if the ballistic test results were good.

111.     On or about July 25, 2003, after ballistic testing on intentionally manufactured Red Thread from Toyobo (not the Red Thread that had been made during its out-of-control manufacturing process), Hexcel began weaving Zylon again.  However, on information and belief, the question of the impact of Red Thread on Zylon degradation remained unanswered.

112.     On or about July 25, 2003, Toyobo, Itochu and Hexcel made presentations to Point Blank and Armor Holdings concerning the Red Thread.  The purpose of these meetings was to convince these ballistic vest manufacturers to continue buying Toyobo's Zylon that had been woven by Hexcel.  During these meetings, Itochu and Hexcel intentionally did not mention the over neutralization problems at Toyobo from October 2002 to February 2003.

113.     On or about August 11, 2003, Toyobo issued an "Official Statement about Reddish Yarn Quality Trouble of Zylon."  This report falsely stated that Red Thread was first reported by a customer in May 2003, despite the fact that Toyobo itself had known of Red Thread by February 2000.  Toyobo reported that it did accelerated aging testing on the Red Thread at $80\,^{\circ}C$ and 80% relative humidity and concluded that after aging the strength of the Red

Thread was 5-10% lower than the regular (non-red) part.

114.    On or about September 8, 2003, Second Chance issued a press release that disclosed that Zylon vests wore out sooner than expected and that there was a potential safety issue with respect to them.

115.    On or about September 19, 2003, Itochu discussed Zylon degradation with Lincoln Fabrics. Itochu chose not to disclose the phosphoric acid component to Zylon degradation because it was "confidential" between Toyobo and Itochu.

116.    In or about September 2003, Mehler, a German company which had been involved in the testing and manufacture of the Zylon Shield vest that had failed in July 2001, issued V-50 test results on aged Zylon vests made of Zylon Shield. The results showed a 2 to 20% reduction in ballistic energy absorption performance over twelve months. Mehler concluded that it was questionable if the Zylon vest could retain the protection requirement over the five-year intended use period.

117.    On or about October 10, 2003, Toyobo issued additional Zylon degradation data, including V-50 testing on Zylon, which, on information and belief, the United States alleges was performed in or about May 2001, showing a 25% drop in ballistic performance from 1900 feet per second to 1425 feet per second after 50 days at $176^{\circ}$F and 80% relative humidity. This report demonstrated that Zylon fabric was degrading at an alarmingly fast rate.

118.    On or about October 20, 2003, Toyobo stated, in part, that since 2001 it had been well understood in the industry that Zylon fiber might be susceptible to degradation under certain extreme temperatures and humidity for prolonged periods of continuous exposure and Toyobo's tests estimated aging performance of Zylon fiber, not actual ballistic performance of the final product.

119.    On or about December 15, 2003, Toyobo met with Barrday and Teijin Shoji concerning Zylon. Toyobo admitted that it had degradation data in its possession from Zylon fabric that had been manufactured in Japan. Tadeo Kuroki of Toyobo told Barrday that Toyobo had changed its strategy in response to Second Chance's attack on Toyobo. Toyobo admitted that it "manufactured and sold fabric in Japan and therefore had the data there but only sold fiber in North America and thought it was appropriate that they only show fiber data here."

120.    On or about January 12, 2004, Hexcel notified Toyobo that Zylon fabric which had been woven approximately one year earlier showed a significant reduction in tensile strength. Hexcel informed Toyobo "[t]his data is consistent with published Toyobo data on fiber tensile strength degradation, and as a result, we are not sure how it impacts the continuing study of Zylon's suitability for ballistic applications." The tensile strength data provided by Hexcel to Toyobo showed a 14 to 19.5% drop in tensile strength.

121.    On or about February 17, 2004, Toyobo responded to Hexcel that the drop in tensile strength was not accompanied by "a correspondingly significant" drop in ballistic performance and told Hexcel that it was waiting until NIJ completed its comprehensive testing on Zylon.

122.    On or about March 3, 2004, Toyobo informed Lincoln Fabrics that Toyobo continued to believe that Zylon was entirely "suitable" for use in ballistic applications in properly designed and manufactured body armor.

