IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

     Plaintiffs,

v.

TOYOBO CO, LTD. and TOYOBO
AMERICA, INC., et al.,

    Defendants.

CV No. 07-1144 RWR

Judge Richard W. Roberts

**DEFENDANTS TOYOBO COMPANY, LTD. AND TOYOBO AMERICA INC.'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR
MOTION TO DISMISS THE COMPLAINT FILED BY PLAINTIFFS, THE
UNITED STATES OF AMERICA**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ..................................................................................... 3

A.    The Complaint .......................................................................................... 3

B.    Factual Background .................................................................................. 5

1.    Commercialization of Zylon in Ballistic Applications ............................ 5

2.    Toyobo's Disclosures Regarding Physical Properties of Zylon ............... 6

3.    United States Continues To Purchase And Certify Zylon Vests ............... 9

ARGUMENT ......................................................................................................... 9

I.    THE UNITED STATES' CLAIMS FOR VESTS REIMBURSED
      UNDER THE BULLET PROOF VEST PARTNERSHIP GRANT
      ACT MUST BE DISMISSED BECAUSE THAT STATUTE DOES
      NOT CONTAIN ANY DURABILITY REQUIREMENT ........................... 11

II.   THE UNITED STATES' CLAIMS FOR VESTS PURCHASED
      DIRECTLY SHOULD BE DISMISSED BECAUSE NO FALSE
      CLAIM WAS SUBMITTED IN CONNECTION WITH THE SALES
      OF THESE VESTS ................................................................................... 15

A.    The Failure Of Any Vest To Live Up To Its Five-Year Warranty Does Not
      Establish A False Claim .......................................................................... 16

B.    Any Allegedly False Statement Regarding Degradation Of Zylon Was Not
      Material Because The United States Continued To Purchase Zylon Vests After
      Being Informed Of Degradation Data ...................................................... 19

III.  THE UNITED STATES CANNOT SHOW THAT TOYOBO
      CAUSED ANY FALSE CLAIM TO BE SUBMITTED ............................. 20

A.    The United States Has Not Pled Facts Sufficient To Show That Toyobo
      Knowingly Caused Any False Claim Or Statement To Be Presented ........ 21

B.    Mere Knowledge Is Insufficient To Establish The Causation Requirement ........ 23

IV.   THE UNITED STATES' HAS NOT—AND CANNOT—ESTABLISH
      THE EXISTENCE OF A FALSE CLAIMS ACT CONSPIRACY
      UNDER 31 U.S.C. § 3729(a) .................................................................... 24

V.    THE UNITED STATES HAS FAILED TO ALLEGE COMMON
      LAW FRAUD AGAINST TOYOBO ........................................................ 29

VI.   THE UNITED STATES CANNOT SHOW THAT TOYOBO WAS
      UNJUSTLY ENRICHED ......................................................................... 31

CONCLUSION ................................................................................................... 33

## TABLE OF AUTHORITIES

### CASES

*Aktieselskabet AF 21 v. Fame Jeans, Inc.*, No. 06-585, 2007 WL 1655877
(D.D.C. Jun. 7, 2007)................................................................................................11

*Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511 (N.D. Cal. 1990).................................28

*Allstate Ins. Co. v. General Motors Corp.,* No. PD 04-12393, 2005 WL 264276
(Minn. Dist. Ct. Jan. 24, 2005) ..............................................................................18

*Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955 (2007).......................*passim*

*Brainard v. Freightliner Corp.*, No. 02-CV-0317, 2002 WL 31207467 (W.D.N.Y.
Oct. 1, 2002) .............................................................................................................18

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984)..............................11

*Chelsea Condominium Unit Owners Ass'n v. 1815 A. St., Condominium Group,
LLC*, 468 F. Supp. 2d 136 (D.D.C. 2007)............................................................31, 32

*Construction Interior Sys., Inc. v. Donohoe Cos., Inc.*, 813 F. Supp. 29
(D.D.C. 1992) ..........................................................................................................34

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562 (11th Cir. 1994) ...........23

*Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61 (D.D.C. 2005) .....................................32

*Int'l Cargo Mgmt. Specialists, Inc. v. EG&G Dynatrend, Inc.*, Civ. No. 91-1360,
1995 WL 170376 (D.D.C. March 31, 1995) ...............................................................30

*James v. England*, 332 F. Supp. 2d 239 (D.D.C. 2004) .......................................................4

*Johnson v. Southern Energy Homes, Inc.*, 391 F. Supp. 2d 1118 (S.D. Ala. 2005)..........18

*Joswick v. Chesapeake Mobile Homes, Inc.*, 747 A.2d 214
(Md. Ct. Spec. App. 2000)........................................................................................18

*Jung v. Ass'n of American Med. Colleges*, 300 F. Supp. 2d 119 (D.C. Cir. 2004)............11

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994)............................31

*McQueen v. Woodstream Corp.*, No. 05-2068, 2007 WL 2284747
(D.D.C. Aug. 10, 2007) ............................................................................................34

ii

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032
(8th Cir. 2002) ...................................................................................................28

*Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527
(D.D.C. Sep. 21, 2006) .....................................................................................33

*Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261 (D. Del. 1983) .....................18

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................11

*Powell v. Dist. of Columbia Housing Auth.*, 818 A.2d 188 (D.C. 2003)....................30

*Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092
(11th Cir. 1983) ................................................................................................20

*Savage v. Scales*, 310 F. Supp. 2d 122 (D.D.C. 2004) ...............................................4

*Shirk v. Garrow*, No. 07-0356, 2007 WL 2570426 (D.D.C. Sep. 6, 2007)..................11

*United States ex rel. Costner v. United States*, 317 F.3d 883 (8th Cir. 2003)..................21

*United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292 (D.D.C. 1996)..........12

*United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. Civ. A. 94-7316,
2004 WL 1686958 (E.D. Pa. July 28, 2004) ....................................................26

*United States ex rel. Bennett v. Genetics & IVF Inst., Inc.*, No. 98-2119,
1999 WL 978881 (4th Cir. Oct. 28, 1999) ......................................................21

*United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321
(9th Cir. 1995) ................................................................................................24

*United States ex rel. Camillo v. Ancilla Sys., Inc.*, No. 03-CV-0024-DRH,
2005 WL 1669833 (S.D. Ill. July 18, 2005) ....................................................25

*United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063,
2000 WL 1336487 (D. Conn. Aug. 24, 2000).............................................27, 28

*United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*,
290 F.3d 1301 (11th Cir. 2002) .......................................................................23

*United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999) ...............26

*United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374
(7th Cir. 2003) ................................................................................................23

*United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605 (8th Cir. 1992)...............14

*United States ex rel. Hochman v. Nackman*, 145 F.3d 1069 (9th Cir. 1998) ................... 15

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996) .............................. 20

*United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204 (E.D. Tex. 1998)............ 29

*United States ex rel. Joslin v. Community Home Health of Maryland, Inc.*,
    984 F. Supp. 374 (D. Md. 1997)................................................................................. 15

*United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999)........... 21

*United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402
    (9th Cir. 1995) ......................................................................................................... 14

*United States ex rel. Milam v. Regents of Univ. of California*, 912 F. Supp. 868
    (D. Md. 1995) ........................................................................................................... 14

*United States ex rel. Piacentile v. Wolk*, Civ. A. No. 93-5773, 1995 WL 20833
    (E.D. Pa. Jan. 17, 1995) ........................................................................................... 25

*United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69 (D.D.C. 2003) .............. 11

*United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932 (8th Cir. 2001)........ 25

*United States ex rel. Sikkenga v. Regence BlueCross/BlueShield of Utah*,
    No. 2:99CV86K, 2001 U.S. Dist. LEXIS 25717 (D. Utah Nov. 27, 2001) ................ 29

*United States ex rel. Stebner v. Stewart & Stevenson Servs., Inc.*,
    305 F. Supp. 2d 694 (S.D. Tex. 2004)........................................................................ 21

*United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542 (D.C. Cir. 2002),
    *aff'd*, 380 F.3d 488, 492-502 (D.C. Cir. 2004) ....................................................... 12, 31

*United States v. Bouchey*, 860 F. Supp. 890 (D.D.C. 1994).......................................26, 33

*United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) ...................................... 15

*Wilkins ex rel. United States v. Ohio*, 885 F. Supp. 1055 (S.D. Ohio 1995)................... 27

*Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455 (D.D.C. 1997) .............................. 30

*X Corp. v. Doe*, 816 F. Supp. 1086 (E.D. Va. 1993).......................................................... 24

## STATUTES

31 U.S.C. § 3729(a)(3) ................................................................................................5, 16

31 U.S.C. § 3729(a)(3) ..................................................................................26, 28, 29

42 U.S.C. § 3796‖, *et seq*.................................................................................12, 13

Fed. R. Civ. P. 9(b) ...........................................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ....................................................................................*passim*

Defendants Toyobo Company, Ltd. and Toyobo America, Inc. (collectively "Toyobo") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the June 26, 2007 Complaint filed by Plaintiff the United States of America (the "United States") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and failure to plead its fraud-based claims with particularity pursuant to Fed. R. Civ. P. 9(b).