123.    In or about April 2004, Hexcel's employees again found Red Thread in Zylon from Toyobo. However, this time, Hexcel did not stop weaving and treated the Red Thread as normal. This yarn had been manufactured in August 2003, after the Red Thread period that was initially identified to Hexcel by Toyobo. Therefore, on information and belief, the United States

alleges that Toyobo's problem in controlling Red Thread during manufacturing was never resolved.

124. On information and belief, the United States alleges that in our about June 2004, Itochu and Toyobo were low on Zylon inventory and offered to deliver 2003 Zylon inventory to Lincoln Fabrics, which they informed Lincoln Fabrics might contain Red Thread. Lincoln agreed to accept 2003 Zylon with knowledge that it might contain Red Thread. After a large amount of Red Thread Zylon was found at Lincoln, representatives of Toyobo and Itochu visited Lincoln. On information and belief, Lincoln, Toyobo, and Itochu informed Point Blank and Armor Holdings about the Red Thread in the Zylon being woven by Lincoln in 2004.

125. On or about June 1, 2004, Toyobo announced that it would re-measure Zylon fiber properties when the manufactured Zylon fiber was in inventory for more than 120 days.

126. On or about August 25, 2005, NIJ issued a report on ballistic testing of used Zylon body armor. The bulk of the Zylon vests failed the testing – 58% of the Zylon vests had at least one penetration and 91% had excessive backface deformation. Following that report, all manufacturers stopped using Zylon.

## COUNT 1

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1) AGAINST TOYOBO CO. LTD. AND TOYOBO AMERICA INC.

127. The United States re-alleges and incorporates herein by reference paragraphs 1 through 126.

128. Toyobo knowingly caused to be presented false or fraudulent claims to the United States for payment, in violation of the FCA, 31 U.S.C. § 3729 (a)(1). Specifically, Toyobo caused to be presented by state, local and tribal law enforcement agencies false claims for

payment under the BPVGPA for Zylon ballistic vests which Toyobo knew were defective.

Additionally, Toyobo caused to be presented by the Zylon Vest Manufacturers false claims for

payment under the GSA FAS Schedule for Zylon vests which Toyobo knew were defective.

Moreover, Toyobo caused to be presented additional false claims for payment by the Zylon Vest

Manufacturers to the United States for purchases outside of the GSA contract for Zylon vests

which Toyobo knew were defective.  Each and every claim for payment for any Zylon vest

presented to the United States was false.  All of these claims were knowingly false claims under

the FCA.

129.    By virtue of these false or fraudulent claims, the United States suffered damages

in an amount to be determined at trial.

<div align="center">

**COUNT 2**
**VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(2)**
**AGAINST TOYOBO CO. LTD. AND TOYOBO AMERICA INC.**

</div>

130.    The United States re-alleges and incorporates herein by reference paragraphs 1

through 126.

131.    Toyobo knowingly made or caused to be made false statements in order to get a

false claim paid by the United States for payment, in violation of the FCA, 31 U.S.C. §

3729(a)(2).  Specifically, Toyobo made or caused to be made false statements in connection with

false claims for payment made by state, local and tribal law enforcement agencies under the

BPVGPA for Zylon vests which Toyobo knew, recklessly disregarded or deliberately ignored

were defective.  Additionally, Toyobo made or caused to be made false statements in connection

with false claims for payment made by the Zylon Vest Manufacturers under the GSA FAS

Schedule for Zylon vests which Toyobo knew, recklessly disregarded or deliberately ignored

were defective.  Moreover, Toyobo made or caused to be made false statements in connection

<div align="center">-30-</div>

with false claims for payment by the Zylon Vest Manufacturers to the United States for purchases outside of the GSA contract for Zylon vests which Toyobo knew, recklessly disregarded or deliberately ignored were defective. All of these claims were knowingly false claims under the FCA.

132.    By virtue of these false statements, the United States suffered damages in an amount to be determined at trial.

## COUNT 3

### VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(3) AGAINST TOYOBO CO. LTD. AND TOYOBO AMERICA INC.

133.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 126.

134.    Toyobo conspired with various other participants in the Zylon manufacturing and marketing chain to defraud the United States by getting false or fraudulent claims paid by the United States, in violation of the FCA, 31 U.S.C. § 3729 (a)(3).