## PRELIMINARY STATEMENT

Toyobo does not belong in this case. Toyobo merely manufactures Zylon, not bullet-resistant vests. Toyobo did not have—nor does the United States allege in its Complaint that Toyobo had—any contact, communication, or involvement with the United States in connection with the United States' purchase, funding, or certifying of Zylon bullet-resistant vests. Nor does the United States allege in its Complaint that Toyobo played any role in the design or manufacture of the bullet-resistant vests that the United States purchased. And, the United States does not allege in its Complaint that Toyobo played any role in the placement of the five-year warranty on any Zylon vests. Indeed, the allegations in the Complaint and the documents referenced in the Complaint show that Toyobo specifically disclaimed any warranty on Zylon and refused to warrant how long Zylon would last in bullet-resistant vests. Yet, the United States, nonetheless, seeks to hold Toyobo liable under the False Claims Act and other theories based on the five-year warranties body armor manufacturers placed on Zylon bullet-resistant vests. For numerous reasons, the United States' claims must fail as a matter of law.

As an initial matter, however, the United States cannot show that any false claim was presented to it in connection with the reimbursement it made to by local, state,

1

or tribal law enforcement agencies for Zylon-containing bullet-resistant vests those agencies purchased. Those vest purchases met the only criteria for reimbursement under the statute authorizing reimbursement, the Bullet Proof Vest Grant Partnership Act ("BVPA")—the vests were certified by the National Institute for Justice ("NIJ"). The United States does not—and, in fact, cannot—allege that the vests were not NIJ-certified, and therefore, the United States cannot establish that a false claim was submitted in connection with these vests.

The United States' claims for vests purchased directly from body armor manufacturers by federal agencies suffer from a similar defect. The United States has not alleged that any of the contracts for the purchase of any vests included durability requirements. Moreover, the failure of a particular vest to last for the entirety of its five-year warranty period would not constitute a false claim. That is because all body armor manufacturers provided repair or replace warranties on their Zylon vests, not guarantees of future performance. If something went wrong within the five years, the vest could be returned to its manufacturer, and the vest would either be repaired or, if it could not be repaired, it would be replaced with a new vest. Thus, the warranties did not represent that the vest would last five years. There are no allegations that the promise to repair or replace any vest that did not meet its five-year warranty were false. Consequently, the United States cannot establish that any false claim was submitted to the United States. In the absence of any false claim being presented to it, the United States cannot establish liability against any party under the False Claims Act.

Furthermore, the United States cannot show any information Toyobo possessed on degradation of Zylon was material to the United States' purchasing

decisions. The United States continued to purchase, fund, and certify Zylon vests long after Toyobo had released the information on Zylon that the United States complains about. And, in any event, the United States cannot show that Toyobo knowingly caused any of the body armor manufacturers to place five-year warranties on their vests. In fact, the allegations included in the Complaint show that Toyobo consistently informed body armor manufacturers that it offered no warranty on Zylon, and that it was up to the manufacturers to determine the useful life of their products.

The United States' common law fraud claims are also without merit. The United States does not allege that Toyobo made any statement or representation to it, let alone statements or representations that were false or fraudulent. Nor does the United States allege any facts that would give rise to a duty by Toyobo to disclose any information about Zylon to the United States. Absent specific allegations about any fraudulent statements made by Toyobo or a duty of dislcosure, the United States' common law fraud claim fails as a matter of law, and for lack of particularity.

Finally, the United States cannot establish that Toyobo was unjustly enriched, as there are no allegations regarding any benefit conferred on Toyobo by the United States. In fact, the United States acknowledges that the only benefit it conferred was its payments to body armor manufacturers, not Toyobo, for bullet-resistant vests. Absent any specific allegations against Toyobo, the United States' conclusory statement that Toyobo was unjustly enriched is insufficient as a matter of law, and thus, should be dismissed. Because none of the United States' claims against Toyobo have merit, this Court should dismiss the United States' complaint in its entirety.

## STATEMENT OF FACTS[1]

### A.    The Complaint[2]

On or about June 26, 2007, the United States filed this action against Toyobo.  The United States asserts claims against Toyobo arising under various provisions of the False Claims Act, as well as claims of common law fraud and unjust enrichment.  All of these claims relate to the United States' purchase of bullet-resistant vests[3] that contain Toyobo's Zylon fiber as a component part.  The Zylon vests at issue were purchased by the United States—either directly or indirectly—from various body armor manufacturers (collectively the "Vest Manufacturers").  (Compl. at ¶ 1.)[4]  The

---

[1] The facts discussed in this section include those alleged in the Complaint, documents attached to, referenced in, and/or quoted from the Complaint, and matters of public record, which may be considered on a motion to dismiss without converting it into a motion for summary judgment.  *See, e.g., James v. England*, 332 F. Supp. 2d 239, 243 (D.D.C. 2004) (holding that "[i]n deciding whether to dismiss a claim under Rule 12(b)(6), the Court can only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference into the complaint, and matters about which the Court may take judicial notice"); *Savage v. Scales*, 310 F. Supp. 2d 122, 129 n.8 (D.D.C. 2004) (adding that courts "may take judicial notice of public documents, even if they are not included in, or attached to the complaint").

[2] The allegations in the Complaint are similar to the allegations contained in the related case, *United States ex rel., Aaron J. Westrick, Ph.D. v. Second Chance Body Armor, Inc., et al.*, Case No. CV 04-0280, currently pending in this Court.  The Complaint in this case relates to Toyobo's sale of Zylon that was ultimately used in the manufacture of Zylon-containing bullet-resistant vests by companies other than Second Chance Body Armor, Inc. ("Second Chance").  Vests sold by Second Chance are the subject of the related case.  (*See* Compl. at ¶ 1.)

[3] Throughout the Complaint, the United States refers to the vests at issue as "bullet-proof," (*see, e.g.,* Compl. at ¶¶ 1, 2, 12, 16, 28, 52, 138, 147), but this is a misnomer.  No body armor claims to be bullet-*proof*, but rather bullet-*resistant*.  The National Institute of Justice—an arm of the United States Department of Justice—recognizes this fact in developing its standards for testing and certification of body armor (*see, e.g.,* NIJ Standard 0101.04 (entitled "Ballistic *Resistance* of Personal Body Armor"), attached as Exh. 1 to the Declaration of Michael J. Lyle ("Lyle Decl.")), and its guide for selection of appropriate body armor, NIJ Selection and Application Guide to Personal Body Armor, at p. 67 ("[i]t is essential that an officer understand that there is *no such thing as bulletproof armor*") (emphasis added), attached as Lyle Decl. Exh. 2).  The use of the term "bullet-proof" by the United States in the Complaint is simply another attempt to mislead this Court about the underlying facts of this case.

[4] According to the Complaint, the Vest Manufacturers whose vests are the subject of the Complaint are: Armor Holdings, Inc. and its subsidiaries, American Body Armor, Inc., Safariland, Inc., and Pro-Tech; DHB, Inc. and its subsidiaries, Point Blank Body Armor, Inc. and Protective Apparel Corporation of America, Inc.; First Choice Armor, Inc.; Gator Hawk, Inc.; and Protective Products International, Inc. (Compl. at ¶ 1.)

United States did not name any of the Vest Manufacturers, or any of the other entities in the manufacturing and distribution chain, as defendants in this case. Toyobo did not design, manufacture or sell any of the vests at issue. (*See generally, id.* at ¶¶ 10-16.)

The United States seeks damages for bullet-resistant vests sold directly to the United States under the Multiple Award Schedule negotiated by the General Services Administration, (*id.* at ¶¶ 10-12), as well as vests purchased directly by various federal agencies through contracts with the Vest Manufacturers (*id.* at ¶ 16). Additionally, the United States seeks damages for vests that were purchased by state, local, and tribal law enforcement agencies and then partially reimbursed by the United States pursuant to the Bullet Proof Vest Grant Partnership Act. (*Id.* at ¶¶ 13-15.) Notably, the United States does not allege that Toyobo played any role in any of these transactions.