135.    As more specifically alleged in paragraphs 17 through 122, Toyobo engaged in multiple conspiracies to continue to manufacture and to sell defective Zylon vests with knowledge, within the meaning of the FCA, that the Zylon fabric in these vests was defective.

      a.    Following the announcement of the DSM Zylon Shield failure in Germany in July 2001 and the release of the Zylon degradation data from Toyobo and DSM in July-October 2001 (see ¶¶ 52–74), Toyobo entered into a conspiracy with other participants in the Zylon manufacturing process to down-play the significance of the Zylon Shield failure and Zylon degradation data. In furtherance of this conspiracy, the participants,

including but not limited to Toyobo, took the following acts:

(1)    In the fall of 2001, Price, then an employee of Point Blank,
contacted the United States Government and informed them that
the Zylon Shield failure was not a "real" failure but the result of a
business dispute over the exclusive rights to Zylon;

(2)    Toyobo falsely represented to the Zylon vest manufacturing
participants that there was no serious indication of strength
degradation from its own testing and the vest manufacturers
accepted Toyobo's representations publicly;

(3)    Certain of the Zylon vest manufacturers, including Point Blank,
performed their own testing on aged vests which did not support
Toyobo's representation that there was no serious indication of
strength degradation;

(4)    Other vest manufacturers and others in the manufacturing process
began testing procedures on used Zylon vests, but ultimately did
not disclose the results of this testing to the public or the United
States Government;

b.    Following Toyobo's release of additional unfavorable Zylon degradation
data in November 2001 and its subsequent withdrawal of that data later in
December 2001 following a meeting with Second Chance (see ¶¶ 75–88),
Toyobo entered into a conspiracy with other participants in the Zylon
manufacturing process to down-play the significance of the November
2001 Zylon degradation data.  In furtherance of this conspiracy, the

-32-

participants, including but not limited to Toyobo, took the following acts:

(1)     Provided the weavers, including but not limited to Hexcel, Barrday

and Lincoln, with indemnification or limitation of liability in the

event that their customers stopped purchasing Zylon;

(2)     Used the trading companies, Itochu and Teijin Shoji, as

intermediaries between Toyobo and at least two of the weavers,

Barrday and Lincoln, and the Zylon vest manufacturers in order to

protect the weavers.  Specifically, the trading companies

maintained title to the Zylon fiber in the possession of the weavers

while it was being woven and then the trading companies shipped

the weavers' finished product to the Zylon vest manufacturers.

c.     Following the "discovery" of Red Thread by Hexcel in or about April

2003, Toyobo (see ¶¶ 89–114) entered into a conspiracy with other

participants in the Zylon manufacturing process to down-play the

significance of the Red Thread.  In furtherance of this conspiracy, the

participants, including but not limited to Toyobo, took the following acts:

(1)     Despite overwhelming evidence obtained by the weavers' testing

that the tensile strength of Red Thread Zylon was 20-30% less than

"normal" Zylon, Toyobo and the participants in the Zylon vest

manufacturing process continued to use Zylon in ballistic vests and

treated any subsequent Red Thread as "normal;"

(2)     Failed to recall the Zylon ballistic vests already in use despite

Toyobo's admission to the weavers, trading companies, and certain

-33-

of the major Zylon vest manufacturers that Red Thread had been present in the Zylon fiber since the beginning of its manufacturer, Toyobo's statement that long Red Thread had been present in all Zylon fiber from October 2002 to February 2003 and Toyobo's knowledge that the tensile strength of Red Thread Zylon was 20-30% less than that or "normal" Zylon;

(3)    Failed to recall the Zylon ballistic vests already in use despite the fact that there were questions where the Red Thread Zylon was more susceptible to hydrolysis which to lead to Zylon degradation;

(4)    Provided certain participants in the Zylon vest manufacturing process with replacement and/or refunds for the Red Thread Zylon in their possession;

(5)    Itochu and Hexcel continued to rely on Toyobo's representations that Red Thread was not defective despite concerns by their executives that Toyobo was providing "incredible" and "not believable" explanations of the Red Thread problem.

(6)    Toyobo, Itochu, and Hexcel failed to disclose that Toyobo had had problems with over-neutralization of Zylon (which caused Red Thread) from October 2002 to February 2003 when they met with Point Blank; and

(7)    Toyobo and Itochu kept information concerning the link between phosphoric acid (Hydrolysis) and Zylon degradation "confidential" from Lincoln Fabrics.