The United States appears to allege that all of the vests purchased or reimbursed by the United States were defective because they failed to meet their five-year warranties. (*See* Compl. at ¶¶ 12, 15, 16.) The Complaint, however, does not contain any specific allegations regarding any vest that actually failed prior to the expiration of its five-year warranty. The United States seeks damages from Toyobo under three separate provisions of the False Claims Act, 31 U.S.C. § 3729(a)-(c). (*See* Counts 1-3, Compl. at ¶¶ 127-136.) The United States also alleges claims of common law fraud (Count 4, Compl. at ¶¶ 137-145) and unjust enrichment (Count 5, Compl. at ¶¶ 146-149) against Toyobo.

**B.    Factual Background**

       **1.    Commercialization of Zylon in Ballistic Applications**

Since 1996, Toyobo has manufactured PBO (Poly p-phenylene-2 6-

5

benzobisoxazole) fiber under the trade name Zylon. (Compl. at ¶ 17.) Zylon is manufactured as a continuous filament yarn, which is then woven into fabric by third-party weaving companies and sold to body armor manufacturers. (*See id.*) Toyobo does not sell Zylon fiber directly in the United States, but rather, Zylon is shipped to trading companies, Itochu International, Inc. and Tejin Shoji, in rolls of continuous filament fiber. (*Id.* at ¶ 23.) The trading companies then send Zylon fiber to various weavers, who weave the fiber into ballistic fabric according to the respective body armor manufacturers' specifications. Toyobo played no role in, and had no control over, the design or manufacturing process of either the Zylon fabric or the Zylon vests at issue in this litigation, nor does the United States allege otherwise in the Complaint.

Toyobo began meeting with the Vest Manufacturers in 1998 to discuss the potential use of Zylon in bullet-resistant vests. (*Id.* at ¶ 24.) Toyobo entered into an agreement with one body armor manufacturer, Second Chance Body Armor, Inc. ("Second Chance"), that provided Second Chance with the exclusive right to sell Zylon vests to the U.S. civilian police market through the end of 1999. (*Id.* at ¶ 24.) Other vest manufacturers were free to sell Zylon vests to other markets, including the federal government, prior to the expiration of this exclusivity agreement. The first bullet-resistant vest containing Zylon was sold in the United States in October 1998. (*Id.* at ¶ 28.)

### 2.    Toyobo's Disclosures Regarding Physical Properties of Zylon

As the United States concedes in its Complaint, Toyobo continually and repeatedly disclosed data regarding the physical properties of Zylon to its customers and the market. For example, in late-1998, Toyobo informed customers that Zylon could lose

strength if exposed to visible and fluorescent light. (Compl. at ¶¶ 30-31.) Additionally, in a July 5, 2001 letter from Toyobo to its customers, Toyobo alerted vest manufacturers to Zylon fiber degradation issues under conditions of high heat and humidity, and also informed them that "the age of the sample we could check is only up to two years and it is impossible for us to guarantee 10 years based on the result." (Compl. at ¶ 60; the July 5, 2001 letter is attached as Lyle Decl. Exh. 3.) The following day, July 6, 2001, after being informed of a purported "failure" of a vest during testing by Dutch State Mines ("DSM"), Toyobo sent a letter to all Zylon customers in the ballistics market informing them of DSM's decision to "put on hold the market introduction" of its Zylon-based vest. (Compl. at ¶ 55; the July 6, 2001 letter is attached as Lyle Decl. Exh. 4.) In this letter, Toyobo advised all users to "carefully examine [their] product[s]," and instructed the body armor manufacturers to "determine for themselves the suitability for their intended use of the fiber." (Lyle Decl. Exh. 4.) Toyobo also reminded its customers that it made "no warranty and assume[d] no liability whatsoever in connection with any use of Zylon fiber." (Id.) Attached to the July 6, 2001 letter was the accelerated aging test data Toyobo had in its possession. (Id.)

Once again, in a July 19, 2001 letter from Toyobo to its customers, Toyobo reminded body armor manufacturers that "Toyobo [was] not in a position to guarantee the performance of end products and of course the lifetime of each end product." (Compl. at ¶ 61; the July 19, 2001 letter is attached as Lyle Decl. Exh. 5.) Toyobo continued to provide information and data about Zylon to the market. On August 28, 2001, Toyobo reported to body armor manufacturers that test data "showed a significant degradation in Zylon strength in less than 100 days at high temperatures and

humidity" (Compl. at ¶ 66; August 18, 2001 data is attached as Lyle Decl. Exh. 6.)

Toyobo continued to release test data to its Zylon customers discussing the various factors that may cause Zylon to degrade—including hydrolysis and exposure to light. (*See, e.g.,* Compl. at ¶¶ 60, 61, 66, 67, 71, 87, 92.) For example, in September 2001, Toyobo released a technical bulletin discussing degradation due to light and hydrolysis announcing that there was a strength decrease of up to 65% after six months in sunlight. (Compl. at ¶ 67; *see* September 14, 2001 technical bulletin at TOYOBO-ZYLON 005045, attached as Lyle Decl. Exh. 7.). In that bulletin, Toyobo also specifically discussed degradation of Zylon in conditions of heat and humidity and disclaimed any warranty on Zylon. (*See* Lyle Decl. Exh. 7 at TOYOBO-ZYLON 005042, 005051.) Where results of any testing that Toyobo performed showed higher than expected amounts of degradation, Toyobo passed this information on to its customers. (*See, e.g.,* Compl. at ¶¶ 66, 92.) Toyobo also consistently informed its customers that it was their responsibility to confirm the design of their products, to ensure that Zylon met their requirements, and to determine their product's lifetime. (*Id.* at ¶ 60.) And, Toyobo disclosed information about "Reddish Yarn" and its effect on Zylon. (*Id.* at ¶ 113.) In August 2003, Toyobo issued an "Official Statement about Reddish Yarn Quality Trouble of Zylon." (*Id.*) In this document, Toyobo disclosed the information it had on the cause of red yarn and its effect on the strength of Zylon. (*Id.*; the August 2003 statement about red yarn is attached as Lyle Decl. Exh. 8.)

The United States' only retort to the myriad of disclosures by Toyobo is its unsupported claim that Toyobo released only some data regarding Zylon degradation, but not all of it. (*See, e.g., id.* at ¶ 60.) The United States does not give any examples of

the types of data it contends Toyobo withheld, and it does not allege how any of the data allegedly withheld makes Toyobo's numerous disclosures misleading or incomplete (or how it caused the Vest Manufacturers to put a five-year warranty on their vests).[5]  On October 10, 2003, Toyobo released additional data it had on Zylon, including the results of V-50 testing it had performed on Zylon. (Compl. at ¶ 117; the October 10, 2003 Zylon testing data is attached as Lyle Decl. Exh. 9.)  Consequently, all of the data on Zylon that the United States appears to be complaining about in the Complaint was publicly available to the market no later than October 2003.[6]

### 3.    United States Continues To Purchase And Certify Zylon Vests

According to the Complaint, in September 2003, Mehler—a German company—allegedly stated that it was "questionable if the Zylon vest could retain the protection requirement over the five-year intended use period."  (Compl. at ¶ 117.) However, notwithstanding Mehler's publicly disclosed concerns, and notwithstanding all the data the Complaint admits Toyobo had disclosed, the United States continued to certify, purchase, and fund new Zylon vests.  Indeed, the United States continued to purchase and fund Zylon vests for almost two more years, through 2005.  (*See id.* at ¶ 12.)  And, the National Institute of Justice ("NIJ")—an arm of the United States

---

[5] Additionally, the United States seems to rely on allegations of actions taken by parties *other than Toyobo*, which the United States claims hid the true nature of Zylon degradation. (*See, e.g.,* Compl. at ¶¶ 57 (Point Blank employee informed employee of United States that purported failure of Zylon shield reported by DSM was not an actual failure), 70 (Point Blank dismissed results of failed vest test).)  The United States does not assert that Toyobo played any role in, or even had knowledge of, these alleged actions by non-parties.  In order to establish False Claims Act liability against Toyobo, the United States must specify the conduct *Toyobo* allegedly engaged in that caused the Vest Manufacturers to violate the False Claims Act— something it has not done in its Complaint.  *See* Section III, *infra.*

[6] Toyobo denies that it withheld any relevant information about Zylon.  As explained above, Toyobo is simply reciting what the United States has alleged solely for purposes of this motion.

responsible for developing testing and certification standards for ballistic-resistant vests—continued to certify bullet-resistant vests containing Zylon until August 25, 2005. (*Id.* at ¶ 126.)