136.    By virtue of these conspiracies, the United States suffered damages in an amount to be determined at trial.

## COUNT 4

### COMMON LAW FRAUD
### AGAINST TOYOBO CO. LTD. AND TOYOBO AMERICA INC.

137.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 126.

138.    Toyobo falsely represented that the Zylon vests, which were being paid for either: (1) in whole by the United States through the GSA and direct federal contracts, or (2) in part by the United States under the BPVGPA, were "bulletproof" and would remain "bulletproof" for five years.

139.    Toyobo failed to inform the United States and the various state and local law enforcement agencies who received vests under the BPVGPA that the Zylon vests were defective.  At the time when the defendants failed to make this disclosure, Toyobo had a duty to disclose the defect in Zylon due to their superior knowledge and the life threatening nature of this defect.

140.    Toyobo knew that their representations, both direct and implied, that the Zylon vests complied with the contractual requirements and its warranties were false.

141.    These misrepresentations were material.

142.    Toyobo knew that the United States would rely, and intended the United States to rely, on these false representations.

143.    The United States justifiably relied upon these false representations and material omissions.

144.    By virtue of Toyobo's fraud, the United States suffered damages in an amount to be determined at trial.

145.    The actions of Toyobo in making these false representations and material omissions with the intent that the United States and its agencies would rely on these false representations and material omissions, was malicious, wanton, and reprehensible conduct. Therefore, punitive damages sufficient to punish and deter Toyobo should be assessed against Toyobo, in an amount to be established at trial.

## COUNT 6

### UNJUST ENRICHMENT
### AGAINST TOYOBO CO. LTD. AND TOYOBO AMERICA INC.

146.    The United States re-alleges and incorporates herein by reference paragraphs 1 through 126.

147.    From 1998 to 2005, the United States paid for defective bulletproof vests made of Zylon due to false statements and omissions by Toyobo.

148.    The United States is entitled to the return of all payments by the United States directly or indirectly to the body armor manufactures for Zylon vests due to the false claims presented for fiscal years 1998 to the present time.

149.    By reason of the above-described payments, Toyobo has received money, directly or indirectly, to which they were not entitled.  Toyobo therefore has been unjustly enriched in an amount to be established at trial.

### PRAYER FOR RELIEF

**AS TO COUNT 1:**

As against all Defendants, judgment in an amount equal to:

    1.     statutory damages in an amount to be established at trial;

    2.     civil penalties for each false claim or false statement as provided by law;

    3.     the cost of this action, plus interest, as provided by law; and

    4.     any other relief that this Court deems appropriate.

**AS TO COUNT 2:**

As against all Defendants, judgment in an amount equal to:

    1.     statutory damages in an amount to be established at trial;

    2.     civil penalties for each false claim or false statement as provided by law;

    3.     the cost of this action, plus interest, as provided by law; and

    4.     any other relief that this Court deems appropriate.

**AS TO COUNT 3:**

As against all Defendants, judgment in an amount equal to:

    1.     statutory damages in an amount to be established at trial;

    2.     civil penalties for each false claim or false statement as provided by law;

    3.     the cost of this action, plus interest, as provided by law; and

    4.     any other relief that this Court deems appropriate.

**AS TO COUNT 4**

As against all Defendants, judgment be in an amount equal to:

    1.     compensatory damages in an amount to be established at trial;

    2.     punitive damages;

    3.     the cost of this action, plus interest, as provided by law; and

    4.     any other relief that this Court deems appropriate.

**AS TO COUNT 5:**

As against all Defendants judgment in an amount equal to:

1. the money paid by the United States to, or received by, these Defendants directly

   or indirectly, plus interest;

2. the cost of this action, plus interest, as provided by law; and

3. any other relief that this Court deems appropriate.

Dated: June 27, 2007

<div style="margin-left:40%">

PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL

By:

MICHAEL D. GRANSTON
ALAN E. KLEINBURD
ALICIA J. BENTLEY
CALLIE R. OWEN
A. THOMAS MORRIS
MICHAEL J. FRIEDMAN
ATTORNEYS
U.S. Department of Justice
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044
Tel:    202-616-9854
Fax:    202-305-7797

</div>