Significantly, nowhere in its 36 pages of allegations does the United States claim that Toyobo had *any* contact with the United States Government or any law enforcement agency that purchased Zylon vests. Moreover, there are no allegations that Toyobo provided any warranty on Zylon fiber or Zylon vests, made any representations about how long Zylon may last in a particular vest, or made any representation about those vests, or the warranties on the vests.

## **ARGUMENT**

Recently, the United States Supreme Court clarified the standard a complaint must meet in order to survive a motion to dismiss. *See Bell Atlantic Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955 (2007). In *Twombly*, the Supreme Court "retired" the oft-quoted passage that a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." *Id.* at 1959 (emphasis added). Rather, the Supreme Court held that in order to survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965.[7] The Supreme Court further held that a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions;

---

[7] Additionally, although a court must treat the well-pleaded allegations of a complaint as true, it "need not accept as true legal conclusions cast as factual allegations." *United States ex rel. Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 73 (D.D.C. 2003).

a formulaic recitation of the elements of a cause of action will not do. *Id.*[8]

Thus, in order to avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all of the material elements of the claim. *Id.* (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)); *see also Jung v. Ass'n of American Med. Colleges*, 300 F. Supp. 2d 119, 157 (D.C. Cir. 2004). Courts, however, are not bound to accept as true legal conclusions couched as factual allegations, *see Twombly*, 127 S. Ct. at 1965 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)), or unwarranted factual inferences, *Purcell*, 254 F. Supp. 2d at 73. And, importantly, *Twombly* requires a plaintiff's allegations to be "plausible." *Twombly*, 127 S. Ct. at 1965.[9] *See also Shirk*, 2007 WL 2570426 at *2; *Aktieselskabet AF 21 v. Fame Jeans, Inc.*, No. 06-585, 2007 WL 1655877, at *3 (D.D.C. Jun. 7, 2007) (applying *Twombly* to trademark dispute).

Additionally, pleadings in False Claims Act cases are subject to the heightened pleading standard of Rule 9(b), and the Court "treats failure to plead fraud with particularity as a ground for dismissal for failure to state a claim upon which relief can be granted." *United States ex rel. Alexander v. Dyncorp, Inc.*, 924 F. Supp. 292, 303

---

[8] *See also Shirk v. Garrow*, No. 07-0356, 2007 WL 2570426, at 4 n.3 (D.D.C. Sep. 6, 2007) (applying *Twombly* in the context of a failed real estate transaction and refusing to limit *Twombly* to the antitrust contest, noting that "[t]his court does not take such a restrictive view of *Twombly*, and neither have its sister courts").

[9] The U.S. Supreme Court explained the rationale for its decision in *Twombly*: in today's modern litigation, the expense of discovery requires trial courts to be more vigilant about scrutinizing claims upon a 12(b)(6) motion to dismiss. *Twombly*, 127 S. Ct. at 1966 ("[w]e [have] explained that something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value. So, when the allegations in a complaint, however true, could not raise to a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the Court.") (citation omitted) (emphasis in original).

(D.D.C. 1996); *see also United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002), *aff'd*, 380 F.3d 488, 492-502 (D.C. Cir. 2004) (holding that the specificity requirements of Rule 9(b) apply to False Claims Act cases).   Rule 9(b)'s heightened pleading requirement also applies to the United States' claim for common law fraud.

      As discussed more fully below, the United States' claims under the False Claims Act, as well as its claim for common law fraud, are inadequately pled under Rule 9(b).   Additionally, based on the allegations in the Complaint, none of the United States' claims are plausible, and thus, Rule 12(b)(6) requires dismissal as mandated by *Twombly*.

| | |
|---|---|
| I. | **THE UNITED STATES' CLAIMS FOR VESTS REIMBURSED UNDER THE BULLET PROOF VEST PARTNERSHIP GRANT ACT MUST BE DISMISSED BECAUSE THAT STATUTE DOES NOT CONTAIN ANY DURABILITY REQUIREMENT** |

      A number of the vest purchases upon which the United States' False Claims Act claims are based—at least 46,000—were purchases allegedly made by state, local, or tribal law enforcement agencies for which the United States provided some reimbursement under the Bullet Proof Vest Grant Partnership Act, 42 U.S.C. § 3796ll, *et seq.* (the "BVPA").  (*See* Compl. at ¶ 15.)  All of the False Claims Act claims based on these indirect purchases must be dismissed, however, because it is undisputed that each of the vests reimbursed by the United States under the BVPA met the requirements for reimbursement.  The *only* condition that a local, state, or tribal law enforcement agency must certify to the United States in order to qualify for reimbursement under the BVPA is that the vest is certified pursuant to the relevant NIJ Standard—which all of the vests at issue were.  Therefore, the United States cannot show that any of the reimbursements to

local, state and tribal law enforcement agencies under the BVPA were not reimbursable under the terms of the BVPA, and thus, cannot show any false claims for reimbursement were presented to it.

Under the BVPA, qualifying law enforcement personnel may purchase a bullet-resistant vest, and then, after paying for and receiving the vest, they can seek reimbursement of a portion of the cost of that vest purchase from the United States. (*Id.* at ¶ 14.) The BVPA statute does not establish any specific standards a vest must meet to be eligible for reimbursement, nor does it specify any warranty that must be placed on the vest. Rather, the only requirement for a vest to be eligible for reimbursement under the BVPA is found in the corresponding public law. This public law defines "armor vest" as "body armor, no less than Type I, which has been tested through the voluntary compliance testing program operated by the National Law Enforcement and Corrections Technology Center of the National Institute of Justice (NIJ), and found to meet or exceed the requirements of NIJ Standard 0101.03, or any subsequent revision of such standard." 42 U.S.C. § 3796ll-2(1)(A).[10] Thus, if a vest satisfies the applicable NIJ standard, a state, local, or tribal law enforcement agency can purchase that vest and seek partial reimbursement under the BVPA program.

NIJ Standards 0101.03 and 0101.04 relate solely to performance standards for new vests, and neither standard considers aging of vests or degradation over time. *See generally*, Lyle Decl. Exhs. 1 and 10. Nor do the NIJ standards provide for any durability or warranty requirements. *Id.* At the time each of the vests at issue in this case

---

[10] NIJ Standard 0101.03 is attached as Lyle Decl. Exh. 10. In November 2000, NIJ Standard 0101.03 was amended to NIJ Standard 0101.04, *see* Lyle Decl. Exh. 1.

was purchased, NIJ Standard 0101.03 or 0101.04 was in effect.[11]  Grant recipients seeking reimbursement under the BVPA were only required to certify that they purchased and paid for a NIJ-certified vest—a requirement that all of the vests at issue met—and they would be reimbursed for a portion of the cost of that vest.  Therefore, even if the United States' allegations regarding Zylon vests were true—which they are not—no False Claims Act liability can be established for vests reimbursed pursuant to the BVPA because the vests met the only criteria for reimbursement by the United States—they were all NIJ-certified.  *See, e.g., United States ex rel. Milam v. Regents of Univ. of Ca.*, 912 F. Supp. 868, 883 (D. Md. 1995) (stating that "as a matter of law, [] False Claims Act liability cannot be imposed on the basis of a literally true statement"); *United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 608 (8th Cir. 1992) (holding that a statement cannot be "false" or "fraudulent" for False Claims Act purposes where the statement is consistent with regulations governing the program); *United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1412 (9th Cir. 1995) (False Claims Act claims for payment based on work that satisfied contractual obligations "could not have been 'false or fraudulent' within the meaning of the [False Claims Act]").

Because all of the Zylon vests at issue were NIJ-certified when they were sold—and when reimbursement was approved by the United States—all of these vests

---

[11] It should be noted that, effective September 26, 2005, NIJ Standard 0101.04 was amended to consider vest durability for the first time.  The amendment was included in the NIJ's August 24, 2005 "Third Status Report to the Attorney General on Body Armor Safety Initiative Testing and Activities."  This Status Report can be found on the Office of Justice Programs' (a division of the United States Department of Justice) website at http://www.ojp.usdoj.gov/bvpbasi, and is attached as Lyle Decl. Exh. 11.  Interestingly, this new durability requirement was imposed by the NIJ—an arm of the United States—just after the United States filed its complaint in *United States ex rel., Aaron J. Westrick, Ph.D. v. Second Chance Body Armor, Inc., et al.*, Case No. CV 04-0280 (D.D.C.).  The amended standard, however, does not apply to any of the vests that are the subject of this action, all of which were sold before the standard's effective date—September 26, 2005.

qualified for reimbursement under the BVPA. Thus, there can be no liability under the False Claims Act for these vest purchases. *See, e.g., United States ex rel. Joslin v. Community Home Health of Md., Inc.*, 984 F. Supp. 374, 379 (D. Md. 1997) (court dismissed False Claims Act case because defendants' practice conformed with the law, and therefore, "any representation to the Federal Government ... [was] correct ... and did not violate the FCA"); *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069 (9th Cir. 1998) (no falsity when defendants' acts conformed with federal payment guidelines); *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006) (holding that "[c]laims are not 'false' under the FCA unless they are furnished in violation of some controlling rule, regulation or standard").[12]

Indeed, it is telling that the United States did not allege *a single fact* regarding what is required for reimbursement under the BVPA—and for good reason. If the United States had pled such facts, it would have been forced to acknowledge that the *only* requirement for reimbursement under the BVPA is that a vest be NIJ-certified. Rather than acknowledge this fatal defect in its claims for vests indirectly purchased under the BVPA, the United States attempts to lump all vest purchases together. This approach is insufficient under *Twombly*, which requires a complaint to meet the standard of plausibility of relief by pleading specific facts sufficient to raise the right to relief above the speculative level. 127 S. Ct. at 1965, 1970. Because the United States has not—and indeed cannot—meet this standard with respect to vests reimbursed under the BVPA, any claim for relief arising from these indirect vest purchases should be dismissed

---

[12] Even if the five-year warranties that accompanied Zylon vests were considered, these warranties are not guarantees of future performances, and thus, do not constitute a certification of durability. *See* Section II. A., *infra*.

as a matter of law.

II.    **THE UNITED STATES' CLAIMS FOR VESTS PURCHASED DIRECTLY SHOULD BE DISMISSED BECAUSE NO FALSE CLAIM WAS SUBMITTED IN CONNECTION WITH THE SALES OF THESE VESTS**

As its name suggests, each of the False Claims Act provisions upon which the United States relies requires the satisfaction of one factor before any liability can be established—the existence of a *false* (or fraudulent) claim.[13]   It follows that, absent a showing that a false or fraudulent claim was presented to the United States Government, Toyobo cannot be found liable under the False Claims Act.  The United States appears to base its False Claims Act claims on allegations that the vests it purchased were defective because they allegedly may not last the length of their respective five-year warranties. (*See, e.g.,* Compl. at ¶¶ 12, 16.)  Notwithstanding the fact that the United States has not alleged that any particular vest failed to meet its five-year warranty, the mere failure of a vest to last for the duration of its warranty period does not mean that the Vest Manufacturer submitted a false claim when it gave the United States a five-year warranty. As explained further below, that is because a warranty is not a guarantee of future performance.

---

[13] The False Claims Act provides that:  "(a) Any person who (1) knowingly presents, or causes to be presented to [the United States Government] *a false or fraudulent claim* for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get *a false or fraudulent claim* paid or approved by the Government; (3) conspires to defraud the Government by getting *a false or fraudulent claim* paid or approved by the Government …."  31 U.S.C. § 3729 (emphases added).

The Complaint does not allege that Toyobo ever presented any statement or claim to the United States or had any relationship whatsoever with the United States.  Therefore, the United States appears to be relying on the theory that Toyobo "caused" some other party to present a false claims or statement to the United States.

A.    **The Failure Of Any Vest To Live Up To Its Five-Year Warranty Does Not Establish A False Claim**

Although the Complaint is far from a model of clarity, the United States appears to allege that the false claims presented to it were the five-year warranties that vest manufacturers placed on the vests purchased by the United States because the vests may not last the length of their respective five-year warranties. (*See* Compl. at ¶¶ 12, 15, 16.) The lynchpin of the United States' False Claims Act claim against Toyobo appears to be its argument that that Zylon allegedly "degraded substantially and quickly" causing vests to fail to meet their five-year warranties. (*Id.*) This, presumably, is the basis for the United States' allegation that Toyobo caused vest manufacturers to submit false claims, although, as explained below, because the Complaint fails to meet Rule 9(b)'s particularity pleading requirement, it is difficult for Toyobo to determine whether this is really the United States' theory. However, if this is its theory, the United States has not alleged that any particular vest actually failed prior to the expiration of its five-year warranty.[14] Moreover, the failure of a product is not synonymous with a breach of a warranty that would give rise to a false claim. The purpose of the warranties at issue was to provide a remedy to a purchaser *if* a defect was found in one of the vests.

Indeed, the warranties that accompanied the Vest Manufacturers' vests were repair or replace warranties, which provided that if a particular vest was found to contain a defect during the warranty period, the purchaser could seek to have the vest

---

[14] And, at least with respect to vests purchased more than five years ago, the United States cannot present any evidence at this point to establish that they did not live up to their warranties, or that the United States did not receive what it bargained for when the vest was used for five years without incident.

17

repaired or replaced by the manufacturer of that vest.[15]  These warranties did not guarantee the performance of the vests into the future. *See Johnson v. Southern Energy Homes, Inc.*, 391 F. Supp. 2d 1118, 1121 (S.D. Ala. 2005) (quoting *Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261, 1266 (D. Del. 1983) (stating that a repair or replace warranty "merely provides a remedy if the product becomes defective," while a warranty guaranteeing future performance "guarantees the performance of the product itself for a stated period of time"))).[16]  Whereas a repair or replace warranty provides a remedy if the product becomes defective during the warranty period, a warranty for future performance guarantees the product's performance for a stated period of time. *See Allstate Ins. Co. v. General Motors Corp.*, No. PD 04-12393, 2005 WL 264276, at *4 (Minn. Dist. Ct. Jan. 24, 2005).  The only representation that the Vest Manufacturers made with respect to the five-year warranties placed on their vests was that they would repair or replace any vest that was found to contain a defect during the warranty period.  (*See, e.g.,* Lyle Decl. Exhs. 12, 13.)

In fact, the warranties associated with the vests at issue expressly contemplate that the vest may not last for the entire five-year warranty period.  The NIJ— the agency responsible for developing performance standards for body armor—has

---

[15] (Exemplar warranties from bullet-resistant vests, as referenced in the Complaint, are attached as Lyle Decl. Exh. 12 and Exh. 13.)

[16] *See also Brainard v. Freightliner Corp.*, No. 02-CV-0317, 2002 WL 31207467, at *3 (W.D.N.Y. Oct. 1, 2002) (holding that a company's repair or replace warranty did not guarantee performance for a specified period of time); *Joswick v. Chesapeake Mobile Homes, Inc.*, 747 A.2d 214, 219 (Md. Ct. Spec. App. 2000) ("A warranty to repair or replace does not ensure future performance, 'rather it anticipates potential defects and specifies the buyer's remedy during the stated period.'") (citation omitted).

admitted that a warranty is not a benchmark for a vest's service life.[17]   Under these

warranties—which accompanied all of the vests at issue in this case—if the United States

found any defect in a particular vest during the five-year warranty period, it was free to

return that vest to the manufacturer, and the manufacturer would repair the vest, or if it

could not be repaired, the manufacturer would replace the vest.  This is the very purpose

of a repair or replace warranty.

The United States never identifies anywhere in its Complaint a single vest

that it contends was defective during its warranty period.  And, the United States does not

allege that it ever attempted to have any of its vests repaired or replaced and was refused.

Nor does the United States allege anywhere that any of the armor manufacturers ever

refused to honor their warranties.  Because the United States has failed to plead any facts

showing any warranties were breached on any vest, the five-year warranties that the Vest

Manufacturers placed on their vests cannot form the basis for the United States' False

Claims Act claims.

Moreover, the United States cannot establish the falsity of the warranties

at issue—an essential element for liability under the False Claims Act.   In order to

establish that a manufacturer's warranty was fraudulently made, the United States would

have to show that the manufacturer had no intention of honoring the warranty at the time

it was made (*i.e.*, when the vest was sold).  *See Royal Typewriter Co. v. Xerographic*

---

[17] *See* Lyle Decl. Exh. 2, National Institute of Justice, "Selection and Application Guide to Personal Body Armor," November 2001 at 62, available at http://www.ncjrs.gov/pdffiles1/nij/189633.pdf ("Many body armor manufacturers currently offer a 5-year warranty on the products they sell to criminal justice agencies…. It is important for agencies to recognize that a manufacturer's warranty *should not be interpreted as a benchmark for service life*. The warranty exists solely to limit the manufacturer's liability on the product *and is not a reflection of the anticipated service life of the product*.") (emphases added).

*Supplies Corp.*, 719 F.2d 1092, 1102 (11th Cir. 1983) (holding that, in order for an express warranty to be actionable as a misrepresentation, plaintiff has to show that "at the time the representation was made, [defendant] either lacked the intent to perform or specifically intended not to perform" actions required by the warranty).  Nor can a breach of an express warranty constitute a false claim for purposes of the False Claims Act unless the plaintiff can show that the defendant had no intention of honoring the warranty at the time it was made.  *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1265 (9th Cir. 1996) (holding that breaching a contract with the federal government does not automatically give rise to a claim under the False Claims Act).  There are no allegations in the Complaint claiming that the Vest Manufacturers did not intend to honor their warranties at the time their vests were sold.[18]

Because the United States has not alleged any facts establishing that any false claim was presented to it based on the warranties that accompanied the vests at issue, under Rule 12(b)(6), the court should dismiss all of the False Claims Act claims against Toyobo as a matter of law.

**B.    Any Allegedly False Statement Regarding Degradation Of Zylon Was Not Material Because The United States Continued To Purchase Zylon Vests After Being Informed Of Degradation Data**

Even if statements allegedly made by, or information allegedly withheld by, Toyobo relating to degradation of Zylon were false—which they were not—the

---

[18] Even if the United States could show that the Vest Manufacturers had a specific intent not to meet the requirements of their five-year warranties, this would not be sufficient to establish liability against Toyobo under the False Claims Act.  In order to state a False Claims Act claim against Toyobo, the United States must allege some conduct by Toyobo that "caused" a particular manufacturer to intend not to honor the warranties at the time the vests were sold.  There are no such allegations made by the United States in the Complaint.

allegations in the Complaint show that such statements were immaterial to the United States' decision to purchase Zylon vests, and therefore, cannot form the basis for liability under the False Claims Act. *See United States ex rel. Stebner v. Stewart & Stevenson Servs., Inc.*, 305 F. Supp. 2d 694, 698 (S.D. Tex. 2004) (noting that "FCA liability does not exist if the alleged fraudulent act had no bearing on the Government's payment decision").[19] The fact that Toyobo's statements were immaterial is evidenced by the fact that the United States admits in its Complaint that it continued to purchase vests until 2005, well *after* it was presented with *all of the* information regarding degradation of Zylon. (*See, e.g.,* Compl. at ¶¶ 12, 15, 16.) Further, until August 25, 2005—when the NIJ submitted its status report to the Attorney General (Lyle Decl. Exh. 11)—the United States, through the NIJ, continued to certify new Zylon vests. The fact that the United States continued to not only purchase Zylon vests, but also continued to certify new Zylon vests, after all of the information regarding Zylon degradation was undisputably in the public domain shows that this information—upon which all of the United States' False Claims Act claims against Toyobo apparently rest—was not material to the United States' payment decision. *See United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999) (no False Claims Act violation even if it could be shown that defendant's representation "was an outright lie," because, unbeknownst to the defendant the lie was immaterial since defendant's practices conformed with the

---

[19] *See also Stebner, supra; see also United States ex rel. Costner v. United States*, 317 F.3d 883 (8th Cir. 2003) (no False Claims Act liability where EPA continued to approve payments after being informed of defendants' operational problems and working with defendant to resolve problems and improve efficiency); *United States ex rel. Bennett v. Genetics & IVF Inst., Inc.*, No. 98-2119, 1999 WL 978881, at *2 (4th Cir. Oct. 28, 1999) (defendants' testing practices, which did not conform with contract, were "obviously immaterial" to the state's decision to pay because state officials were aware that defendants' practices did not conform, and nonetheless, renewed the contract with defendants).

underlying regulation).

**III.      THE UNITED STATES CANNOT SHOW THAT TOYOBO
          CAUSED ANY FALSE CLAIM TO BE SUBMITTED**

The United States has not pled facts sufficient to show that Toyobo knowingly caused any of the Vest Manufacturers to place a five-year warranty on any of their vests when the vests may not last five years. In fact, the allegations in the Complaint directly contradict this claim. Nor can the United States save itself by simply claiming that Toyobo had knowledge of the five-year warranties.

**A.      The United States Has Not Pled Facts Sufficient To Show That
          Toyobo Knowingly Caused Any False Claim Or Statement To
          Be Presented**

Even if the five-year warranties placed on the vests at issue were sufficient to form the basis of a False Claims Act claim—which, as discussed above, they are not—dismissal of the False Claims Act claims against Toyobo is still warranted because the United States has failed to show that Toyobo "knowingly caused" any false claim or false statement to be presented to the United States. As discussed above, the basis for the United States claims under the False Claims Act appears to be the five-year warranty placed on Zylon vests by the Vest Manufacturers, knowing that the vests wold not last five years. (*See, e.g.,* Compl. at ¶¶ 12, 15, 16.) Thus, in addition to establishing that the five-year warranty theory is a sufficient basis for a false claim, to hold Toyobo liable under the False Claims Act, the United States must also show that Toyobo "knowingly" did something that would have caused the Vest Manufacturers to place five-year warranties on Zylon vests that may not last five years. The United States cannot meet this requirement.

Because the False Claims Act is aimed at preventing fraud against the government, pleadings in False Claims Act cases are subject to the heightened pleading requirements of Rule 9(b). *See United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 375 (7th Cir. 2003). This requires False Claims Act pleadings to include specific allegations regarding "'facts as to time, place, and substance of the defendant's alleged fraud,'" including "details of the defendants' [] allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 568-69 (11th Cir. 1994)). The United States does not allege *any* specific action taken by Toyobo that "caused" any of the Vest Manufacturers to submit five-year warranties with their vests, knowing the vests may not last five years, much less specific allegations regarding "facts as to time, place, and substance of the defendant's alleged fraud." *Clausen*, 290 F.3d at 1310. Absent these specific allegations, Rule 9(b) mandates dismissal of the United States' False Claims Act claims against Toyobo.

Additionally, the allegations that are included in the Complaint show that Toyobo could not have caused the submission of any false claim. The Complaint acknowledges the numerous disclosures by Toyobo stating that it provided *no warranty* on Zylon and that Toyobo refused to make any representations about the use of Zylon in the Vest Manufacturers' vests. (*See, e.g.*, Compl. at ¶¶ 55, 61.) For example, in a July 5, 2001 letter from Toyobo to its customers, Toyobo alerted vest manufacturers to Zylon fiber degradation issues under conditions of high heat and humidity, and also informed them that "the age of the sample we could check is only up to two years and it is

impossible for us to guarantee 10 years based on the result." (Compl. at ¶ 60, Lyle Decl. Exh. 3) In addition to this letter, Toyobo informed its customers on numerous occasions of issues surrounding Zylon. (*See* "Statement of Facts," Section B., 2., *supra*.) Additionally, in a July 19, 2001 letter from Toyobo to its customers, Toyobo reminded bullet-resistant vest manufacturers that "Toyobo [was] not in a position to guarantee the performance of end products and of course the lifetime of each end product." (Compl. at ¶ 61; Lyle Decl. Exh. 5.) Toyobo's disclosures, as admitted by the United States in its allegations in the Complaint, are inconsistent with an intent to deceive the United States—or anyone else—about how long Zylon would last in an end product manufactured by someone else. *See, e.g., United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir. 1995) (holding that defendant's disclosure of test data showed that defendant had no intent to deceive); *X Corp. v. Doe*, 816 F. Supp. 1086, 1094 n.12 (E.D. Va. 1993) (holding that disclosure negated the scienter element).

In light of these disclosures, the United States' conclusory statements that Toyobo "knowingly caused to be presented false or fraudulent claims to the United States for payment" (Compl. at ¶ 128), are also not plausible. Nothing in the Complaint indicates any action by Toyobo that could have arguably caused the Vest Manufacturers to place five-year warranties on their vests, knowing the vests may not last five years. To the contrary, the Complaint is replete with references that Toyobo specifically told all of its customers that it provided *no warranty* on Zylon, and would not make any representations about how long Zylon may last in any particular end product. Under these circumstances, *Twombly* mandates dismissal of the United States' claims for lack of plausibility. 127 S. Ct. at 1965.

**B.    Mere Knowledge Is Insufficient To Establish The Causation Requirement**

Toyobo's alleged knowledge of the Vest Manufacturers' five-year warranties is insufficient to prove Toyobo caused the Vest Manufacturers to put five-year warranties on their vests sold to the United States. *See United States ex rel. Camillo v. Ancilla Sys., Inc.*, No. 03-CV-0024-DRH, 2005 WL 1669833, at *3 (S.D. Ill. July 18, 2005) (holding that "[u]nder the FCA, mere knowledge of a claim with nothing more does not constitute a violation").   The United States must also allege some action by Toyobo that caused the Vest Manufacturers to submit vests with five-year warranties, when the Vest Manufacturers knew the vests may not last five years. *See United States ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932, 933 (8th Cir. 2001) (dismissing False Claims Act case because there was no allegation that the defendant "affirmatively instructed" the relator to submit a false claim to the government, but merely that the defendant knew that he was going to do so); *United States ex rel. Piacentile v. Wolk*, Civ. A. No. 93-5773, 1995 WL 20833, at *4 (E.D. Pa. Jan. 17, 1995) (stating that "[t]he False Claims Act requires both knowledge of a claim's falsity and some action by the defendant which causes the claim to be presented to the government").   Moreover, the United States cannot maintain its False Claims Act claims against Toyobo by simply alleging that Toyobo created some of the circumstances which led the Vest Manufacturers to place five-year warranties on their vests.   The False Claims Act's causation element requires a stronger nexus between Toyobo's conduct and that of the Vest Manufacturers. *See Camillo*, 2005 WL 1669833 at *4 (stating that "[t]he creation of general circumstances leading to the submission of false claims are insufficient to state a

FCA violation").

In order to prevail under Counts 1 and 2 of the Complaint, the United States is required to set forth concrete allegations of actual conduct by Toyobo, which, in turn, caused the Vest Manufacturers to put five-year warranties on their vests, knowing the vests may not last five years, in an alleged violation of the False Claims Act. The Complaint is devoid of such allegations, and thus, Counts 1 and 2 fail to state a claim and should be dismissed.

IV.    **THE UNITED STATES' HAS NOT—AND CANNOT—ESTABLISH THE EXISTENCE OF A FALSE CLAIMS ACT CONSPIRACY UNDER 31 U.S.C. § 3729(a)**

Count 3 of the Complaint alleges that "Toyobo conspired with various other participants in the Zylon manufacturing and marketing chain to defraud the United States by getting false or fraudulent claims paid by the United States," in violation of the False Claims Act. (Compl. at ¶ 134.) General conspiracy principles apply to claims brought under section (a)(3) of the False Claims Act. *See, e.g., United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 546 n.3 (7th Cir. 1999). Therefore, in order to establish liability against Toyobo under this provision, the United States must demonstrate that: (1) Toyobo conspired with another party to have a false or fraudulent claim paid by the United States; (2) one of the conspirators committed an act in furtherance of the conspiracy; and (3) the United States was damaged as a result. *See United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994); *see also United States ex rel. Atkinson v. Penn. Shipbuilding Co.*, No. Civ. A. 94-7316, 2004 WL 1686958, at *4 n.11 (E.D. Pa. July 28, 2004). Claims under section (a)(3) also must "specify the particulars of how and when the alleged conspiracy arose, who entered into it, [and] what

26

act was committed in furtherance of the conspiracy." *United States ex rel. Capella v. Norden Sys., Inc.*, No. 3:94-CV-2063, 2000 WL 1336487, at *11 (D. Conn. Aug. 24, 2000). The United States has not met any of these pleading requirements.[20]

The allegations of the existence of a conspiracy are wholly conclusory and do not indicate any agreement between Toyobo and any other party to conspire to defraud the United States. Nor does the United States allege how and when the alleged conspiracy arose, who entered into it, or what act was committed in furtherance of it. Rather, the United States merely alleges that Toyobo "conspired with various other participants in the Zylon manufacturing and marketing chain to defraud the United States." (Compl. at ¶ 134.) Although the Complaint alleges various *independent* actions taken by Toyobo and others, there is nothing in the Complaint to support the notion that any of these independent actions were undertaken pursuant to an agreement between Toyobo and any other entity to engage in a conspiracy to defraud the United States. Significantly, the United States does not even indicate who the "various other participants" are. Furthermore, the United States alleges that Toyobo, and these unidentified "other participants" engaged in "multiple conspiracies." (*Id.* at ¶ 135.)

Such conclusory allegations are insufficient to meet the heightened pleading standards required to sustain a conspiracy claim. *See, e.g., Wilkins ex rel. United States v. Ohio*, 885 F. Supp. 1055, 1063 (S.D. Ohio 1995) (holding that conclusory allegations of an agreement cannot support a claim under section (a)(3));

---

[20] Additionally, as set forth above, no false or fraudulent claim was presented to the United States by any party, and therefore, no fraudulent claim was paid by the United States. *See* Section II., *supra.* Because the United States cannot show that any false claim was submitted to it, it necessarily follows that it cannot establish that Toyobo conspired with any other party to submit a false claim to the United States. For this additional reason, the United States' conspiracy claim under 31 U.S.C. § 3729(a)(3) fails.

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1056-57 (8th Cir. 2002) (affirming grant of summary judgment on conspiracy claims where plaintiff had not provided any evidence that defendants conspired to submit false claims); *Capella*, 2000 WL 1336487 at *11 (dismissing section (a)(3) claim, and stating that "[g]eneral allegations that defendants conspired in alleged scheme to defraud do not sufficiently attribute fraud to each individual defendant and do not satisfy requirements of pleading fraud with particularity") (internal citation omitted). Absent a showing that Toyobo agreed with some other specified party to submit a false claim to the United States, a claim for conspiracy under § 3729(a)(3) cannot be sustained. *See Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1521 (N.D. Cal. 1990) (holding that in order to meet the stringent requirements of pleading a civil conspiracy, Rule 9(b) requires a plaintiff to "allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement"). The Complaint does not meet the heightened pleading requirements of Rule 9(b) for establishing a conspiracy, and therefore, Count 3 should be dismissed.

Further, the allegations presented in the Complaint do not "raise a right to relief above the speculative level" as required by *Twombly*. 127 S. Ct. at 1965. As in *Twombly*, the United States in this case alleges nothing more than various independent actions tied together by the unsupported statement that these actions were undertaken as part of a conspiracy. There are no allegations showing any actual agreement between Toyobo and any other party other than the United States' conclusory allegation that such an agreement existed. (Compl. at ¶ 134.) *Twombly* makes clear that this is not enough to raise a conspiracy allegation to the level of plausibility, and therefore, must be dismissed.

*Twombly*, 127 S. Ct. 1965.

Additionally, throughout the Complaint, the United States acknowledges numerous occasions on which Toyobo released information in its possession regarding degradation of Zylon, *see* pp. 7-9, *supra*, actions that are wholly inconsistent with an intent to defraud the United States by concealing information about the degradation of Zylon from the United States. If anything, these actions tend to show an intent to be upfront and forthcoming about degradation of Zylon rather than an intent to defraud the United States as required for False Claims Act conspiracy under § 3729(a)(3). And, under section (a)(3), the knowledge requirements are heightened. *See United States ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 208 (E.D. Tex. 1998) (holding that "the conspiracy provision of the [False Claims] Act seems to require the specific intent to defraud, unlike the other provisions which merely require knowledge. The requirements of particularity are therefore more compelling."); *see also United States ex rel. Sikkenga v. Regence BlueCross/BlueShield of Utah*, No. 2:99CV86K, 2001 U.S. Dist. LEXIS 25717, at *18 (D. Utah Nov. 27, 2001), *aff'd in part and remanded in part*, 472 F.3d 702 (10th Cir. 2006) (listing intent to defraud among the elements of a claim under section (a)(3)). The Complaint does not allege any facts demonstrating that Toyobo ever had specific intent to defraud the United States. In fact, the opposite is true.

Toyobo's conduct, as chronicled in the Complaint, is totally incompatible with the existence of an agreement between Toyobo and any other party to defraud the United States. Throughout the Complaint, the United States acknowledges numerous occasions on which Toyobo released information in its possession regarding degradation of Zylon—an act wholly inconsistent with an intent to defraud and conceal information

29

from the United States.  (*See, e.g.,* Compl. at ¶¶ 60, 61, 66, 67, 71, 87, 92.)  Rather than support a conspiracy claim, these actions show Toyobo's intent to be upfront and forthcoming about the physical properties of Zylon, including degradation.  The United States seeks to save its conspiracy claims by alleging that, although Toyobo released some data, this data was either inaccurate in some way or it was incomplete.  (*See, e.g.,* Compl. at ¶¶ 60, 83.)  As with the rest of its conspiracy-related allegations, however, these allegations are wholly conclusory and are, therefore, insufficient to meet the heightened pleading standards of Rule 9(b).  For all these reasons, the United States' False Claims Act conspiracy claim should be dismissed.

## V.  THE UNITED STATES HAS FAILED TO ALLEGE COMMON LAW FRAUD AGAINST TOYOBO

The United States' claim for common law fraud (Count 4) suffers from the same fatal defects as its False Claims Act claims, *see* Section II., *supra*, and therefore, this claim should be dismissed for failure to meet the heightened pleading requirements of Rule 9(b).  *See Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 459 (D.D.C. 1997).  In order to establish common law fraud, the United States must show that Toyobo made: "'(1) a false representation, (2) in reference to material fact, (3) [] with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken [by the United States] in reliance upon the representation.'"  *Powell v. Dist. of Columbia Housing Auth.*, 818 A.2d 188, 197 (D.C. 2003) (citation omitted).  Moreover, these elements must be established by clear and convincing evidence.  *Int'l Cargo Mgmt. Specialists, Inc. v. EG&G Dynatrend, Inc.*, Civ. A. No. 91-1360, 1995 WL 170376, at *17 (D.D.C. March 31, 1995).

Under Rule 9(b), claims of fraud must include matters such as "'time, place, and contents of the *false* representation.'" *Totten*, 286 F.3d at 552 (citation omitted). This requires the pleading to provide the "who, what, when, where, and how" regarding the circumstances of the fraud. *Chelsea Condominium Unit Owners Ass'n v. 1815 A. St., Condominium Group, LLC*, 468 F. Supp. 2d 136, 146 (D.D.C. 2007). Although the court must take as true all allegations of material fact and construe them in the light most favorable to the pleader in resolving a Rule 9(b) challenge, the pleader nevertheless must satisfy his burden by stating with particularity the supporting factual allegations for his claim. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). The allegations in the Complaint are insufficient to meet this standard.

As support for its fraud claim, the United States alleges that Toyobo "falsely represented that Zylon vests ... were 'bulletproof' and would remain 'bulletproof' for five years." (Compl. at ¶ 138.) However, the United States does not offer any support for this allegation; it does not allege who from Toyobo made these statements, when they were made, where they were made, who they were made to, or how the United States relied on them. Indeed, the facts alleged in the Complaint are inconsistent with this allegation. Notwithstanding the fact that the Complaint never alleges any statement by anyone from Toyobo that Zylon vests were "bulletproof," the United States concedes that Toyobo consistently informed its customers that it placed no warranty on Zylon (*see, e.g.,* Compl. at ¶¶ 55, 61)—a position inconsistent with the allegation that Toyobo represented that Zylon vests would remain "bulletproof" for five years. Absent any support, this allegation is insufficient to meet Rule 9(b)'s requirements for pleading fraud.

31

The United States' seeks to save itself by making conclusory allegations that Toyobo committed fraud by failing to inform it that Zylon vests were allegedly defective. (Compl. at ¶ 139.) In order to establish that Toyobo committed fraud by failing to disclose information, the United States would have to establish that Toyobo owed a duty to the United States to disclose such information. *See generally Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 78 (D.D.C. 2005) (noting that concealment of a fact that should be disclosed can constitute fraud where there is a duty to disclose). The United States has not pled any fact to show that Toyobo ever had any contact with the United States regarding the vests the United States purchased, let alone that Toyobo owed the United States any duty of disclosure. Indeed, the Complaint does not even allege that Toyobo played any role in the design, manufacture, or sale of the vests. Therefore, this claim cannot survive the requirements of Rule 9(b) that claims of fraud be pled with particularity. *See Chelsea Condominium Unit Owners, supra.*

For these same reasons, based on the lack of any contact between Toyobo and the United States, Toyobo's lack of any role in the design, manufacture, or sale of the vests at issue, and considering the numerous disclosures Toyobo made to the market about Zylon, it is not plausible that Toyobo owed the United States a duty to disclose any information it had about Zylon. Therefore, the United States' fraud claim based on Toyobo's purported failure to disclose information fails under *Twombly's* plausibility standard. 127 S. Ct. at 1965.

## VI.    THE UNITED STATES CANNOT SHOW THAT TOYOBO WAS UNJUSTLY ENRICHED

In Count 5, the United States alleges that Toyobo has been unjustly

enriched through the receipt of money from the Vest Manufacturers for Zylon used in defective vests purchased by the United States. (Compl. at ¶ 149.)[21] Under the law of this Circuit, for the United States to establish that Toyobo was unjustly enriched, it must show that: (1) it conferred a benefit upon Toyobo; (2) Toyobo possessed an appreciation or knowledge of the benefit; and (3) Toyobo accepted or retained the benefit under circumstances so "as to make it inequitable for [Toyobo] to retain the benefit without payment of its value." *Bouchey*, 860 F. Supp. at 894. The United States' allegations are insufficient to satisfy any of these elements.

The facts alleged by the United States do not show that it conferred any benefit upon Toyobo for purposes of an unjust enrichment claim. Rather, as the United States concedes, any benefit conferred by the United States was conferred on the Vest Manufacturers—either directly or indirectly—not Toyobo. (Compl. at ¶ 148.) Any benefit arguably conferred upon Toyobo was conferred by the Vest Manufacturers or other third parties, not the United States. This is insufficient to meet the first element of an unjust enrichment claim. *See Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 WL 2711527 (D.D.C. Sep. 21, 2006) (dismissing plaintiff's claim for unjust enrichment where only benefit allegedly conferred on defendant was by third party).

Further, to say that the allegations of unjust enrichment are merely

---

[21] The United States claims that it paid for defective Zylon vests due to false statements by Toyobo. (Compl. at ¶ 147.) Therefore, it follows that if the United States cannot establish that Toyobo made any false statements, its unjust enrichment claim would necessarily fail. For the reasons discussed above, the United States cannot establish that any false statements were submitted to it, *see* Section II., *supra*, and even if false statements were submitted, it cannot show that Toyobo caused them to be presented to the United States, *see* Section III., *supra*. Therefore, the claim for unjust enrichment should be dismissed.

conclusory is an understatement.  All the United States alleges is that it paid the Vest

Manufacturers for defective Zylon vests, and that by reason of these payments, Toyobo

has received money to which it is not entitled.  (Compl. at ¶¶ 147-149.)  No attempt is

made to tie any money paid by the United States to any benefit conferred on Toyobo.

These allegations do not rise to the standard laid out by *Twombly* that a complaint must

plead specific facts sufficient to "to raise a right to relief above the speculative level."

*Twombly*, 127 S. Ct. at 1965.  For all of these reasons, the United States' claim for unjust

enrichment should be dismissed.[22]

---

[22] Even if the United States could establish a claim for unjust enrichment—which it cannot—this claim
would be limited to vests purchased *after* June 27, 2004.  Any claims for vests purchased prior to June 27,
2004 are barred by the three-year statute of limitations for unjust enrichment claims.  *See Construction
Interior Sys., Inc. v. Donohoe Cos., Inc.*, 813 F. Supp. 29, 33 n.4 (D.D.C. 1992) (noting that equitable
claims, such as unjust enrichment, are subject to a three-year statute of limitations).  An unjust enrichment
claim begins to accrue when the defendant receives the allegedly unjust benefit, and the plaintiff's
expectations are irrelevant for statute of limitations purposes.  *See McQueen v. Woodstream Corp.*, No. 05-
2068, 2007 WL 2284747, at *8-9 (D.D.C. Aug. 10, 2007) (holding that the statute of limitations for an
unjust enrichment claim begins to run at the time the defendant receives benefit and is unjustly enriched,
and stating that "it is 'inappropriate to look at [the plaintiff's] expectations of payment, rather than at the
services [the defendant] provided'") (citing *News World Comm., Inc. v. Thompsen*, 878 A.2d 1218, 1224
(D.C. 2005)).  And, there is no discovery rule that would toll the statute until the United States discovered,
or should have discovered, the circumstances establishing that Toyobo was purportedly unjustly enriched.
*See, e.g., McQueen*, 2007 WL 2284747 at *9; *Thompsen*, 878 A.2d at 1225.

## CONCLUSION

For the foregoing reasons, Toyobo respectfully requests that each of the Counts set forth in the Complaint against Toyobo be dismissed and that the Court grant Toyobo such other and further relief as is just and proper.

Dated: October 11, 2007

Michael J. Lyle, Esq.
Holly E. Loiseau, Esq.
WEIL, GOTSHAL & MANGES LLP
1300 Eye Street, NW - Suite 900
Washington, D.C. 20005
Telephone: (202) 682-7000
Facsimile:  (202) 857-0940

Arvin Maskin, Esq.
Konrad L. Cailteux, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Defendants*
*Toyobo Company, Ltd.*
*and Toyobo America, Inc.*