## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CV No. 07-1144 (RWR) |
| | ) |
| Plaintiff. | ) **UNITED STATES' BRIEF IN** |
| | ) **OPPOSITION TO DEFENDANTS** |
| v. | ) **TOYOBO CO., LTD. AND TOYOBO** |
| | ) **AMERICA, INC.'S MOTION TO** |
| TOYOBO CO., LTD., and TOYOBO | ) **DISMISS** |
| AMERICA, INC., | ) |
| | ) **RELATED CASE:** |
| Defendants. | ) <u>United States ex rel. Westrick v. Second Chance</u> |
| | ) <u>Body Armor, Inc., et al.</u> (D.D.C. No. 04-0280 RWR) |

# TABLE OF CONTENTS

I.  OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  The United States' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.  Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.  RESPONSE TO TOYOBO'S FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . 4

III.  TOYOBO'S MOTION TO DISMISS SHOULD BE DENIED . . . . . . . . . . . . . . . . . . 8

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  The Allegations in the Complaint State Claims under Sections 3729(a)(1)
       and 3729(a)(2) of the False Claims Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1.  Toyobo Cannot Claim that It Made Full Disclosure To the
           Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.  The United States Has Alleged More Than Mere Knowledge Against
           Toyobo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        3.  Toyobo Incorrectly Argues that FCA Liability Does Not Attach to
           Vests Purchased Pursuant to the Bullet Proof Vest Grant Partnership
           Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        4.  Toyobo Incorrectly Argues that FCA Liability Does Not Attach to
           Direct Purchases because "No False Claim was Submitted in
           Connection with the Sale of these Vests." . . . . . . . . . . . . . . . . . . . . . 21

        5.  Toyobo Incorrectly Argues that any "Causation" Requirement in the
           False Claims Act is not Adequately Pled in the Complaint . . . . . . . . . . 26

    B.  The Complaint Complies With Fed. R. Civ. Proc. 9(b) . . . . . . . . . . . . . . . . . . . 29

    C.  Conspiracy to Submit False Claims to the United States . . . . . . . . . . . . . . . . . 31

    D.  The Common Law Claims For Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        1.  Common Law Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        2.  Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

     a. Indirect Benefits Support An Unjust Enrichment Claim . . . . . . . 40

   3. Toyobo Cites The Wrong Statute of Limitations . . . . . . . . . . . . . . . . . . . 42

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

## TABLE OF AUTHORITIES

### CASES

In re Adler, Coleman Clearing Corp.,
  247 BR. 51 (Bankr. S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Alfus v. Pyramid Tech. Corp.,
  745 F.Supp. 1511 (N.D. Cal. 1990) (cited by Toyobo at p. 28) . . . . . . . . . . . . . . . . . . 34

Allen v. Beta Constr.,
  309 F. Supp. 2d 42 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Allison Engine Co., Inc. v. U.S. ex rel. Sanders,
  128 S. Ct. 491 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Allstate Ins. Co. v. General Motors Corp.,
  No. PD-04-12393, 2005 WL 264276 (Minn. D. Ct., Jan. 24, 2005) . . . . . . . . . . . . . . 23

BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil,
  56 F. Supp. 2d 14 (D.D.C. 1999),
  aff'd in part, rev'd in part, 214 F.2d 168 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 40

Ballot v. General Electric Co.,
  393 F.2d 398 (1st Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Bell Atlantic Corp. v. Twombly,
  127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

In re Cardizem CD Antitrust Litig.,
  105 F. Supp. 2d 618 (E.D. Mich. 2000),
  aff'd, 332 F.3d 896 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Condor Am., Inc. v. American Power Dev'l. Inc.,
  128 F.R.D. 229 (S.D. Ohio 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Constr. Interior Sys., Inc. v. Donohoe Cos.,
  813 F. Supp. 29 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D.R. Ward Constr. Co. v. Rohm & Haas Co.,
  470 F. Supp. 2d 485 (E.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Eastman Kodak Co. v. Wachovia Bank N.A.,
    2007 WL 2406919 (W.D.N.Y. Aug. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Erickson v. Pardus,
    127 S. Ct. 2197 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

FDIC v. Kucera Builders, Inc.,
    503 F. Supp. 967 (N.D. Ga. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,
    2001 WL 1266317 (D.N.J. Sept. 30, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Graham v. Renbrook Sch.,
    692 F. Supp. 102 (D. Conn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Hokama v. E.F. Hutton & Co.,
    566 F. Supp. 636 (C.D. Cal. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Independent Bus. Forms, Inc. v. A-M Graphics, Inc.,
    127 F.3d 698 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Joswick v. Chesapeake Mobile Homes, Inc.,
    747 A.2d 214 (Md. App. 2000),
    aff'd 765 A.2d 90 (Md. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

In re K-Dur Antitrust Litig.,
    3328 F. Supp. 2d 517 (D.N.J. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Kowal v. MCI Comm'ns Corp.,
    16 F.3d 1271 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8

In re Lorazapem & Clorazepate Antitrust Litig.,
    295 F. Supp. 2d 30 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

In re Lupron Mktg. & Sales Practices Litig.,
    295 F. Supp. 2d 148 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Marshall County Health Care Authority v. Shalala,
    988 F.2d 1221 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

McQueen v. Woodstream Corp.,
    244 F.R.D. 26 (D.D.C. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Miller v. Holzmann, Civ. A. 95-1231(RCL),
   2007 WL 710134 (D.D.C. Mar. 6, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.,
   276 F.3d 1032 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Murray & Sorensen, Inc. v. U.S.,
   207 F.2d 119 (1st Cir. 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

In re Newbridge Networks Sec. Litig.,
   926 F. Supp. 1163 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

News World Commc's, Inc. v. Thompsen,
   878 A.2d 1218 (D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

Oceanic Exploration Co. v. ConocoPhillips, Inc., Civ. A. 04-332(EGS),
   2006 WL 2711527 (D.D.C. Sept. 21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42

Ontario Hydro v. Zallea Sys., Inc.,
   569 F.Supp. 1261 (D.Del. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

Pence v. U.S.,
   316 U.S. 332 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

Sparrow v. United Air Lines, Inc.,
   216 F.3d 1111 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

U.S. ex rel. Augustine v. Century Health Servs., Inc.,
   136 F. Supp. 2d 876 (M.D. Tenn. 2000),
   aff'd, 289 F.3d 409 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

U.S. ex rel. Bennett v. Genetics & IVF Inst., Inc.,
   199 F.3d 1328 (table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

U.S. ex rel. Berge v. Board of Trustees of Univ. of Ala.,
   104 F.3d 1453 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24, 25

U.S. ex rel. Butler v. Hughes Helicopters, Inc.
   71 F.3d 321 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

U.S. ex rel. Camillo v. Ancilla Sys., Inc.,
   No. 03-CV-0024-DRH, 2005 WL 1669833 (S.D. Ill. July 18, 2005) . . . . . . . . . . . . .   15

U.S. ex rel. Clausen v. Laboratory Corp. of Am., Inc.,
   290 F.3d 1301 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30, 31

U.S. ex rel. Costner v. URS Consultants, Inc.,
    317 F.3d 883 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. ex rel. Ervin v. The Hamilton Securities Group, Inc.,
    No. 96-CV-1258 (D.D.C. Jan. 25, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. ex rel. Franklin v. Parke-Davis,
    147 F. Supp.2d 39 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. ex rel. Glass v. Medtronic, Inc.,
    957 F.2d 605 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. ex rel. Guadalupe v. Goodyear Tire & Rubber Co.,
    No. 5:01 CV 2007, 2005 WL 1324977 (N.D. Ohio June 3, 2005) . . . . . . . . . . . . . . . 18

U.S. ex rel. Hochman v. Nackman,
    145 F.3d 1069 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. ex rel. Johnson v. Shell Oil Co.,
    183 F.R.D. 204 (E.D. Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

U.S. ex rel. Joseph v. Cannon,
    642 F.2d 1373 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 31

U.S. ex rel. Joslin v. Community Home Health of Md., Inc.,
    984 F. Supp. 374 (D. Md. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. ex rel. Lamers v. City of Green Bay,
    168 F.3d 1013 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. ex rel. Lee v. SmithKline Beecham Corp.,
    2001 WL 310945 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. ex rel. Lindenthal v. General Dynamics Corp.,
    61 F.3d 1402 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. ex rel. Long v. SCS Business & Technical Institute,
    999 F. Supp. 78 (D.D.C. 1998),
    *reversed on other grounds by* 173 F.3d 870 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . 15, 16

U.S. ex rel. Marcus v. Hess,
    317 U.S. at 544-45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. ex rel. Milam v. Regents of the Univ. of Cal.,
  912 F. Supp. 868 (D. Md. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

U.S. ex rel. Piacentile v. Wolk, Civ. A 93-5773,
  1995 WL 20833 (E.D. Pa. Jan. 17, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.,
  238 F. Supp. 2d 258 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

U.S. ex rel. Roby v. The Boeing Company,
  184 F.R.D. 107 (S.D. Ohio 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

U.S. ex rel. Sanders v. Allison Engine Co., Inc.,
  471 F.3d 610 (6th Cir. 2006),
  cert. granted, 128 S. Ct. 491 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

U.S. ex rel. Schmidt v. Zimmer, Inc.,
  386 F.3d 235 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

U.S. ex rel. Shaver v. Lucas Western Corp.,
  237 F.3d 932 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

U.S. ex rel. Sikkenga v. Regence BlueCross/BlueShield of Utah,
  No. 99 CV 86K, 2001 U.S. Dist. LEXIS 25717 (D. Utah, Nov. 27, 2001) . . . . . . . . . .  32

U.S. ex rel. Stebner v. Stewart & Stevenson Servs., Inc.,
  305 F. Supp.2d 694 (S.D. Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

U.S. ex rel. Totten v. Bombardier Corp.,
  380 F.3d 488 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

U.S. ex rel. Wilkins v. Ohio,
  885 F. Supp. 1055 (S.D. Ohio 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

U.S. ex rel. Williams v. Martin-Baker Aircraft Co.,
  389 F.3d 1251 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

U.S. v. Bornstein,
  423 U.S. 303 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

U.S. v. Bouchey,
  860 F. Supp. 890 (D.D.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 42

U.S. v. Hibernia Nat'l Bank,
  841 F.2d 592 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

U.S. v. Incorporated Village of Island Park,
    888 F. Supp. 419 (E.D.N.Y.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

U.S. v. Intrados/Intern'l Mgmt. Group,
    265 F. Supp. 2d 1 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

U.S. v. Kimbell Foods, Inc.,
    440 U.S. 715 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

U.S. v. McLeod,
    721 F.2d 282 (9th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. v. Neifert-White Co.,
    390 U.S. 228 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. v. TDC Mgmt. Corp., Inc.,
    288 F.3d 421 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

U.S. v. Teeven,
    862 F. Supp. 1200 (D. Del.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Witherspoon v. Philip Morris, Inc.,
    964 F. Supp. 455 (D.D.C. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

X Corp. v. Doe
    816 F. Supp. 1086 (E.D. Va. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**STATUTES**

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 9, 10, 26, 29, 30, 31, 32

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 83

28 U.S.C. § 2415(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

28 U.S.C. § 2415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

31 U.S.C. 3729(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17, 18, 19, 27

31 U.S.C. 3729(a)(1-3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 10

31 U.S.C. 3729(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

31 U.S.C. 3729-33 .................................................................. 1

42 U.S.C. § 3796ll, *et seq* ......................................................... 1

# I.
# OVERVIEW

This case is about faulty bulletproof vests,[1] and an industry-wide scheme to sell to the American law enforcement community vest which utilized a defective polymer fiber known as Zylon, manufactured by defendants Toyobo Co., Ltd. and Toyobo America, Inc. (collectively Toyobo). Despite Toyobo's contention that it does not "belong" in this case, (Motion to Dismiss, Doc. 14 at 1), it was the principal driving force behind the introduction and continued sale of Zylon bulletproof vests to the American market. As such, Toyobo was at the epicenter of the scheme to manufacture and, above all, sell defective Zylon vests, despite its ever-burgeoning knowledge about Zylon's rapid degradation that made the material inappropriate for use in bulletproof vests. This degradation was not unexpected to Toyobo, which had been performing internal testing and concealed much of its internal evidence of Zylon degradation from the United States.

In the face of these allegations, pled with particularity in the Complaint, Toyobo filed the instant Motion to Dismiss. Doc. 14. The Motion to Dismiss obfuscates the central issues in this case, introducing contested factual issues in an attempt to induce the Court to rule upon the merits prior to allowing discovery. Moreover, Toyobo misconstrues the nature and scope of the False Claims Act, 31 U.S.C. §§ 3729-33, and the common law causes of action that give rise to Toyobo's liability. For the reasons set forth below, the Motion to Dismiss should be denied.

## A.    The United States' Complaint

This is an action brought under the False Claims Act, 31 U.S.C. §§ 3729-33, and at

---

[1]    Though Toyobo takes issue with the United States' use of the term "bulletproof," and contends that this term is a misnomer, Toyobo readily admits that payments were made by the United States Government for Zylon vests pursuant to the Bullet Proof Vest Grant Partnership Act ("BPVGPA") enacted by Congress. See 42 U.S.C. § 3796ll, et seq.

common law to recover federal funds used to purchase defective bulletproof vests. The Complaint alleges that the bulletproof vests at issue were defective because they contained Zylon, a synthetic polymer fiber manufactured exclusively by Toyobo, and which Toyobo knew degraded at such an alarmingly high rate that it was unfit for use in bulletproof vests.

The Complaint alleges that each and every Zylon vest paid for with federal funds was defective and that, as a result, the United States was fraudulently billed for a defective product that would not properly perform its life-and-death function of protecting law enforcement officers. The Complaint also alleges that Toyobo knowingly misrepresented Zylon's suitability for use in bulletproof vests and publicly downplayed the problems with Zylon fiber degradation, all while making extensive efforts to encourage the growth of the American market for Zylon vests by conspiring with vest manufacturers and other companies in the chain of bulletproof vest production to mislead the United States into purchasing these vests. Ultimately, the United States paid over $40 million for Zylon vests for itself and for state, local, and tribal law enforcement agencies under the BPVGPA, each of which carried a false warranty that the vests were free of manufacturing defects and would last for at least five years.

Toyobo "belongs in this case" because its behavior, as alleged in 149 paragraphs of very detailed allegations, creates liability under three separate provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1-3), and at common law. As detailed in the Complaint and explained below, Toyobo (1) knowingly caused false or fraudulent claims for defective Zylon vests to be presented to the United States, (2) knowingly made (and caused others to make) false statements about the suitability of Zylon fiber and the quality of the Zylon vests to get those claims paid, (3) conspired with numerous participants in the bulletproof vest manufacturing process to get the United States to purchase and pay for the defective vests, (4) engaged in common law fraud, and (5) was

unjustly enriched as a result of its behavior, at the expense of the United States.

Though Toyobo's Motion to Dismiss inappropriately attaches documentary evidence and asks the Court to resolve factual issues (before discovery and before Toyobo has even answered the Complaint), the dozens upon dozens of specific factual allegations in the Complaint must, for purposes of the Motion to Dismiss, be taken as true; the Court "must construe the allegations and facts in the complaint in the light most favorable to the plaintiff" and also "grant the plaintiff the benefit of all inferences that can be derived from the facts alleged in the complaint." Kowal v. MCI Comm'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

The allegations in the Complaint, taken as true, state claims upon which relief can be granted, and do so with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b).  For this reason, and the reasons set forth below, Toyobo's Motion to Dismiss should be denied.

**B.**    **Procedural Background**

This case is the second matter that the Government has filed against Toyobo  concerning defective Zylon bulletproof vests.  In July 2005, the United States intervened in a related *qui tam* action, U.S. ex rel. Westrick v. Second Chance Body Armor, Inc., et al. (D.D.C. No. 04-0280) (Second Chance Action), and filed its Amended Complaint in that action on September 19, 2005. The United States' Amended Complaint in the Second Chance Action named Toyobo as a defendant, and alleged that Toyobo is liable to the United States under the False Claims Act, 31 U.S.C. § 3729(a)(1-3), and at common law for its role in causing the United States to purchase defective Zylon bulletproof vests from one particular manufacturer of bulletproof vests, Second Chance Body Armor, Inc., as well as former executives and its related entities.  The Second Chance Action (like this case) alleges that the bulletproof vests were defective precisely because

they contained Toyobo's Zylon, and that the claims for payment presented to the United States

for the sale of those vests were false or fraudulent. Toyobo's Motion to Dismiss the United

States' Amended Complaint is pending in the Second Chance action.[2]

The United States filed its Complaint in this action on June 26, 2007 (Doc. 1) (the

Complaint). The Complaint alleges that Toyobo is liable to the United States in connection with

its role in causing the United States to purchase defective Zylon bulletproof vests from vest

manufacturers other than Second Chance, and expressly excludes from its scope the false or

fraudulent claims presented to the United States by Second Chance. Compl., ¶ 1. Toyobo filed a

Motion to Dismiss the Complaint on October 11, 2007, arguing that the Complaint fails to state a

claim upon which relief can be granted, Fed. R. Civ. P. 12(b)(6), and fails to state the

circumstances constituting fraud with sufficient particularity, Fed. R. Civ. P. 9(b). As set forth

below, the Motion to Dismiss is without merit and should be denied.

## II.
## RESPONSE TO TOYOBO'S FACTUAL BACKGROUND

The Complaint sets forth how Toyobo continued to manufacture, sell and promote Zylon

fiber for use in bulletproof vests as the evidence of Zylon's degradation accumulated. As early as

May 1999, Toyobo was aware that Red Thread, a weakened and discolored variant of Zylon with

a 10-30 percent lower tensile strength, was occurring in Toyobo's manufacturing process.

Compl., ¶¶ 37, 42-45, 51. From May 1999 to June 2001, despite Toyobo's efforts, Toyobo was

unable to eradicate the Red Thread from its Zylon production. Id. In July 2001, DSM, a fiber

laminator, announced the test failure of a Zylon vest, which contained a Zylon laminate product,

---

[2]       Because Toyobo's Motion to Dismiss it from that case raises many of the same
arguments that Toyobo raises here, the United States respectfully incorporates by reference its
brief in opposition to Toyobo's Motion to Dismiss the Second Chance Action.

in Germany. Id. at ¶¶ 52-56, 58. At the same time, Toyobo announced to the industry that its accelerated aging testing of Zylon was yielding evidence of substantial degradation at extreme environmental conditions. Id. at ¶ 60. In November 2001, Toyobo announced that additional accelerated aging testing of Zylon – this time at normal conditions – showed substantial and unpredictable degradation. Id. at ¶¶ 75-76. Following a meeting with one bulletproof vest manufacturer in December 2001, Toyobo withdrew this data the same month. Id. at ¶¶ 78-79. However, even after this data was withdrawn, Toyobo continued to obtain bad Zylon degradation test results in 2002. Id. at ¶¶ 80-82. From January to March 2003, Toyobo continued to study its Red Thread problem. Id. at ¶¶ 87-91. In May 2003, when a weaver discovered Red Thread on its looms and stopped weaving, Toyobo was unable to keep the Red Thread problem a secret any longer. Id. at ¶¶ 93-96, 98-102, 104-06. While Toyobo and the weaver were discussing the Red Thread problem, two officers wearing Zylon vests manufactured by Second Chance were shot through their vests. Id. at ¶¶ 97, 108. In August 2005, the United States announced that it had completed testing of over 100 used Zylon vests and the bulk of the vests had failed. Id. at ¶ 126. As a result of that announcement, all American body armor manufacturers stopped using Zylon. Id.

Despite Toyobo's assurances that its "Statement of Facts" may be considered without converting it into a motion for summary judgment, the assertions therein belie a proper purpose and, instead, reveal their true strategy: to inject a host of improper considerations and inapposite case law at this preliminary stage of the litigation, in an attempt to obtain, in effect, a summary judgment ruling based on their one-sided assertions of fact. Doc. 14 at 4-10. As no discovery has yet been taken in this case, the United States will not attempt to respond to each and every statement of contested fact that Toyobo puts forth, but rather, returns to the facts pled in the

Complaint, which contradict those alleged by Toyobo.

For example, Toyobo contends that it "played no role in, and had no control over, the design or manufacturing process of either the Zylon fabric or the Zylon vests at issue in this litigation, nor does the United States allege otherwise in the Complaint." Doc. 14 at 6. At the forefront of the Complaint, however, is the plain assertion that:

> During 1996 and 1997, Toyobo selected the body armor manufacturers who would be given access to Zylon, selected the weavers who would be authorized to purchase Zylon and to weave it into ballistic fabric, and the trading companies that would import it into the United States. Toyobo kept **complete control** over access to and use of Zylon for ballistic applications.

Compl., ¶ 21 (emphasis added). The Complaint specifically alleges that Toyobo played a prominent role in the marketing, design and manufacturing process of Zylon fabric and Zylon vests, and the Complaint is replete with enumerations of meetings and issues discussed between Toyobo and the various weavers and vest makers. Id. at ¶¶ 32, 34-35, 38, 40, 46, 50, 55, 58, 60, 66, 71, 75-76, 78-79, 83, 85-87, 90, 93, 96, 100-02, 105-07, 110, 112-13, 115, 119, 121-22.

Though Toyobo also makes much of its disclosures regarding the properties of Zylon, and of its various disclaimers of warranty in its discussions with companies in the Zylon vest manufacturing chain, including the trading companies, weavers, and vest makers, Toyobo ignores the fact that nowhere does the Complaint allege that Toyobo or any of its co-conspirators shared this information with the United States. Doc. 14 at 6-9. While it is true that Toyobo made certain limited disclosures to *its customers* – the trading companies, weavers, and vest makers with whom it conspired to downplay any negative data and continue marketing, manufacturing, and selling Zylon fabric and vests – Toyobo did not share even the limited data with the end-use customers – the local, state, tribal and federal officers who were buying and wearing the vests. Id. at ¶¶ 75-90. These disclosures and disclaimers between members of the Zylon manufacturing

chain, all of whom had a monetary incentive to keep selling defective Zylon vests, bolster, rather than undercut, the United States' assertion that Toyobo was the leading actor in the scheme that culminated in the sale of Zylon vests to the United States. E.g., id. at ¶¶ 75-90 (recounting Toyobo's release of the November 26, 2001 data and subsequent withdrawal of same, after the reaction of and discussions with various companies in the manufacturing chain). More importantly, the Complaint alleges that Toyobo was aware of additional Zylon degradation data beyond that disclosed in the data it released; however, this data was designated as "Top Secret" and "Confidential" and was not disclosed. Id. at ¶ 87 ("During 2002 and 2003, Toyobo provided the bulletproof vest manufacturers with quarterly updates on its Zylon research that confirmed Zylon lost its tensile strength when exposed to heat and moisture. However, Toyobo did not provide other 'confidential' and 'top secret' Toyobo internal documents concerning Zylon research in its possession to the body armor manufacturers.").

Toyobo's Motion to Dismiss also injects and relies upon various disputed factual issues – arguing that the warranties attached to the vests were merely promises to "repair or replace" any defective vests and that the National Institute of Justice (NIJ) required only that the vests pass testing at the beginning of their life in order to be eligible for reimbursement. Doc. 14 at 17-20. Toyobo utilizes these assertions of contested fact to articulate its rather perplexing argument that, essentially, the vests did not have to work – that is, to stop bullets. Id. This argument is wrong as a matter of both fact and law, as discussed below.

Toyobo also misstates the specific wording of the warranties when it argues that they merely promised to repair or replace any defective vests. The documents attached to Toyobo's counsel's declaration appear to be current warranties (one copyrighted in 2007) and not the applicable warranties from the 1998 to 2005 time frame when the defective Zylon vests were

-7-

sold. Doc. 14, Ex. 12. For example, the warranty cards for the relevant time period from Armor

Holding, Inc. (and its subsidiaries, American Body Armor, Inc., Protech, and Safariland, Inc.),

which sold over $22 million in Zylon vests that were paid for with federal funds, warranted that

the ballistic pads were free from manufacturing defects and do not limit the warranty to repair or

replacement. See, e.g., Ex. 1. At a minimum, Toyobo's attached warranties raise factual issues

that are not appropriate for a motion to dismiss.

## III.
## TOYOBO'S MOTION TO DISMISS SHOULD BE DENIED

In evaluating Toyobo's Motion to Dismiss under Fed. R. Civ. Proc. 12(b)(6), the Court

"must construe the allegations and facts in the complaint in the light most favorable to the

plaintiff[.]' " Kowal, 16 F.3d at 1276. The Court must also "grant the plaintiff the benefit of all

inferences that can be derived from the facts alleged in the complaint." Id.

The Court's analysis on a motion to dismiss is to be very limited and "should look only

within the four corners of the complaint, and [the court] should accept the plaintiff's allegations

as true[.]" Marshall County Health Care Authority v. Shalala, 988 F.2d 1221, 1227-28 (D.C. Cir.

1993). Despite what has been referred to as a "narrow exception" to allow courts to take

"judicial notice of facts on the public record" to avoid unnecessary proceedings, id at 1228, the

general rule remains that courts should not consider "matters outside the pleadings" when

considering a motion to dismiss under Rule 12(b)(6). If matters outside the pleadings are

considered by the court, such as documentary evidence that does more than "merely restate what

is said in the pleadings," id., "the motion shall be treated as one for summary judgment . . . and

all parties shall be given reasonable opportunity to present all material made pertinent to such a

motion by Rule 56." Fed. R. Civ. P. 12(b).

The requirement in Fed. R. Civ. Proc. 9(b) that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity" Fed. R. Civ. P. 9(b), "normally means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." U.S. ex rel. Joseph v. Cannon, 642 F.2d 1373, 1385 (D.C. Cir. 1981). The D.C. Circuit has described the purpose of this rule as to "discourage the initiation of suits brought solely for their nuisance value, [to] safeguard potential defendants from frivolous accusations of moral turpitude, . . . [and to] guarantee all defendants sufficient information to allow for preparation of a response." Id. The D.C. Circuit has also affirmed that Rule 9(b) "should be harmonized with the general directives in . . . Rule 8 that the pleadings should contain 'a short and plain statement of the claim or defense' and that each averment should be 'simple, concise and direct." Id. As set forth below, the Complaint, with its 149 paragraphs of detailed allegations, clearly satisfies this requirement.

These principles are well-established, and were not in any way altered by the Supreme Court's recent decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), which agreed with a district court's decision to dismiss a complaint that "failed in toto to render plaintiffs' entitlement to relief plausible" and explicitly stated that "[i]n reaching this conclusion, we do not apply any 'heightened' pleading standard." Twombly, 127 S. Ct. 1955 at n.14. The Supreme Court in Twombly took issue with a plaintiff's complaint because it alleged "merely legal conclusions." Id. at 1970. Just two weeks after issuing the Twombly decision, the Supreme Court cited that very opinion for the well-established proposition that a complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007).

Toyobo's overstatement of the Court's holding in <u>Twombly</u> is an inappropriate attempt to induce the Court to rule upon the merits of the case at this early stage by accepting Toyobo's inappropriate assertions of contested fact.  The Court should reject Toyobo's attempts to obtain a ruling on ultimate and disputed factual issues under the auspices of a motion to dismiss.

**IV.**
**ARGUMENT**

Toyobo's Motion to Dismiss should be denied because the Complaint adequately states claims upon which relief can be granted under three separate provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1-3), as well as under the common law theories of fraud and unjust enrichment.  The Complaint also alleges the "circumstances constituting fraud" with sufficient detail and particularity to satisfy any requirement imposed by Fed. R. Civ. Proc. 9(b).

**A.      The Allegations in the Complaint State Claims under Sections 3729(a)(1) and 3729(a)(2) of the False Claims Act.**

Section 3729(a)(1) of the False Claims Act attaches liability to any entity that "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1).  The Complaint sufficiently alleges that (1) claims for payment were presented to the United States, (2) those claims for payment were false or fraudulent, (3) Toyobo caused them to be submitted, and (4) Toyobo knew that the claims were false.[3]

Section 3729(a)(2) of the False Claims Act attaches liability to any entity that "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3720(a)(2).  The Complaint adequately

---

[3]      The False Claims Act defines knowledge as (1) actual knowledge, (2) deliberate ignorance; or (3) reckless disregard of the falsity of the information.  31 U.S.C. § 3729(b).

alleges that (1) false statements were made or used to get the claims paid, (2) Toyobo caused the false statements to be made or used, and (3) Toyobo knew (as that term is defined in the False Claims Act) that the statements were false.

First, the Complaint details three separate methods by which "claims for payment" for the bulletproof vests at issue in this case were presented to the United States: through the General Services Administration Multiple Award Schedule (GSA-MAS) (Compl., ¶¶ 10-12), as requests for reimbursement from state, local and tribal authorities pursuant to the BPVGPA (id. at ¶¶ 13-15), and as direct contract purchases by federal agencies (id. at ¶¶ 16-17).

Second, the Complaint alleges a substantial number of particularized facts establishing that all of those claims for payment were "false or fraudulent." The Complaint alleges that each and every Zylon vest purchased by the United States or for which the United States provided reimbursement was "defective" because the Zylon in the vests degraded as a result of the weaving process (id. at ¶ 22), light exposure (id. at ¶ 30), over-neutralization which led to Red Thread (id. at ¶ 37), and most importantly, the impact of hydrolysis (id. at ¶ 49), and that the United States therefore was fraudulently billed directly and indirectly for a defective product that would not properly perform its function. Id. at ¶¶ 1, 22, 25, 30-31, 33, 36-37, 41-45, 49, 51-55, 60-63, 65-67, 69-73, 75, 80, 82, 87, 91-93, 96-100, 103, 110, 116-118, 126. The Complaint also alleges that the claims for payment for these Zylon vests stated that the vests were warranted to be free of manufacturing defects and that they would last for at least five years. The United States alleges that these warranty statements were all false. id. at ¶¶ 12, 15-16, 128.

The false statements also include a large collection of statements made by Toyobo to participants in the bulletproof vest manufacturing process designed to (1) downplay the problems with Zylon fiber – including the DSM failure announcement (id. at ¶¶ 55-56), the November

2001 degradation data regarding hydrolysis (id. at ¶¶ 79, 83, 85), and the Red Thread issue (id. at ¶¶ 96, 101, 112-13), (2) induce those companies to continue using Zylon in bulletproof vests, through, e.g., agreements to provide refunds, rebates and/or other special business arrangements (id. at ¶¶ 76, 78, 84, 104), and (3) encourage the growth of the American market for Zylon vests (id. at ¶¶ 102, 106, 122, 124). Likewise, the false statements alleged in the Complaint include the warranties attached to each and every bulletproof vest at issue in this case, stating that the vests were free from defect and would last for at least five years. Id. at ¶¶ 12, 15-16, 128.

Third, the Complaint alleges that Toyobo engaged in a variety of acts that "caused" the false statements and the false or fraudulent claims to be presented, and that Toyobo itself made false statements to get the claims paid. Toyobo was the sole manufacturer of Zylon, and the Complaint alleges that the reason that the vests were defective and the warranties false was entirely because the vests contained Zylon. Id. at ¶¶ 17-29. Also, the allegations detail Toyobo's extensive efforts to market Zylon for use in the American bulletproof vest market, even after securing initial partnerships with large vest manufacturers such as Second Chance and Point Blank, by pursuing additional relationships with other manufacturers, such as Safariland, Gator Hawk and PPI. Id. at ¶ 20, 34, 40, 86. In a very real sense, Toyobo caused the vests to be sold to the United States and local American law enforcement because it went to such great lengths to place its defective fiber into the stream of American commerce, and to keep it there in spite of Toyobo's ever-expanding knowledge about Zylon degradation. Id. at ¶¶ 18, 20-21, 23-24, 26, 29. Toyobo also took numerous steps encouraging bulletproof vest manufacturers and industrial weavers to continue selling Zylon vests and fabric despite the mounting evidence of the fiber's defective nature, including making false statements to those vest manufacturers, weavers, and others. Id. at ¶¶ 35, 38, 40, 41, 55-56, 58-61, 66, 76, 78, 83-87. For example, Toyobo "falsely

told Hexcel, as well as the American body armor manufacturers, that Toyobo had first

manufactured Zylon containing Red Thread in October 2002," when it had actually observed the

problem years earlier.  Id. at ¶ 41.  Indeed, Toyobo's outright misrepresentations regarding

Zylon's suitability for use in ballistic applications resulted in the application of false five-year

warranties.

      Fourth, Toyobo knew that the statements were false, and the claims for payment false or

fraudulent, because Toyobo possessed data revealing Zylon's defective nature as far back as 1998

at the very latest.  Id. at  ¶¶ 19, 22, 25, 30, 31.  From this point on, Toyobo waged a dogged

campaign to install Zylon in bulletproof vests sold to United States law enforcement personnel,

despite the proliferation of worsening data regarding the degradation of Zylon from numerous

causes, including the weaving process (id. at ¶ 22), light (id. at ¶ 30), heat, moisture and

hydrolysis (id. at ¶ 49), and over neutralization and Red Thread (id. at ¶ 37).  The Complaint

makes literally dozens of allegations about the huge amount of knowledge in Toyobo's

possession (as early as 1996) that Zylon was defective and inappropriate for use in bulletproof

materials.  Compl., ¶¶ 1, 22, 25, 30, 31, 33, 36, 37, 41-45, 49, 51, 52, 53-55, 60-63, 65-67, 69-73,

75, 80, 82, 87, 91-93, 96-100, 103, 110, 116-118, 126.  Despite this information, Toyobo

continued to promote the use of Zylon in vests which were targeted to sell to the United States

and state, local and tribal law enforcement agencies and failed to disclose the fact that the vests

would not satisfy their five-year warranty.  Compl., ¶¶ 12, 15, 16.  Contrary to Toyobo's

argument, the Complaint alleges more than "mere knowledge of a [false] claim with nothing

more[.]"  Doc. 14 at 25.  Rather, the United States alleged the various steps taken by Toyobo to

promote the sale of Zylon for bulletproof vests.  Compl., ¶¶ 20-21, 23-24, 26-29, 34-35, 38, 55-

56, 76, 78-79, 83, 85-86, 96, 101, 104, 112-13, 122.

### 1.     Toyobo Cannot Claim that It Made Full Disclosure To the Government

Toyobo claims that its disclosure of some Zylon degradation information to selected participants in the body armor industry precludes an allegation that it caused submission of a false claim.  The cases cited by Toyobo do not support its position that the knowledge requirement has not been met.  Doc. 14 at 22-25.  In U.S. ex rel. Butler v. Hughes Helicopters, Inc., for example, the Ninth Circuit concluded that "if the district court found that the only reasonable conclusion a jury could draw from the evidence was that [the defendant] and the Army has so completely cooperated and shared all information during the testing," then the defendant did not "knowingly" present false claims.  71 F.3d 321, 327 (9th Cir. 1995) (emphasis added).  Likewise, in X Corp. v. Doe, the defendants expressly "disclosed to the Government" that the supplied computer equipment might contain re-manufactured equipment.  816 F. Supp. 1086, 1093 (E.D. Va. 1993), citing as dicta U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp., 985 F.2d 1148, 1157 (2nd Cir. 1993) ("[t]he fact that a contractor fully disclosed all information to the Government may show that the contractor has not 'knowingly' submitted a false claim, that is, that it did not act with 'deliberate ignorance' or 'reckless disregard for the truth'") (emphasis added).  Certainly, Toyobo's partial disclosure of limited information, while retaining the confidentiality of the worst Zylon degradation evidence, does not meet the standards articulated by Toyobo's cases.

### 2.     The United States Has Alleged More Than Mere Knowledge Against Toyobo

Toyobo contends that the Complaint alleges "mere knowledge and nothing more" by Toyobo of the falsity of the body armor manufacturers' false claims.  Doc. 14 at 25-26.  However, the United States alleges at great length Toyobo's involvement in the scheme to sell defective bulletproof vests.  See, page 5, supra.

The United States' allegations are different in kind from the cases cited by Toyobo. For example, in U.S. ex rel. Piacentile v. Wolk, Civ. A 93-5773, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995), cited by Toyobo at page 25, the court dismissed the United States' claims against one shareholder defendant, where the sole allegation against the shareholder was that he knew the company was falsifying certificates of medical necessity and destroying documents. The United States made no allegation that the shareholder participated in these acts. The court said that there must be "some action" on the part of the shareholder in order for him to be liable. Id.

The United States has sufficiently alleged such action on the part of Toyobo.[4] As this Court stated in U.S. ex rel. Long v. SCS Business & Technical Institute, 999 F. Supp. 78, 90-91 (D.D.C. 1998), reversed on other grounds by 173 F.3d 870 (D.C. Cir. 1999):

> The FCA reaches anyone who knowingly participates in causing the federal government to pay a false claim. See U.S. ex rel. Marcus v. Hess, 317 U.S. at 544-45; S. Rep. 99-345, at 9, 1986 U.S. Code Cong. & Admin. News 5266 ("The False Claims Act is intended to reach all fraudulent attempts to cause the Government to pay out sums of money...."). Thus, for example, the FCA reaches subcontractors who cause general contractors to present false claims. See U.S. v. Bornstein, 423 U.S. at 309. The FCA has been held to reach conduct which results in a loss to the government, even though the defendant did not "make an actual demand for the money." U.S. v. McLeod, 721 F.2d 282, 284 (9th Cir.1983) (holding that a defendant who converted and refused to return money, resulting in a financial loss to the government, was sufficient to invoke the FCA). The FCA has also been held to reach the operating policy of a defendant which caused others to present false claims to the government. U.S. v. Teeven, 862 F. Supp. 1200, 1223 (D. Del.1992) (holding that defendants, whose policy to withhold refunds due to students resulted in inflated default claims to the government, were

---

[4]    The other cases cited by Toyobo are no more supportive of its "mere knowledge" argument. See also  U.S. ex rel. Camillo v. Ancilla Sys., Inc., No. 03-CV-0024-DRH, 2005 WL 1669833 (S.D. Ill. July 18, 2005) (the relator in a declined qui tam action alleged that the parent company knew that one of its subsidiary hospitals was submitting false claims because the parent company set up the billing procedures); U.S. ex rel. Shaver v. Lucas Western Corp., 237 F.3d 932 (8th Cir. 2001) (a pro se relator in a declined qui tam sued his former employer for not paying his medical bills as worker's compensation, "knowing" that the relator would submit those bills to Medicare).

liable under the FCA because the "[d]efendants knowingly assisted in causing the Government to pay claims which were grounded in fraud."). Thus, in broad terms, the FCA reaches all parties who "engage[] in a fraudulent course of conduct that causes the government to pay a claim for money." <u>U.S. v. Incorporated Village of Island Park</u>, 888 F. Supp. 419, 439 (E.D.N.Y.1995).

The <u>Long</u> Court went on to state that the operative issue was whether the defendant's "alleged failure to act was a course of conduct that allowed fraudulent claims to be presented to the federal government." <u>Id.</u> at 91.  In the instant case, the United States has alleged a course of conduct by Toyobo, consisting of affirmative actions including the testing, sale and marketing of its defective product, which resulted in false or fraudulent claims being presented to the Government.  Accordingly, Toyobo's argument regarding its "mere knowledge" of false claims should be rejected.  <u>See</u> <u>U.S. ex rel. Roby v. The Boeing Company</u>, 184 F.R.D. 107, 111 (S.D. Ohio 1998).

### 3.  Toyobo Incorrectly Argues that FCA Liability Does Not Attach to Vests Purchased Pursuant to the Bullet Proof Vest Grant Partnership Act.

Toyobo incorrectly asserts in its Motion to Dismiss that the Complaint fails to state a claim upon which relief can be granted under the False Claims Act with respect to the reimbursement provided by the United States to state, local and tribal authorities for their purchase of defective Zylon vests. Doc. 14 at 12-16.  Toyobo essentially argues that it could not have possibly caused false or fraudulent claims to be presented, or made false statements to get those claims paid, because all of the vests for which reimbursement was provided were "certified" by the NIJ (<u>id.</u> at 12), a requirement that Toyobo describes as the "*only* condition that a local, state, or tribal law enforcement agency must [meet] in order to qualify for reimbursement." <u>Id</u>.  Under Toyobo's logic, a contractor can escape liability under the False Claims Act for providing a defective life-and-death product, that the contractor knows will

-16-

rapidly degrade to dangerous levels, so long as that product "works" on the first day of its life (and consequently is granted NIJ approval). Toyobo's logic is absurd.

First, the Complaint alleges that each and every vest sold to local, state, and tribal authorities, and for which reimbursement was provided by the United States under the BPVGPA, was defective because it contained Toyobo's defective Zylon material that was not fit for ballistic use. Additionally, each of these vests carried a five-year warranty that was, as alleged in the Complaint, false. Given that the state, local and tribal law enforcement agencies did not get what they paid for because the vests did not meet the five-year warranties, then the federal Government also did not get what it paid for when it partially reimbursed these agencies for their vests. The fact that the body armor manufacturers had their vests tested in accordance with the NIJ voluntary certification program does not change the fact that the United States paid money as reimbursement for a product that the manufacturers knew was defective and knew did not meet their five-year warranties. Nor does this testing immunize from liability those who caused the vests to be defective or to fail to comply with the five-year warranties.

Toyobo misunderstands the broad reach of Section 3729(a)(1) of the False Claims Act, which attaches liability to an entity like Toyobo that "causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). The False Claims Act grants the United States a right of recovery in situations like this, where false or fraudulent claims are presented to state, local and tribal authorities in a grant relationship that involves reimbursement by the United States. The statute defines the term "claim" in a very inclusive way to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or

-17-

property which is requested or demanded, or if the Government will reimburse such contractor,

grantee, or other recipient . . .".  31 U.S.C. § 3729(c) (emphasis added).

A false certification, whether implied or express, is not an element of a violation under 31

U.S.C. 3729(a)(1).  See, e.g., U.S. ex rel. Lee v. SmithKline Beecham Corp., 2001 WL 310945,

*4 (9th Cir. 2001) ("Neither false certification nor a showing of government reliance on false

certification for payment need be proven if the fraud claim asserts fraud in the provision of goods

and services").  Even where there is nothing false on the face of a claim submitted to the

government, courts have repeatedly stated that the withholding of "information critical to the

decision to pay is the essence of a false claim."  U.S. v. TDC Mgmt. Corp., Inc., 288 F.3d 421,

426 (D.C. Cir. 2002) (citation omitted).  The sequence of events laid out in the Complaint shows,

over a period years, the myriad ways in which Toyobo's statements, omissions, and conduct

withheld critical information – namely, that Zylon fiber was defective and unfit for use in

bulletproof vests.

When federal funds are used to procure a commercial item like a bulletproof vest, the

supplier must conform to its own commercial requirements.  See generally U.S. ex rel.

Guadalupe v. Goodyear Tire & Rubber Co., No. 5:01 CV 2007, 2005 WL 1324977 (N.D. Ohio

June 3, 2005) (military purchase of tires as commercial item).  To the extent that the BPVGPA

required that the vests be tested and certified by the NIJ, that requirement would be in addition to

the requirement that the sale of the vests not involve fraud or knowingly false claims.  Because

the vests were defective and failed to comply with their warranties, the United States did not get

what it paid for when it partially reimbursed the state, local and tribal law enforcement agencies

for their vests, and suffered a cognizable loss under the False Claims Act.  See U.S. v. Neifert-

White Co., 390 U.S. 228, 233 (1968) ("[t]his remedial statute reaches beyond "claims" which

-18-

might be legally enforced, to <u>all fraudulent attempts to cause the Government to pay out sums of money</u>") (emphasis added).

<u>Second</u>, Toyobo ignores that the United States has alleged a claim under Section 3729(a)(2) of the False Claims Act, which specifically attaches liability not to a false claim for payment itself, but to a party who "makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).  The Complaint alleges in great detail the ways that Toyobo <u>made</u> false statements that were designed to get the United States to pay for defective Zylon vests, and caused others to make false statements to sell the vests, such as the five-year warranties and Toyobo's various statements about the suitability of Zylon for use in ballistic applications.  Compl., ¶¶ 20, 48, 55-56, 58-60, 66-67, 79, 83, 92, 96, 105-06, 109, 112-13, 119.

<u>Third</u>, false statements made to recipients of federal funds, such as the state, local, and tribal law enforcement authorities at issue in this case, create liability to the United States under Section 3729(a)(2) of the False Claims Act.  Section 3729(a)(2) does not require that the false statement be made directly to the United States; unlike Section 3729(a)(1), there is no requirement that anything be "presented" to the United States Government at all, so long as the false statement was made to a recipient of federal funds get the United States to pay a false or fraudulent claim.[5]  <u>See U.S. ex rel. Sanders v. Allison Engine Co., Inc.</u>, 471 F.3d 610 (6th Cir.

_____

[5]        Though the D.C. Circuit Court of Appeals held in <u>U.S. ex rel. Totten v. Bombardier Corp.</u>,380  F.3d 488 (D.C. Cir. 2004) that Section 3729(a)(2) requires direct presentation of the underlying claim for payment to the United States, <u>see Totten</u>, 380 F.3d at 498-502, the United States respectfully suggests that(1) claims here were presented to the United States, and (2) the <u>Totten</u> decision was wrongly decided, and additionally notes that the Supreme Court recently granted *certiorari* in <u>Allison Engine Co., Inc. v. U.S. ex rel. Sanders</u>, No. 07-214, a case which puts this very issue directly before the Supreme Court this term.  If the Supreme Court reverses <u>Totten</u> on this issue, this will be yet another reason why the claims to the

2006), *cert. granted*, 128 S. Ct. 491 (2007).

Unlike the cases cited by Toyobo, the claims and statements at issue here were not at all "literally true," U.S. ex rel. Milam v. Regents of the Univ. of Cal., 912 F. Supp. 868, 883 (D. Md. 1995) (relator in a declined *qui tam* action sued a research university for its reliance on scientific studies and articles in its grant applications, which she considered to be inaccurate; university had no obligation to disclose the retraction of research), nor did the claims for payment for defective bulletproof vests satisfy contractual obligations, U.S. ex rel. Lindenthal v. General Dynamics Corp., 61 F.3d 1402, 1412 (9th Cir. 1995).  In Lindenthal, there was no evidence that the defendant made any warranties or representations beyond the contractual requirements about the technical drawings it submitted under a contract for a radar system or that the product was inherently defective separate and apart from their failure to comply with the contractual requirements.  In the present case, by contrast, the Complaint alleges that the Zylon vests were inherently defective and unfit for the purpose for which they were sold – to stop a bullet.  For this reason, the other cases cited by Toyobo are similarly inapposite, since there were no allegations that the underlying product was defective separate and apart from the defendant's failure to comply with certain contractual or regulatory requirements.[6]

_____

BPVGPA are false.

[6]    See U.S. ex rel. Glass v. Medtronic, Inc., 957 F.2d 605, 608 (8th Cir. 1992) (the relator in a declined *qui tam* alleged that the defendant was responsible for him filing false claims when the defendant told the relator to submit his medical bills for the removal of his defective pacemaker to Medicare; however, the governing statute expressly permitted reimbursement for the removal of defective medical devices); U.S. ex rel. Hochman v. Nackman, 145 F.3d 1069, 1074 (9th Cir. 1998) (affirming summary judgment for the defendant in a declined *qui tam* action where the defendant hospital paid a doctor at a bonus authorized under Scare Speciality Pay because there was no evidence that the hospital knew that the bonus was not authorized because the doctor did not spend most of his time caring for patients); U.S. ex rel. Joslin v. Community Home Health of Md., Inc., 984 F. Supp. 374, 379 (D. Md. 1997) (where the defendant was in

**4.      Toyobo Incorrectly Argues that FCA Liability Does Not Attach to Direct Purchases because "No False Claim was Submitted in Connection with the Sale of these Vests."**

Toyobo also incorrectly asserts that the Complaint fails to state a claim upon which relief can be granted under the False Claims Act with respect to direct purchases of defective Zylon vests made by federal agencies because either (a) the warranties attached to the vests did not, in Toyobo's words, "guarantee future performance," or (b) any alleged false statement was "immaterial" to the United States' decision to purchase the vests. Doc. 14 at 19-20. Toyobo's arguments should be rejected for several reasons.

First, the Complaint alleges that the claims for payment were false or fraudulent because the Zylon vests contained a latent defect that rendered them inherently unsuitable as body armor and, thus, were defective. Compl., ¶¶ 1, 22, 25, 30, 31, 33, 36-37, 41-45, 49, 51-55, 60-63, 65-67, 69-73, 75, 80, 82, 87, 91-93, 96-100, 103, 110, 116-118, 126. In other words, the five-year warranty is not the only basis of False Claims Act liability alleged in the Complaint. The false and fraudulent nature of these claims for payment is exacerbated by the fact that bulletproof vests are life-and-death products purchased by the taxpayers to safeguard their law enforcement personnel. Toyobo's obstinate contention that "the United States never identifies anywhere in its Complaint a single vest that it contends was defective during its warranty period," Doc. 14 at 19, is blind to the substance of the Complaint. To the contrary, the Complaint clearly alleges that all of the Zylon vests were defective (id. at ¶¶ 12, 15-16) precisely because they contained Toyobo's defective Zylon which was not suitable for use in body armor. Given this latent defect, Toyobo's

---

compliance with the previous and later repealed state home health licensure laws, his representations of such compliance to the federal government did not violate the FCA because there was no evidence that the license itself had been revoked).

suggestion that it was somehow immune from liability by the fact that the vest manufacturer limited any warranty to "repair and replacement" of the vests would be comical, were it not for the dire consequences of Toyobo's concealment and the human stakes with which they were playing.

Second, the Complaint alleges that the Zylon vests were falsely warranted to be free of manufacturing defects and last for at least five years. Id. at ¶¶ 12, 15-16, 128.  The Complaint makes the specific allegation that the claims for payment for the direct purchases were "false claims in that the Zylon in those vests was defective and degraded substantially and quickly and, thus, did not meet their five-year warranty." Id. at ¶¶ 12, 16.

Toyobo's argument that the warranties placed on the vests were "repair or replace warranties" that did not guarantee the performance of the vests into the future improperly relies on "facts" that are outside the four corners of the Complaint. Doc. 14 at 17-20.  If Toyobo disputes the veracity of the facts alleged in the Complaint, it can and should deny the allegations and this case should proceed to discovery.  The introduction of "matters outside the pleadings" is inappropriate here, especially when Toyobo has eschewed the idea that it intends its motion to be treated as one for summary judgment (in which case the United States "shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56," Fed. R. Civ. P. 12(b)).

In any event, Toyobo's representations that the warranties attached to the Zylon vests were merely "repair or replace warranties" is factually incorrect.  One of the warranties that Toyobo attaches as an exhibit to its Motion to Dismiss appears to be from 2007, years after any of the violations alleged in this case. Doc. 14, Ex. 12.  The other warranty provided by Toyobo states that the vest is "warranted to provide protection as stated on the protective panel label and

-22-

to be free of defects in material and workmanship for the applicable warranty period." Doc. 14, Ex. 13. Though the United States has no obligation at all to present <u>evidence</u> here in support of its allegations, the United States respectfully provides for the Court examples of warranties attached to vests at issue in this case that expressly warrant that the vest is free of manufacturing defects and would last for at least five years. Exs. 1 & 2.

More importantly, even if the warranties promised only to repair or replace vests, such a promise does not preclude an additional guarantee of fitness for future use on the part of the manufacturer. The cases that Toyobo cites in support of its "repair or replace" argument actually show that the warranties provided with the Zylon vests were <u>not</u> limited to merely promises to "repair or replace." Doc. 14 at 18. In <u>Allstate Ins. Co. v. General Motors Corp.</u>, No. PD-04-12393, 2005 WL 264276 (Minn. D. Ct., Jan. 24, 2005) (cited by Toyobo at p. 18), the Court analyzed a warranty which stated that the manufacturer "warrants . . . that each new [product] shall be free from any defect in material or workmanship[.]" The Court concluded that such language guaranteed future performance. <u>Id</u>. at *4. A guarantee that a product was free from material or workmanship defects for a period of time, like the warranties at issue in this case, "explicitly extends to future performance." <u>Id</u>. <u>Accord</u> <u>Joswick v. Chesapeake Mobile Homes, Inc.</u>, 747 A.2d 214, 218 (Md. App. 2000), <u>aff'd</u> 765 A.2d 90 (Md. 2001); <u>Ontario Hydro v. Zallea Sys., Inc.</u>, 569 F.Supp. 1261, 1266 (D.Del. 1983) (with a warranty of future performance, "the buyer is relying on the warranty as a guarantee of future performance and therefore has no opportunity to discover the breach until the future performance has been tested."). A bulletproof vest is a life-and-death product, and the purchaser expects not just to be able to replace a defective vest, but that the vest will generally be defect-free during the warranty period. If a vest turns out to be defective, the wearer may not survive long enough to seek "repair or

-23-

replacement" of the defective product.

Consequently, Toyobo is wrong to argue that demonstrating the falsity of the warranties would require the United States to prove that "the manufacturer had no intention of honoring the warranty at the time it was made." Doc. 14 at 19-20. Rather, the allegation is (and the evidence will prove) that the warranties were false because the vests were indeed defective and would not last for five years.

Third, Toyobo is flat wrong to argue that "the allegations in the Complaint show that [the allegedly false statements] were immaterial to the United States' decision to purchase Zylon vests[.]" Doc. 14 at 21. Toyobo makes the perplexing and incorrect statement in support of this argument that "the United States admits in its Complaint that it continued to purchase vests until 2005, well *after* it was presented with *all of the* information regarding degradation of Zylon." Id. (emphasis in original). While the United States continued to purchase Zylon vests until 2005, Toyobo is absolutely incorrect to state that the Complaint contains even one single allegation that the United States possessed all of the information regarding degradation of Zylon at that time. Id. The Complaint contains no such statement. Toyobo fails to point to any statement in (or even outside of ) the Complaint in support of this proposition. Doc. 14 at 21. Instead, Toyobo relies on its own farfetched interpretation of a straightforward complaint, and exhorts this Court to do the same.

In reality, the Complaint sufficiently alleges facts in support of any "materiality" requirement contained in the False Claims Act. To the extent that the False Claims Act requires proof of a materiality requirement, the case law is clear that whether a false claim or statement is "material" depends upon "whether the false [claim or] statement has a natural tendency to influence agency action or is capable of influencing agency action." U.S. ex rel. Berge v. Board

-24-

of Trustees of Univ. of Ala., 104 F.3d 1453, 1459 (4th Cir. 1997) (reversing judgment in favor of

plaintiff in part because "no reasonable jury could possibly conclude" that the "NIH's decision-

making would have been influenced by [the false statements]"). U.S. ex rel. Ervin v. The

Hamilton Securities Group, Inc., No. 96-CV-1258 (D.D.C. Jan. 25, 2005) (materiality of a false

record or statement is an element of False Claims Act liability) (attached as Ex. 5).

 The facts alleged in the Complaint, along with "all inferences that can be derived" from

them, MCI, 16 F.3d at 1276, establish that whether a bulletproof vest (intended to protect the life

of a law enforcement officer) actually works and will protect the officer throughout the life of its

warranty, is exactly the sort of information that "has a natural tendency" to influence agency

action. The Complaint also specifically alleges that when the NIJ tested used Zylon vests, "the

bulk of the Zylon vests failed the testing – 58% had at least one penetration and 91% had

excessive backface deformation. Following that report, all manufacturers stopped using Zylon."

Compl., ¶ 126. Toyobo's assertion that information showing that a bulletproof vest is defective

is not the sort of information that is capable of influencing the decision to purchase the vest is

absurd.

 The allegations in the Complaint are radically different from the facts at issue in cases

like U.S. ex rel. Lamers v. City of Green Bay, 168 F.3d 1013 (7th Cir. 1999), cited by Toyobo.

The defective nature of a life-and-death product like a bulletproof vest is material and is a far cry

from the city of Green Bay's "immaterial" representations about whether schoolchildren will be

transported on public buses or on exclusively private buses. Id. at 1019. Nor is this case

analogous to those cases cited by Toyobo where the Government was fully aware of the pertinent

facts.[7]  Here, the Complaint clearly alleges that neither Toyobo nor any of the other participants

in this fraud were forthcoming to the Government about the defects in the Zylon vests.

### 5.    Toyobo Incorrectly Argues that any "Causation" Requirement in the False Claims Act is not Adequately Pled in the Complaint.

Toyobo is also wrong to argue that the Complaint should be dismissed because it does not

plead facts "sufficient to show that Toyobo knowingly caused any of the Vest Manufacturers to

place a five-year warranty on any of their vests" or that the "allegations in the Complaint"

somehow "directly contradict this claim."  Doc. 14 at 22.  Toyobo also incorrectly asserts that the

United States' allegations about "causation" fail to satisfy the pleading requirements of Fed. R.

Civ. Proc. 9(b).  Rather, the standard for causation under the False Claims Act is whether the

defendant's conduct was a substantial factor in causing the false claim to be submitted.  See, U.S.

ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 244-245 (3rd Cir. 2004) ("assuming that a jury

were to conclude that Zimmer's marketing scheme was a substantial factor in bringing about

Mercy's filing and that Mercy's filing was a normal consequence of the situation created by that

scheme, Zimmer could be found to have caused, and thus be held responsible for, that filing.");

U.S. ex rel. Franklin v. Parke-Davis, 147 F. Supp.2d 39, 52 -53 (D. Mass. 2001) (holding that

relator had adequately stated a claim alleging "causation" because "when all reasonable

_____

[7]     See U.S. ex rel. Bennett v. Genetics & IVF Inst., Inc., 199 F.3d 1328 (table), No. 98-2119, 1999 WL 978881 (4th Cir. 1999) (affirming grant of summary judgment against the relator where the government "was aware from the inception of the contract" that the defendant was not complying with the terms of the contract and was only testing one vial of blood from each paternity candidate); U.S. ex rel. Costner v. URS Consultants, Inc., 317 F.3d 883 (8th Cir. 2003) (in a declined qui tam, not only did the defendants disclose the problems at the Superfund site, "the EPA worked with the defendants to resolve problems as they arose"); U.S. ex rel. Stebner v. Stewart & Stevenson Servs., Inc., 305 F. Supp.2d 694, 701 (S.D. Tex. 2004) (in a declined qui tam, the relator's allegations of falsity were not material where the defects had been disclosed to the government and the defendant offered an additional ten-year warranty to induce the government's acceptance of the non-conforming goods).

inferences are drawn in favor of the Relator, the participation of doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of the alleged scheme of fraud"). Thus, Toyobo's Zylon and its conduct in promoting it for ballistic use were substantial factor in causing the false claims in this case.

First, Toyobo did cause the false warranties to be made by manipulating and downplaying the problems with Zylon. See pages 12, 30 & 34.

Second, liability under the False Claims Act does not require the United States to prove, or even plead, that Toyobo caused the vest manufacturers to place a five-year warranty on their vests. Rather, the United States must only plead that Toyobo "caused . . . a false or fraudulent claim" to be presented to the United States, 31 U.S.C. § 3729(a)(1), or that Toyobo "ma[de], use[d], or cause[d] to be ma[de] or use[d], a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). The United States has so pled in its Complaint that because the Zylon vests were defective, the claims to the United States for these vests were false. The United States has further alleged that Toyobo caused these false claims by actively marketing Zylon and misrepresenting its fitness for use in ballistic body armor.

Additionally, the allegations that the claims were false or fraudulent are not at all limited to the five-year warranty; the Complaint alleges that each and every Zylon vest was "defective" and that, as a result, the United States was fraudulently billed for a defective product that would not properly perform its function. Id. at ¶¶ 1, 22, 25, 30-31, 33, 36-37, 41-45, 49, 51-55, 60-63, 65-67, 69-73, 75, 80, 82, 87, 91-93, 96-100, 103, 110, 116-118, 126.

Toyobo caused these false or fraudulent claims to be presented because Toyobo actively encouraged bulletproof vest manufacturers to continue selling Zylon vests despite ever-mounting

-27-

evidence of its defective nature.  Compl., ¶¶ 35, 38, 40-41, 55-56, 58-61, 66, 76, 78, 83-87.  For

example, after the discovery of the weakened Red Thread at Hexcel's weaving facility, Toyobo

was determined to restart Hexcel's production (which had temporarily ceased, due to Hexcel's

concerns), Compl., ¶ 102, even as the companies considered a recall of all Zylon vests – which

Toyobo wanted to avoid.  Compl., ¶ 106.  Even though the question of Red Thread's impact on

Zylon degradation "remained unanswered," Compl., ¶ 111, Toyobo, Itochu and Hexcel

representatives held meetings with armor manufacturers "to convince [them] to continue buying

Toyobo's Zylon that had been woven by Hexcel."  Compl., ¶112.  Even in these meetings,

Toyobo's agents (Itochu and Hexcel) made intentional omissions regarding overneutralization

during a specific time period.  Id.  Toyobo's official statement on the issue likewise falsely

represented how long the problem had been occurring.  Compl., ¶ 113.

　　　None of these events restrained Toyobo, in March 2004, from telling Lincoln Fabrics, a

company that wove the Zylon fiber into a fabric, that it "continued to believe that Zylon was

entirely 'suitable' for use in ballistic applications. . . ."  Compl., ¶ 122.  Moreover, Toyobo

agreed, with Lincoln Fabrics, to a commercial arrangement in which Lincoln would accept the

delivery of "Red Thread" Zylon that was even weaker than ordinary Zylon.  Compl., ¶ 124.

Toyobo also entered into commercial arrangements with entities like the trading company Itochu

and the industrial weaver Hexcel Corp. designed to protect Hexcel financially in the event that its

customers discovered the degradation problem and stopped purchasing Zylon.  Compl., ¶¶ 76,

104.  The Complaint alleges numerous meetings between Toyobo and other participants in the

Zylon vest manufacturing process to discuss continued sale of Zylon vests.  Compl., ¶¶ 85, 86,

90, 99, 105-107, 110, 112, 119, 134-36.

　　　Third, Toyobo is liable not only because it caused false statements but because it made

false statements itself to get false claims paid.  The Complaint alleges a large collection of false statements made directly by Toyobo to participants in the bulletproof vest manufacturing process designed to downplay the problems with Zylon fiber, and to induce those companies to continue using Zylon in bulletproof vests.  Compl., ¶¶ 55-56, 58, 60-61, 66, 73-74, 76-78, 83, 85-87, 89-90, 92-93, 99-101.  One example of these false statements is Toyobo's disingenuous withdrawal of the November 2001 Zylon degradation data, purportedly after deciding that it was "statistically not correct and not reliable," but in reality, because it caused extreme concern among the weavers and body armor companies, including the Zylon Crisis Meeting.  Id. at ¶¶ 75-90.  Toyobo employed similar tactics in managing and minimizing the Red Thread problems discovered by Zylon weavers in May 2003 but long known to Toyobo since 1999.  Id. at  ¶¶ 37, 42, 91-126. These false statements independently support liability against Toyobo.

The Complaint does not merely allege that "Toyobo created some of the circumstances which led the Vest Manufacturers to place five-year warranties on their vests."  Doc. 14 at 25. Toyobo played a leading role in encouraging the use of its Zylon in the bulletproof vests, despite its knowledge of the defective nature of the material.  Thus, Toyobo can fairly be said to have contributed substantially to the sale of the defective vests to American law enforcement officers.

**B.    The Complaint Complies With Fed. R. Civ. Proc. 9(b)**

For the same reasons, the Complaint clearly satisfied the requirement in Fed. R. Civ. Proc. 9(b) "the circumstances constituting fraud or mistake shall be stated with particularity." The United States has reasonably and "adequately pleaded the time, place, and contents of the allegedly false representations and claims."  Allen v. Beta Constr., 309 F. Supp. 2d 42, 47 (D.D.C. 2004).  The 149-paragraphs of detailed allegations in the Complaint make it clear that Toyobo "cannot credibly argue that they are not now on notice of the charges against them."  Id.

Specifically, the Complaint sets forth ample enumerations of Toyobo's role in virtually every aspect of the marketing, design and manufacturing process which resulted in the creation and sale of Zylon bulletproof vests, as well as the meetings and discussions that occurred between Toyobo and the various other participants in this process.

A defendant is not entitled at the pleading stage to know every detail or piece of evidence that will be offered against it. See, e.g., Ballot v. General Electric Co., 393 F.2d 398, 399 (1st Cir. 1968); Hokama v. E.F. Hutton & Co., 566 F. Supp. 636, 645 (C.D. Cal. 1983) ("Rule 9(b) does not require nor make legitimate the pleading of detailed evidentiary matter."); Condor Am., Inc. v. American Power Dev'l. Inc., 128 F.R.D. 229, 232 (S.D. Ohio 1989) ("Plaintiff need only plead the circumstances of the fraud with particularity, not the evidence of fraud"). Moreover, "Rule 9(b) does not require plaintiff to allege every fact pertaining to every instance of fraud when a scheme spans several years." U.S. ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1259 (D.C. Cir. 2004). Where, as here, the United States has alleged Toyobo's involvement in the fraudulent scheme and the claims at issue in detail, no more is required.

Toyobo's reliance on the decision of the Eleventh Circuit in U.S. ex rel. Clausen v. Laboratory Corp. of Am., Inc., 290 F.3d 1301, 1308 (11th Cir. 2002), to support its claim that the United States did not plead causation, is contrary to the law of this Court. Doc. 14 at 23. In U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 258, 268-69 (D.D.C. 2002), this Court concluded that Clausen's pleading requirements for False Claims Act claims were too strict:

> The Clausen dissent criticizes the majority for focusing too much on "particularity" and not enough on the purpose of the rule, which is to give defendants notice of the claims against them. . . . This Court agrees with the dissent, and believes that if the D.C. Circuit were to consider Clausen it would come to the same conclusion. The D.C. Circuit has taken a generous approach to pleadings. This approach is

-30-

exemplified in <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111 (D.C. Cir. 2000), which holds that a complaint is not deficient even if it fails to set out a prima facie case as an initial matter. <u>Sparrow</u>, 216 F.3d at 1113, 1114. While <u>Sparrow</u> notes that Rule 9(b) requires more particularity than Rule 8, which governed <u>Sparrow</u>, <u>id.</u> at 1118, Rule 9(b) does not completely vitiate the liberality of Rule 8. <u>See</u> <u>U.S. ex rel. Joseph v. Cannon</u>, 642 F.2d 1373, 1385-86 (D.C. Cir.1981).

In any event, even if <u>Clausen</u> was the applicable law, the United States' detailed Complaint clearly satisfies it.

## C.    Conspiracy to Submit False Claims to the United States

Toyobo's Motion to Dismiss should also be denied with respect to the claim brought under Section 3729(a)(3) of the False Claims Act, which makes liable any party that "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). The Complaint is replete with allegations that Toyobo conspired with other participants in the bulletproof vest manufacturing to get the United States to purchase Zylon vests, despite all of the manufacturing parties' knowledge that the Zylon was defective.

The Complaint alleges with sufficient particularity each of the elements that this Court has required to state a claim under Section 3729(a)(3): (1) that the defendant knowingly conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States; (2) that one or more of the conspirators performed an act to have such a claim paid by the United States; and (3) that the United States suffered damages as a result of the false or fraudulent claim." <u>U.S. v. Bouchey</u>, 860 F. Supp. 890, 893-94 (D.D.C. 1994); <u>accord</u> <u>U.S. ex rel.</u> <u>Wilkins v. Ohio</u>, 885 F. Supp. 1055, 1059 (S.D. Ohio 1995). A claim under Section 3729(a)(3) need not allege that the defendant acted with specific intent to defraud, but only that the

defendant conspired to defraud the Government by getting a false or fraudulent claim paid.[8]  See, e.g., Murray & Sorensen, Inc. v. U.S., 207 F.2d 119, 122-24 (1st Cir. 1953) (finding FCA conspiracy liability even though defendants had not acted "deliberate[ly]"); U.S. ex rel. Augustine v. Century Health Servs., Inc., 136 F. Supp. 2d 876, 887-888 (M.D. Tenn. 2000), aff'd, 289 F.3d 409 (6th Cir. 2002).

Toyobo incorrectly argues that the United States' allegations about the existence of a conspiracy to defraud are "wholly conclusory" and "purely speculative" because they "do not indicate any agreement" and fail to allege "how and when the alleged conspiracy arose, who entered into it, or what act was committed in furtherance of it."  Doc. 14 at 26-30.  Toyobo urges the Court to dismiss the claim under Section 3729(a)(3) because the allegations that Toyobo shared some information about the defective nature of Zylon with its co-conspirators (Doc. 14 at 29-30) is contrary to establishment an intent to defraud.  Neither of Toyobo's arguments have any merit.

_____

[8]      Toyobo argues that the United States must establish intent to defraud in order to state a conspiracy claim (Doc. 14 at 29), citing U.S. ex rel. Johnson v. Shell Oil Co., 183 F.R.D. 204, 208 (E.D. Tex. 1998) and U.S. ex rel. Sikkenga v. Regence BlueCross/BlueShield of Utah, No. 99 CV 86K, 2001 U.S. Dist. LEXIS 25717, at *18 (D. Utah, Nov. 27, 2001).  However, this Court in Bouchey did not include intent to defraud as an element of a conspiracy claim under the False Claims Act.  This conclusion is consistent with the general provision of the False Claims Act, 31 U.S.C. § 3729(b), which states that "no proof of specific intent to defraud is required."  Of course, had Toyobo any controlling authority requiring intent to defraud, it would have cited it.  Toyobo's reliance on Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1056-57 (8th Cir. 2002), underscores the dearth of authority that supports Toyobo's position.  In the court's twenty-three page opinion, which primarily addresses issues of original source under the False Claims Act in a declined qui tam, the court in one paragraph at the end of the opinion agreed with the district court's determination that there was no conspiracy.  Id. at 1057.  The court noted that the plaintiff had limited its attack on that holding to a footnote and had presented no evidence for reversal.  The court provided no citation to, let alone analysis of, the law applicable to conspiracy nor of any evidence submitted by the plaintiffs.  Id.  Toyobo now asks this Court to rely upon that cursory discussion as the basis for dismissing the United States' allegations.

First, Toyobo's partial disclosures to the other participants in the Zylon vest manufacturing chain are consistent with a conspiracy to defraud the government. Toyobo entered into agreements with numerous companies participating in the chain of Zylon vest production that were designed to (1) publicly downplay the problems with Zylon, and (2) induce the United States to purchase the Zylon vests when the conspiring parties were each well aware of their defective nature. Though nearly all of the companies participating in Zylon vest production knew about Zylon's defective nature by mid-2001 (Compl., ¶¶ 54-55), Toyobo entered into agreements with them to continue selling the vests to the United States. For example, Toyobo agreed with Lincoln Fabrics, a company that wove the Zylon fiber into a fabric, to a commercial arrangement in which Lincoln would accept the delivery of Zylon that both parties knew might contain "Red Thread" that was even more defective than ordinary Zylon. Id. at ¶ 124. Toyobo agreed with Itochu and Hexcel Corporation (another weaver of Zylon fabric) to various commercial arrangements designed to protect Hexcel financially in the event that its customers stopped using Zylon due to degradation concerns. Id. at ¶¶ 76, 104.

Second, Toyobo's agreements to continue to market Zylon made with companies that knew about the defective nature of the Zylon fiber, fabric, and laminate, create conspiracy liability because those agreements were designed to defraud the United States by getting federal agencies to pay for Zylon vests. These include Toyobo's agreements to sell Zylon to numerous bulletproof vest manufacturers who were aware of the defective nature of Zylon, including Armor Holdings, DHB, Point Blank, PACA, First Choice, Gator Hawk, and PPI, as well as Honeywell, Hexcel and Lincoln. Id. at ¶ 28. Toyobo agreed with numerous weavers and vest manufacturers that they would continue producing and selling Zylon vests despite ever-mounting evidence that the vests were defective. Id. at ¶ 55.

-33-

The Complaint alleges multiple meetings between Toyobo and other participants in the Zylon vest chain of production where they discussed the sale of Zylon bulletproof vests after Toyobo and the other participants were aware that the Zylon in the vests was rapidly degrading. Id. at ¶¶ 85-86, 90, 99, 105-07, 110, 112, 119, 134-36. Such meetings are not innocent business meetings, but rather are evidence of the agreements between Toyobo and the participants to sell knowingly defective Zylon vests to federal, state, local and tribal law enforcement agencies. These meetings demonstrate a tacit understanding by Toyobo and the other participants to continue to sell defective Zylon vests which were paid for with federal funds. Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983); Alfus v. Pyramid Tech. Corp., 745 F.Supp. 1511 (N.D. Cal. 1990) (cited by Toyobo at p. 28).

Toyobo's limited disclosure of Zylon degradation data shows the expansion of the conspiracy to submit false claims. From July 2001 on, Toyobo provided the body armor manufacturers with selected information about Zylon degradation and its internal testing. Compl., ¶¶ 55, 60-61, 66-67, 71, 73, 75, 83, 92, 96, 113, 117-119. For example, following Toyobo's disclosures of some of the degradation data in July 2001, Hexcel was aware that Zylon degradation could result in the loss of all of Hexcel's Zylon business. Id. at ¶ 54. After Toyobo released its substantially worse November 2001 degradation data, Hexcel sought indemnification from Toyobo and a refund agreement from Toyobo's trading company, Itochu. Id. at ¶ 76. Similarly, in February 2002, Toyobo representatives met with Barrday and Gator Hawk to discuss the continued sale of Zylon to, inter alia, federal, state, local, and tribal law enforcement agencies – after Toyobo, Gator Hawk and Barrday were aware that Zylon was defective. Id. at ¶¶ 85-86. In February 2003, Toyobo, Itochu and Lincoln representatives met to discuss the further sale of defective Zylon. Id. at ¶ 90.

-34-

In June 2003, following the discovery of the much weaker Red Thread Zylon and the shootings of two police officers wearing Second Chance Zylon vests, Toyobo's representatives met with several other participants in the Zylon vest industry to guarantee the continued sale of these defective bulletproof vests. Id. at ¶¶ 99 (meeting with Hexcel), 105 (meeting with Point Blank), 106 (meeting with Hexcel), 107 (meeting with Lincoln), 110 (meeting with Lincoln), ¶ 112 (meetings with Point Blank and Armor Holdings), 119 (meeting with Barrday and Teijin Shoji). The meetings were successful, for every participant – except Barrday – remained in the Zylon business.

Moreover, since the filing of the complaint in June 2007, the United States has had additional Japanese documents translated, has obtained additional documents from other participants in the Zylon manufacturing process, and has reviewed additional documents from various sources. From that evidence, the United States knows that there were additional meetings between Toyobo and (1) United States Ballistics Lab and Al Price, (2) Honeywell; (3) Armor Holdings, and (4) Point Blank. The primary purposes of these myriad meetings was Toyobo's continuing efforts to keep these entities selling Zylon products as the evidence of Zylon degradation accumulated. Additionally, other manufacturers went further in the conspiracy. For example, on July 20, 2001, Armor Holdings sent a fax to Mr. Saito of Toyobo which threatened that if they could not "stick together" over the DSM data, Armor Holdings would be forced to issue an immediate recall of all of its Zylon vests. Ex. 3. Later, on December 6, 2001, Toyobo met with Armor Holdings to discuss the November 2001 degradation data. Armor Holdings told Toyobo that "We don't want to show such data to customers." Ex. 4. This evidence is consistent with and further supports the United States' allegations on conspiracy. Compl., ¶¶ 134-36. As this list of examples reveals, the allegations of a conspiracy to get false or fraudulent claims paid

-35-

are not "speculative" or "conclusory," but are instead extensive and detail Toyobo's prominent

role in working with numerous other companies towards the goal of getting the United States to

pay for defective Zylon vests.

**D.    The Common Law Claims For Relief**

Toyobo's Motion to Dismiss the Complaint should also be denied with respect to the

common law claims for relief because the Complaint sufficiently states claims upon which relief

can be granted with respect to the common law claims of fraud and unjust enrichment.

**1.    Common Law Fraud**

Toyobo incorrectly contends that the Complaint fails to state a claim against it for

common law fraud. Doc. 14 at 30-32. Under the federal common law,[9] the elements of common

law fraud are: (1) a false representation, (2) in reference to a material fact, (3) made with

knowledge of its falsity, (4) with the intent to deceive, and (5) with action taken in reliance upon

the representation. See Pence v. U.S., 316 U.S. 332, 337 (1942); Graham v. Renbrook Sch., 692

F. Supp. 102, 108 (D. Conn. 1988) (citing Pence for federal common law fraud standard); In re

Adler, Coleman Clearing Corp., 247 B.R. 51, 116 (Bankr. S.D.N.Y. 1999) (citing similar

elements under federal common law).

Contrary to Toyobo's arguments, Doc. 14 at 30-32, the Complaint alleges specific facts

showing that the claims presented by the vest manufacturers were false or fraudulent, and that

---

[9]    Federal common law governs the common law claims in this action. See U.S. v. Kimbell Foods, Inc., 440 U.S. 715, 726 (1979); U.S. v. Hibernia Nat'l Bank, 841 F.2d 592, 595 (5th Cir. 1988) (finding that federal law governs suits by the United States to recover overpayments of Treasury checks, especially where the action would have an immediate impact on the federal fisc); FDIC v. Kucera Builders, Inc., 503 F. Supp. 967, 971 (N.D. Ga. 1980) (noting that while claims of fraud are usually based on state common law, when determining the rights and duties of a federal agency exercising authority derived from acts of Congress, federal common law applies).

while the defective nature of Zylon was in the possession of Toyobo and the other participants in

the manufacturing process, the United States was misled into paying those claims.  Compl., ¶¶

20-24, 26, 28-29, 32, 34-35, 38, 40, 55, 76, 78, 86-87, 90, 102, 104.  The United States also

alleged what Toyobo gained as a consequence – millions of dollars – for worthless vests. Id. at ¶¶

22, 25, 37, 39, 41-45, 47, 49, 51, 55-56, 58, 60-63, 68, 72-75, 78, 80-82, 85, 88, 91, 96, 100-01,

106, 115.

Toyobo contends that despite its superior knowledge of the Zylon degradation, it had no

duty to disclose.  Doc. 14 at 32.  This argument is a red herring and is irrelevant, because Toyobo

actually made affirmative misrepresentations about the suitability of Zylon for use in bulletproof

vests.  Compl., ¶¶ 20, 48, 55-56, 58-60, 66-67, 79, 83, 92, 96, 105-06, 109, 112-13, 119.  Toyobo

also propounded a lie by publishing some degradation data but not other even more troubling

data.[10]  Id. at ¶¶ 22, 25, 37, 39, 41-45, 49, 51, 54, 61-64, 68, 72-75, 80-81, 83, 87-89, 91, 94, 100.

See, e.g., In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 167-68 (D. Mass.

2003) ("Whether one views the defendants' actions as involving the dissemination of information

that was wholly false, or false because of an incomplete depiction of the truth, they are actionable

under the mail and wire fraud statutes.").

Toyobo also argues that the United States' allegations must be dismissed because the

Complaint failed to identify any statement by Toyobo to the United States that was false.  Doc.

---

[10]    The fact that Toyobo had additional data which it did not disclose to the United
States or the body armor industry does not mean that those in the body armor industry who did
not receive Toyobo's internal Zylon degradation data are somehow immune from liability for
their acts in making false claims and false statements to the United States in connection with the
sale of the defective Zylon bulletproof vests.  Such parties would face liability based upon their
own knowledge of the falsity of such claims and statements, including knowledge due to testing
of their Zylon products which was not provided to the United States.

14 at 31.  However, Toyobo's contention is undercut by the very case law it cites.  Toyobo need

not make affirmative  false statements in order to be liable for common law fraud.  Non-

disclosure, for example, may constitute fraud.  See Witherspoon v. Philip Morris, Inc., 964 F.

Supp. 455, 459 (D.D.C. 1997) (cited by Toyobo at page 30).  See also In re Newbridge Networks

Sec. Litig., 926 F. Supp. 1163, 1170 (D.D.C. 1996) (fraud by non-disclosure raises issues that

may not be resolved on a motion to dismiss).  In Witherspoon, the plaintiff alleged fraud by non-

disclosure due to the failure of a tobacco company to disclose the addictive nature of cigarettes.

While the court granted the defendant's motion to dismiss, it allowed leave to amend because it

concluded that by alleging that the defendant had advertised its cigarettes without disclosing their

addictive nature, the plaintiff had "all but pleaded common-law fraud by non-disclosure."  Id. at

460-61.  All the plaintiff had to identify was advertisements issued during her period as a

smoker.

The United States has alleged at great length that Toyobo had evidence in its possession

that the Zylon fiber it manufactured was degrading more quickly than anyone disclosed to the

United States.  Compl., ¶¶ 37, 39, 41-45, 47, 49, 51-52, 60, 62-64, 68, 72-73, 77, 80, 82, 85, 88,

89, 91, 96, 99-101, 106, 110, 112, 115, 119.  In particular, the Complaint alleges numerous

instances in which Toyobo had secret internal information which it withheld.  Id. at ¶¶ 39

(internal discussions about "how Toyobo should not give out too much information about

Zylon"); 51, 58, 60 (Toyobo failed to release other data about Zylon in its possession that would

have shown the extent to which Zylon degraded and that Toyobo's manufacturing process was

functioning improperly). 67 (Toyobo failed to state that a 25-39 % loss of Zylon strength had not

occurred under extreme conditions), 81, 87, 91, 96. 100, 105, 109, 115 (Itochu, Toyobo's trading

company, chose not to disclose the phosphoric acid component to Zylon degradation because ot

-38-

was "confidential" to Toyobo and Itochu).  The United States also alleged that Toyobo knew that

many, if not most, of the bulletproof vests containing Zylon were paid for in whole or in part by

federal funds.  Id. at ¶ 29.  The fraud alleged was Toyobo's false misrepresentations (both overt

and by omission), and its role in the knowing submission of false claims for payment by the vest

manufacturers.  Further, as stated above, Toyobo's protestations that it played no role in the

design, manufacture, or sale of the vests at issue are contradicted by the allegations in the

Complaint.  Id. at ¶¶ 21-22, 24-25, 75-90.

Toyobo argues that it had no duty to disclose to the United States that it knew the Zylon

fiber used in a life-or-death product sold to federal, state, local and tribal law enforcement

officers was degrading quickly.  Doc. 14 at 32.  As explained above, the United States' claims

against Toyobo are not limited to a "duty to disclose theory."  Moreover, Toyobo's claim that it

was entitled to sit on information showing that its product was unfit for ballistic use is wrong

because of its superior knowledge.  Particularly given the life-and-death nature of the product at

issue, Toyobo had a duty to disclose the defective nature of its Zylon.  See In re Eashai, 87 F.3d

1082, 1089 (9th Cir 1996).  See also Independent Bus. Forms, Inc. v. A-M Graphics, Inc., 127

F.3d 698, 702 (8th Cir. 1997) (where defendant knew that printing press had defective part and

sold it to plaintiff anyhow, defendant had superior knowledge and, thus, a duty to disclose the

defect; plaintiff states a claim for fraud under Missouri law); Eastman Kodak Co. v. Wachovia

Bank N.A., No. 02-CV-6441T, 2007 WL 2406919 (W.D.N.Y. Aug. 21, 2007) (a party may be

obligated to disclose relevant facts where one party possesses superior knowledge, not readily

available to the others, and knows that the other is acting on the basis of mistaken knowledge); In

In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., No. 96-3125, 2001 WL 1266317, at

**20-21(D.N.J. Sept. 30, 1997) (declining to dismiss the plaintiffs' fraud allegations based on

-39-

the failure of the manufacturer of a component in a defective vehicle ignition system to disclose that its product tended to smoke and catch fire, a significant defect and finding that a duty to disclose existed).

### 2.    Unjust Enrichment

#### a.    Indirect Benefits Support An Unjust Enrichment Claim

Toyobo contends that the United States cannot state a claim for unjust enrichment against it because the benefits were conferred on third parties: the bulletproof vest manufacturers.  Doc. 14 at 32-34.  Under the law of this District, an indirect benefit is sufficient to state a claim for unjust enrichment.  See, e.g., In re Lorazepam & Clorazepate Antitrust Litig., 295 F. Supp. 2d 30, 50 (D.D.C. 2003).  "The doctrine of unjust enrichment has at all times been fundamentally equitable in nature, notwithstanding its long association with the law of contracts."  Id. (citing BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil, 56 F. Supp. 2d 14, 64 (D.D.C. 1999), aff'd in part, rev'd in part, 214 F.2d 168 (D.C. Cir. 2000)).  "Every unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next."  Id. at 65.

In In re Lorazepam, 295 F. Supp. 2d at 50, Chief Judge Hogan denied the defendant generic drug manufacturers' motion to dismiss claims of price-fixing on generic anti-anxiety drugs by indirect purchasers of the drugs.  The plaintiffs, several large insurance companies, alleged that the drug manufacturers were unjustly enriched by payments made by the insurance companies to their beneficiaries as reimbursement for the over-priced drugs.  Id. at 50.

> In order to state a general claim for unjust enrichment, Plaintiffs must establish that: (1) they conferred a legally cognizable benefit upon the Defendants; (2) Defendants possessed an appreciation or knowledge of the benefit; and (3)

Defendants accepted or retained the benefit under inequitable circumstances.

Id. Even though the insurance company plaintiffs' beneficiaries had transferred the reimbursement funds to the defendant drug companies, the court found that there was a viable claim for unjust enrichment. "'A plaintiff alleging unjust enrichment may be seeking to recover a benefit which he gave directly to the Defendant, or one which transferred to the Defendant by a third party.'" Id. at 51 (quoting State Farm Gen. Ins. Co. v. Stewart, N.E.2d 625, 633 (Ill. App. 1997)).

In fact, courts routinely allow unjust enrichment claims to proceed against component and ingredient manufacturers. See also, D.R. Ward Constr. Co. v. Rohm & Haas Co., 470 F. Supp. 2d 485, 506-09 (E.D. Pa. 2006) (indirect purchasers of products containing plastic additives could sue various plastics manufacturers and distributors for price fixing); In re K-Dur Antitrust Litig., 3328 F. Supp. 2d 517, 544-45 (D.N.J. 2004) (indirect purchasers of potassium supplements could maintain unjust enrichment claims against manufacturers); In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 671 (E.D. Mich. 2000) (finding that common law unjust enrichment theory of liability does not require passing of direct benefit from plaintiff to defendant and permitting indirect purchasers of heart medication to sue manufacturers for unjust enrichment), aff'd, 332 F.3d 896 (6th Cir. 2003).

The United States has alleged that it paid the bulletproof vest manufacturers for the vests purchased by federal agencies or by state, local and tribal law enforcement agencies under the BVPGPA. Compl., ¶13-15. Part of that payment was compensation to the vest manufacturers for the Zylon fabric and laminate components in the vests, for which the vest manufacturers had already paid Toyobo, the Zylon fiber manufacturer. In this manner, the unjust enrichment for the defective Zylon components was indirectly paid to Toyobo. Additionally, each purchase by the

-41-

United States also enabled the vest manufactures and the weavers to purchase additional Zylon from Toyobo. Certainly the allegations in the Complaint regarding Toyobo's <u>direct</u> role as the mastermind of the scheme to retain Zylon for use in bulletproof vests belies any indirect or speculative nature of the benefit to Toyobo.

The cases cited by Toyobo do not address the issue of allegations of indirect benefits being sufficient to state an unjust enrichment claim. Doc. 14 at 32-34. Rather, those cases merely state the basic elements of unjust enrichment claims. <u>See</u> <u>Bouchey</u>, 860 F. Supp. at 894. This court's ruling in <u>Oceanic Exploration Co. v. ConocoPhillips, Inc.</u>, Civ. A. 04-332(EGS), 2006 WL 2711527, at *20-*21 (D.D.C. Sept. 21, 2006), cited by Toyobo, is not to analogous to the situation at issue in this case (Doc. 14 at 33). In <u>Oceanic Exploration</u>, the plaintiff was a disappointed bidder on a Government contract, and the benefit at issue was the Government contract – money from the Government which the plaintiff felt it should have obtained if the contract had been properly awarded to it. Such a situation is inapplicable to this case, where the money paid by the United States to compensate the vest manufacturers and/or the BVPGPA beneficiaries (who had paid the vest manufacturers) found its way back to Toyobo. Thus, Toyobo had a very real incentive to do everything in its power to ensure the ongoing use of its material in bulletproof vests.

**2.      Toyobo Cites The Wrong Statute of Limitations**

Toyobo's argument that the United States' claims for unjust enrichment are governed by the three year statute of limitations is simply wrong. Doc. 14 at 34, n.22. Federal law, not District of Columbia law, controls the statute of limitations for an action brought by the United

States.[11]  28 U.S.C. § 2415 ("time for commencing actions brought by the United States).  As this

Court has clearly held, unjust enrichment claims brought by the United States are governed by

the six-year statute of limitations set forth in 28 U.S.C. § 2415(a).  U.S. v. Intrados/Intern'l

Mgmt. Group, 265 F. Supp. 2d 1, 12-13 (D.D.C. 2002) (the United States' claims for unjust

enrichment are subject to the six-year limitations period because they are claims arising from

contract or quasi-contract); accord, Miller v. Holzmann, Civ. A. 95-1231(RCL), 2007 WL

710134 (D.D.C. Mar. 6, 2007).  Given that the Complaint was filed on June 27, 2007, under the

applicable six year statute of limitations, it includes all vests purchased after June 27, 2001.

Therefore, the United States has pled a timely and viable cause of action for unjust enrichment.

**V.**

**CONCLUSION**

For these reasons, the United States respectfully urges the Court to deny Toyobo's

Motion to Dismiss.

Dated:        January 10, 2008

                                        Respectfully submitted,

                                        JEFFREY S. BUCHOLTZ
                                        Acting Assistant Attorney General


                                        MICHAEL D. GRANSTON

---

        [11]      The cases cited by Toyobo apply the state law statute of limitations involving
substantive state law claims.  See McQueen v. Woodstream Corp., 244 F.R.D. 26, 33 (D.D.C.
2007) (interpreting D.C. Official Code §12-301); Constr. Interior Sys., Inc. v. Donohoe Cos., 813
F. Supp. 29, 33 n.4 (D.D.C. 1992) (applying D.C. Code Ann. § 12-301); see also News World
Commc's, Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005) (District of Columbia court
applying the District of Columbia statute of limitations).

ALAN E. KLEINBURD
ALICIA J. BENTLEY
A. THOMAS MORRIS
CALLIE R. OWEN
MICHAEL J. FRIEDMAN
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
(202) 616-9854

## CERTIFICATE OF SERVICE

I hereby certify that on this 10 th day of January 2008, a copy of the foregoing was served by first class mail, postage prepaid, as indicated below upon:

Konrad L. Cailteux, Esq.
Weil Gotschal & Manges LLP
767 Fifth Avenue
New York, New York   10153

Holly Elizabeth Loiseau
Michael J. Lyle
WEIL, GOTSHAL & MANGES, L.L.P.
1300 Eye Street, NW
Suite 900
Washington, DC 20005

Alicia J. Bentley

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CV No. 07-1144 (RWR) |
| | ) |
| Plaintiff. | ) |
| | ) |
| v. | ) |
| | ) |
| TOYOBO CO., LTD., and TOYOBO | ) |
| AMERICA, INC., | ) **RELATED CASE:** |
| | ) <u>United States ex rel. Westrick v. Second Chance</u> |
| Defendants. | ) <u>Body Armor, Inc., et al.</u> (D.D.C. No. 04-0280 RWR) |
| | ) |

## PROPOSED ORDER

Having considered the Motion to Dismiss filed by defendants Toyobo Co., Ltd. and

Toyobo America, Inc., as well as the brief in opposition filed by plaintiff United States of

America, and any memoranda submitted in reply thereto,

IT IS HEREBY ORDERED that the Motion to Dismiss be, and hereby is, DENIED.


_____
Richard W. Roberts
United States District Judge

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of January 2008, a copy of the foregoing was served by first class mail, postage prepaid, as indicated below upon:

Konrad L. Cailteux, Esq.
Weil Gotschal & Manges LLP
767 Fifth Avenue
New York, New York   10153

Holly Elizabeth Loiseau
Michael J. Lyle
WEIL, GOTSHAL & MANGES, L.L.P.
1300 Eye Street, NW
Suite 900
Washington, DC 20005

_____
Alicia J. Bentley

XX-Large (50/54) -     560.49 square inches [.36 m2]

Female sizes are determined based on individual measurements, including bust size.

## 21. FIT AND ALTERATION POLICY

The manufacturer shall perform all required alterations of more than one inch within 30 days after original shipment of the product at no charge.   Adjustments of an inch or less than an inch can be accomplished by utilizing the adjustable strap feature on the vest.

## 22. PRE-AWARD AND RETEST POLICY

Bid submissions that appear to conform to these specifications will be considered as prospective vendors.  However, the purchaser reserves the right to perform laboratory testing on any and all armor submitted to verify strict compliance with these specifications.  The purchaser may perform V50 Ballistic Limit Testing in strict accordance with MIL-STD-662F. An American Body Armor representative shall witness all testing.

American Body Armor & Equipment, Inc. (ABA) encourages valid body armor testing for the purpose of acceptance testing, confirmation of required performance, and used body armor evaluations.  For these purposes, ABA *will only recognize properly performed V50 Ballistic Limit Testing* in strict accordance with MIL-STD-662F. Testing shall be performed at an NIJ approved ballistic test laboratory.   The test projectiles shall be 9mm 124 grain FMJ as those used in the NIJ Standard 0101.04.

The Probable Ballistic Limit (V50) test shall be conducted on a complete vest.  The V50 shall be calculated on ten fair hits, with five shots on the front panel and five shots on the back panel.  If required, up to 12 shots, 6 in each panel may be used to obtain the V50 value.   If the range of mixed results exceeds 125 feet per second [38 meters per second] or if the V50 cannot be determined in 12 shots, the test will be considered invalid.   Shot placement shall be in accordance with MIL-STD-662F except that no shot may be within three (3) inches [7.6cm] of any edge nor two (2) inches [5cm] from any other ballistic impact.  Panels shall be shot against clay armor backing material, which has been conditioned in accordance with NIJ Standard 0101.04.

Prior to each shot, the panel will be placed flat against the clay backing material.   The sample size shall be no smaller than size 46/48 or equal for male vest and size 42/44 or equal for female vest.  Vest samples used in testing must be wearable and in suitable condition, free from abuse.

For each particular level, the V50 Ballistic Limits shall be no lower than the allowable <u>highest</u> 9mm NIJ test velocity. In addition, there shall be no complete penetration lower than the <u>highest</u> 9mm NIJ test velocity.

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship.*

AZE 00214302

## 23. PRODUCT LIABILITY INSURANCE

Vest manufacturer shall agree to provide a minimum of $20,000,000 product liability insurance coverage on delivered vests.

## 24. WARRANTY

Ballistic Panels: For five (5) years after date of purchase the manufacturer warrants the ballistic panels *against defects in materials and workmanship*.

The alteration of ballistic panels in any way shall render the warranty void.

## 25. REMOVABLE COVERS

Removable machine washable covers shall be fully warranted for twelve (12) months after the date of purchase against any defects in the material and/or workmanship.

## 26. PACKAGING

All soft body armor shall be packaged and shipped consistent with good commercial practices.

Plastic Bags: Each set of armor, along with its optional equipment, shall be placed in an individual plastic bag.

Shipping Cartons: The soft body armor shall be packed into suitable corrugated cardboard box.  The box shall allow for normal shipping without damage to the soft body armor.

## 27. FINANCIAL DATA

All vendors are required to provide a certified financial statement, for 2002, which represents the manufacturer(s) of which they are bidding. Failure to provide a certified financial statement shall be cause for rejection.

## 28. DOCUMENTATION

The following documents, certifications, test-reports and samples must be included with the vendor's bid. Where one manufacturer is bidding through multiple vendors, the manufacturer may submit the appropriate paperwork on behalf of all vendors. Failure to submit the following shall be cause for rejection:

1.      Models made by manufacturers <u>other than American Body Armor</u> must be clearly identified and shall include the following:
    a.    Full product description.
    b.    Complete bid sample, male and female.
    c.    Drawings and/or photographs.
    d.    Technical specifications.

2.   Manufacturers bidding direct must include a service proposal as to how measuring, alterations and customer service will be maintained without local distribution.

AZE 00221312

JUL. 20. 2001 12:48PM TOYOBO AMERICA INC. OR HOLDINGS PRODUCTS          NO. 1299   P. 2

**13386 International Parkway,**
**Jacksonville, FL, USA 32218**
**Phone number:  (904) 741-1720**
**Fax number:  (904) 741-9995**



# Fax

| To: | Masakazu Saito | From: | Steve Croskrey |
|-----|----------------|-------|----------------|
| Fax: | 81-6-6348-3413 | Pages: | 7 |
| Phone: | | Date: | July 20, 2001 |
| Re: | Zylon Fiber Issue | CC: | Yoshinari O'Hira 212-317-9280 |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Mr. Saito and Mr. O'Hira:

If we stick together, we can overcome this threat from DSM, but if this is positioned as a problem with shield, then we have no recourse but to issue the attached.

Sincerely,

Steve Croskrey

TOY002-0881

# Draft

Dear Customer:

Please be informed that Armor Holdings, Inc. is recalling all vests containing Zylon fiber effective immediately.

Attached is data which we received from the manufacturer of Zylon fiber, Toyobo, which shows significant degradation in strength when the product is exposed to high temperature and humidity.

Also please find attached a letter which we received from Toyobo which states:

> *"Please be reminded that Toyobo makes no warranty and assumes no liability whatsoever in connection with any use of Zylon fiber."*

We can not in good conscious continue to sell this product and put the lives of our customers at risk.

**TOYOBO - ZYLON        001557**

TOY002-0882



**TOYOBO CO., LTD.**

**TOYOBO CO., LTD.**
2-8 DOJIMAHAMA 2-CHOME, OSAKA
530-8230 JAPAN
PHONE +81-6-6348-3130 FAX +81-6-6348-3413

7 of 6

July 6, 2001

Armor Holdings Products Division
13386 International Parkway
Jacksonville, FL 32218
U.S.A.

Attn: Stephen Croskrey

Dear Mr. Croskrey:

We were informed that DSM HPF decided to put on hold the market introduction of its PBO fiber containing product such as Zylon UD-SB10. This information is totally new for us.

We also have already started some accelerated aging tests on Zylon fiber at our customer's request. As you can find the update in attached, we have not found any serious indication from our test using Zylon fiber up to now. We hope this information would be helpful for your product's design. As a matter of course, we will keep you informed of additional update.

Here we must mention what is very important. DSM HPF mentioned that the use of PBO fiber in bullet resistant vests may not be justified, however, we have not confirmed any serious indication about woven fabric made of Zylon fiber at this moment. However, we advise you to carefully examine your product again in this occasion.

Please be reminded that Toyobo makes no warranty and assumes no liability whatsoever, in connection with any use of Zylon fiber. Users determine for themselves the suitability for their intended use of the fiber.

We are pleased to visit you and discuss on this matter at your office as soon as possible. Please feel free to contact us on this matter.

Yours sincerely,

Masuaki Sato
Global Business Manager
TOYOBO CO., LTD.
ZYLON DEPARTMENT
Phone +81-6-6348-3130
Fax +81-6-6348-3413

Attached is our formal reply to DSM HPF.

**TOYOBO - ZYLON**        **001558**

JUL.20.2001 12:49PM  TOYOBO AMERICA INC. OR HOLDINGS PRODUCTS                NO.1299  P. 5
07/20/01  FRI 11:56 FAX 19047 ...        TOYOBO カ゛ン (N-KT)

2/5
3 of 6



**TOYOBO CO., LTD,**
2-8 DOJIMAHAMA 2-CHOME, OSAKA
530-8290 JAPAN
PHONE +81-6-6348-3130 FAX +81-6-6348-3413

July 5, 2001

Dear Sirs:

I would like to inform you of our progress on the acceleration test to predict the performance of ZYLON after a long time. As you may know, we recently started the acceleration test to predict the performance after 10 years, because our customers requested us to guarantee 10 years stability of the performance of ZYLON in German tender business. One of the simple methods to predict the lifetime is to expose the material to higher temperature and higher humidity. We chose 80 and 60 degree C at 80% relative humidity.

Attached is the test result. As you can find, the strength of ZYLON fiber decreases under high temperature and humidity conditions. We assume this is due to the hydrolysis. To predict the behavior at room temperature, we plotted the slope of strength change in the logarithmic figure vs reciprocal of absolute temperature. This type of plot is known well as Arrhenius plot. As a result, we can expect almost no strength loss at about 40 degree C even at 80% humidity.

We already started the aging test at 40 degree C at 80% humidity to confirm our estimation. You can find some data in the figure, but it will take a long time to reach the conclusion. We continue the measurement and update you.

We also expose the fiber to 80 degree C without control of humidity. We found much smaller strength loss due to the low humidity. Our final target is to estimate the strength loss in the actual circumstances after a long time, but our data is surely not enough at this time.

We have had about two and half years history in the production of ZYLON fiber. We also checked the properties of our fiber samples in stock. We may be able to estimate less than 5% strength loss for 10 years at room temperature based on the extrapolation of the result. However, the age of the sample we could check is only up to two years and it is impossible for us to guarantee 10 years based on the result.

This is the update of our progress on this matter.

Sincerely yours,

Tadao Kuroki
TOYOBO CO., LTD,
ZYLON DEPARTMENT
Phone +81-6-6348-3130
Fax +81-6-6348-3413
e-mail tadao_kuroki@kisc.toyobo.co.jp

07/06/01  FRI 04:56  [TX/RX NO 5451]  @003

**TOYOBO - ZYLON          001559**

TOY002-0884

JUL. 20. 2001 12:49PM   TOYOBO AMERICA INC. OR HOLDINGS PRODUCTS         NO. 1299   P. 6
07/20/01 FRI 11:56 FAX 18047...          07/06/01 FRI 04:36 [TX/RX NO 5451] @004



TOYOBO-ZYLON        001560

TOY002-0885

JUL. 20. 2001 12:49PM    TOYOBO AMERICA INC.        OR HOLDINGS PRODUCTS        NO. 1299    P. 7
07/20/01  FRI 11:56 FAX 18047419555
07/06/01  FRI 04:38  [TX/RX NO 5451]



printed on July 5, 2001

TOYOBO - ZYLON        001561

TOY002-0886

JUL. 20. 2001 12:49PM   TOYOBO AMERICA INC.   OR HOLDINGS PRODUCTS              NO. 1299   P. 8

07/20/01 FRI 11:56 FAX 18047418888

07/06/01 FRI 04:36 [TX/RX NO 5451]



ZYLON AS

○ 60C×80%RH
△ 80C×80%RH
◇ 40C×80%RH

Test period: May, 2001 ~

Strength Retention (%)

Time (day)

y = -9.6084Ln(x) + 102.27

y = -5.2905Ln(x) + 101.45

printed on July 5, 2001

TOYOBO - ZYLON              001562

TOY002-0887

| 部長 | 課長 | 担当者 |
|------|------|--------|
|      |      |        |

## ザイロン事業部　商談・出張報告

| 日付 | 2001年12月6日 | 担当者 | 大平 |
|------|------|------|------|
| 販売グループ | ○ ZDA ○ ZDE ○ ZDH<br>● ZDC ○ ZDF ○ ZDJ<br>○ ZDD ○ ZDG ○ ZDK | 国名 | USA |
| 顧客名 | Armor Holdings | 今回訪問日<br>前回訪問日 | 2001年12月6日<br>2001年7月19日 |
| 窓口・<br>職務/氏名 | Steve Croskrey<br>Jim Harmon<br>Itochu:辻氏 | 訪問回数 | 10回目 |
| 現在の開発レベル | ○ A ● B ○ C ○ D ● E<br>● (4) | 現レベルでの<br>滞留月数 | ヶ月 |
| 対象用途 | コード：ZAA<br>大分類：防弾<br>中分類：Ballistic Vest<br>用途： | 現在使用中<br>の他素材 | ケブラー、スペクトラ等 |

| 顧客の要望/悩み | 1.早期にシールドを復活させたい。 |
|------|------|
| 商談・打合せ内容 | 1.ザイロン展開状況<br>(1)シートが手に入らなくなったため、織物でシールド使いのベストと同じ重量で数週間前にNIJ認証を取った。バックフォースはステッチを工夫した。<br>(2)シートが手に入らないため出荷できなかった売上は1.3百万ドルにもなる。また一旦代理店へ卸したものを引き取って必要なユーザーへ移したりした費用も相当ある。生産コストも高いとのこと。損害を被った。一日でも早くシールドを展開したい。現状は(仕方なしに?)織物を展開しているが、シールドを手に入手できるようになれば即切り替えたい。但し、NIJの再認証が必要になるだろう。<br>(3)織物は9月に20,000ヤードのオーダーを出した。最終納期年内。このペースで行くと2月頃にファイバー在庫が無くなる。従って1月には最初の出荷をして欲しい。1,2,3月で3回に分けて出荷を申し出たが、運送費が高くなるので2回にして欲しいと要望された。(従わざるを得ない。)<br>(4)シールドの問題があって現在消費量をスローダウンしているが、今後5トン/Q消費の見通し。<br>2.高湿劣化性について<br>(1)先週出したレターは泥縄を抱かせるだけ、我々のマーケティングを妨げる。顧客にこんなデータを見せたくない。3枚目のグラフは良いが全く説明がないのがいけない。顧客やNIJの人間はRetentionの意味が分からず、グラフを見たらV50が落ちると誤解する。<br>(2)この問題の後NIJや軍は独自に研究を進めているとのこと。<br>(3)ここまではマーケットの反応は相対的に静か。<br>(4)レターのコメント対して)どんなコメントをしても何か問題が起こったら、当然ファイバーメーカーにも責任が行く。<br>(5)7月以降のボディアーマーメーカーの対応について、Point BlankやPACAは、特にザイロンシールドに焦点を当てて攻撃している。それに比べSecond Chanceはファイバー自体の問題として、織物かシールドの問題ではないとしている。(Second Chanceの方は賢く振る舞っているとCroskreyの弁。)<br>3.その他<br>(1)ABAは、カリフォルニア(Safariland)へ移転する。ボディアーマーを集約する。8月より移転し始め2002/3月で移転完了の予定。責任者はScott Obrien。彼に会うように依頼された。<br>(2)織造物に指紋検査パウダーとかの会社を買収した。このJacksonvilleには現在4社(ABA、カンザ社、麻薬検査薬、指紋パウダー)は入っている。 |
| 何をすれば良いか | 1.残りのトンの出荷調整。1月：2トン、2月：3トン出荷必要か。<br>2.前回送ったレターについて誤解やネガティブなイメージを払拭するためリカバリー策検討。<br>3.シールド展開サポート(ファイバー供給) |
| 本件を加速するための提案 | |
| 今後の予定 | カリフォルニア工場訪問 |
| その他 | レターについて苦言をもっと言われるかと思っていたが、今回のCroskreyは挨拶時から笑顔であった。何を言っても無駄と思ったのか、何か起これば、いずれにしてもTCも巻き込むことになると思ってか。 |

TOYOBO–ZYLON

019422

TYA022-0570

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <u>ex</u> <u>rel.</u>, ERVIN AND ASSOCIATES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) ) | Civil Action No. 96-CV-1258 (LFO) Civil Action No. 99-CV-1698 (LFO) |
| THE HAMILTON SECURITIES GROUP, INC., <u>et</u> <u>al.</u>, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

### <u>SUPERSEDING MEMORANDUM</u>

The instant *qui tam* action was filed on June 6, 1996, on behalf of the United

States by plaintiffs John Ervin and Ervin Associates, Inc. (collectively, "Ervin") against

several entities, including Hamilton Securities Group, Inc. ("Hamilton").  Over the course

of four days of trial in October 2003, Ervin submitted testimony and documentary

evidence against Hamilton and rested.  Thereupon, Hamilton moved for Judgment on

Partial Findings under Federal Rule of Civil Procedure 52.  A January 7, 2004 Order

granted the motion with respect to Count VII of the Second Amended Complaint, related

to the West of Mississippi note sale.  [Dkt. No. 198].  The Order also granted the motion

with respect to Counts I, III, IV, V, VI, and VIII of the Second Amended Complaint on

the grounds that Ervin failed to identify or introduce evidence, in either its pretrial

statement or at trial, in support of the allegations contained in these Counts.  <u>Id.</u>  The

Order denied Hamilton's motion with respect to Count IX (related to the North and

Central note sale), Count II (related to the Single Family Offering), Counts XIII and XIV

(related to the Williams, Adley 8(a) contract), and Counts XV and XVI (related to the

crosscutting contract). Id.

Over three trial days in July 2004, Hamilton presented its trial defense. Ervin did

not put on a rebuttal. Following the completion of the trial, the parties submitted

modified proposed findings of fact and conclusions of law. An August 16, 2004 Order

and Partial Judgment ruled that (1) Ervin is entitled to Judgment on Count IX of the

Second Amended Complaint - related to the North Central Sale, (2) the amount of

damages caused to the United States by Hamilton's False Claim on the North-Central sale

was $1,511,244.00, and (3) Hamilton is entitled to Judgment on the counts related to the

three remaining issues: Count II, related to the Single Family Offering, Counts XIII and

XIV, related to the Williams 8(a) contract, and Counts XV and XVI, related to the

crosscutting contract. [Dkt. No. 452]. The Court's Order and Partial Judgment also

ordered supplemental briefing "addressing (1) the proper penalty to be assessed under 31

U.S.C. § 3729; and (2) the proper division of payment as between Ervin and the United

States." Id. The parties and the United States filed briefs in response. See Hamilton's

Mem. Regarding Proper Penalty, filed Aug. 27, 2004 [Dkt. No. 454]; Joint Suppl. Brief of

the United States and Ervin, dated Aug. 16, 2004, filed Aug. 26, 2004 [Dkt. No. 455];

Suppl. Report by United States, filed Oct. 13, 2004 [Dkt. No. 460]. Having considered

2

the trial testimony and documents offered by both parties, and having reviewed the above-

recited pleadings, the Court enters the following Memorandum and accompanying Order,

granting judgment for plaintiffs John Ervin and Ervin Associates, Inc. on Count IX of the

Second Amended Complaint and granting judgment for defendant Hamilton Securities

Group, Inc. on Counts II, XIII and XIV of the Second Amended Complaint.  The amount

of damages assessed against Hamilton is $4,533,732.00 plus a $5,000.00 penalty, for a

total damage award of $4,538,732.00.  This Memorandum supersedes the Court's

Memorandum filed on August 16, 2004. [Dkt. No. 452].

## I.    FINDINGS OF FACT

**A.    Background**

Throughout the 1970s and 1980s, the United States Department of Housing and

Urban Development ("HUD"), as part of an effort to promote broad home ownership,

insured the mortgages of certain individuals and entities for whom private financing was

not feasible.  United States ex rel. Ervin & Assoc., Inc. v. Hamilton Sec. Group, Inc., 298

F.Supp.2d 91, 93 (D.D.C. 2004) [hereinafter, "Jan. 7, 2004 Mem."].  HUD often assumed

control of and responsibility for the mortgages if the insured individuals and entities

failed to make the mortgage payments.  Id.  In so doing, HUD accumulated a portfolio of

over $408 billion dollars by September 1993.  Id.  This massive real estate management

responsibility interfered with HUD's ability to discharge its various other responsibilities.

Id.  In 1993, in order to allow HUD to "better fulfill its mission," HUD initiated a

3

program to restructure its portfolio. Hamilton Ex. 7 at HUD/EE 817. HUD sought to sell

its inventory of single family and multifamily HUD-held mortgages and HUD-held

properties. See id. Because HUD had never before engaged in a massive sell-off of

mortgage assets and did not have the in-house expertise to manage such a project, HUD

decided to contract the note sale operations to the private sector. See id. Fair Housing

Authority's Commissioner, Nicolas Retsinas, assigned Helen Dunlap, HUD's Deputy

Assistant Secretary for Multifamily Housing, to oversee the design of the loan sales

program. Tr. 7/20/2004 AM at 120, ln. 17-19.

Subsequently, on September 30, 1993, HUD awarded the "first financial advisor

contract" to Hamilton. See Hamilton Ex. 8. Under the contract, Hamilton designed and

developed the blueprint for selling HUD-held mortgage notes through public auctions.

See Hamilton Ex. 8; Tr. 11/3/2003 AM at 259, ln. 2-14; id. at 331, ln. 22 - 332, ln. 3; Tr.

7/20/2004 AM at 122, ln. 16-22. Additionally, Hamilton's responsibilities in its role as

financial advisor to HUD included "all aspects of running asset sales and getting

supportive services to assist in doing that such as conducting analyses, strategizing

approaches to sales, [and] due diligence." Tr. 10/29/03 PM at 13, ln. 5-16. Hamilton, in

turn, employed Bell Labs (now Lucent Technologies) as a subcontractor to develop and

run an optimization model to assist in the mortgage note sales. Tr. 10/30/03 PM at 114,

ln. 11-15. The optimization model was a computer-operated algorithm designed to select

as winners that combination of bids which, if accepted, would produce the maximum

4

potential revenue to HUD.  Jan. 7, 2004 Mem. at 5.  Hamilton also retained Coopers &

Lybrand to manage security and bid processing for the auctions.  Id. at 6.

**B.      Williams, Adley 8(a) Contract**

    **1.      Small Business Administration Section 8(a) Program**

    In 1994, HUD decided to procure due diligence services for its loan sales program

from a minority-owned contractor through the Small Business Administration Section

8(a) program.  The purpose of the Section 8(a) program is to assist small and socially

disadvantaged businesses.  Tr. 10/29/2003 PM at 8, ln. 18-22.  To this end, the Section

8(a) program waives many of the competitive requirements in traditional government

procurement regulations.  Tr. 10/30/2003 AM at 115, ln. 22 - 116, ln. 4.  Thus, the

Section 8(a) program permitted HUD to procure services from a single contractor without

competitive bidding.  Id.

    **2.      Williams, Adley Vies for HUD Due Diligence Contract**

    In the fall of 1994, HUD contacted Williams, Adley & Company ("William,

Adley"), a certified Section 8(a) contractor, and requested an in-person presentation of

Williams, Adley's due diligence capabilities.  Tr. 7/19/2004 at 86, ln. 19-22.  At the time,

Williams, Adley was a certified public accounting firm that provided a variety of

accounting services, including due diligence to government agencies.  Id. at 83, ln. 21-25.

Williams Adley had previously provided due diligence and financial advisory services to

HUD.  Id. at 84, ln. 19 - 85, ln. 2.  Contemporaneously, HUD solicited presentations from

at least two other due diligence contractors.  Tr. 7/20/2004 at 139, ln. 11-14; id. at 140, ln.

15-18.  On October 7, 1994, HUD selected Williams, Adley as the "8(a) firm of choice"

and provided a Request for Proposal.  Tr. 7/19/2004 at 89, ln. 17-19; Williams, Adley Ex.

20.  According to Helen Dunlap, HUD's Deputy Assistant Secretary, HUD selected

Williams, Adley because "they were the most experienced of the [sic], at the kinds of

things we were looking for of the firms, and they also had the most and we perceived it

[sic] had capacity and they had good recommendations . . . ."  Tr. 7/20/2004 at 140, ln. 1-

5.  Hamilton did not recommend Williams, Adley to HUD, or otherwise participate in the

Section 8(a) contractor selection process.  Id. at ln. 19-24.  On October 26, 1994,

Williams, Adley responded to HUD's Request for Proposal, submitting both technical and

cost proposals.  Tr. 7/19/2004 at 90, ln. 22 - 91, ln. 10; Williams, Adley Exs. 23, 24.

Hamilton was not named as a potential subcontractor under the Section 8(a) contract in

Williams, Adley's technical proposal.  Williams, Adley Ex. 24.

3.    **Williams, Adley Vies for HUD's Financial Advisory Services Contract**

HUD subsequently asked Williams, Adley about its capabilities to perform

financial advisory services in connection with the loan sales program.  Tr. 7/19/2004 at

92, ln. 10-12.  HUD informed Williams, Adley that they needed a "stop gap measure"

until they had a new financial advisory contract in place.  Id. at 94, ln. 13-18.  Williams,

Adley previously had contracted to provide financial advisory services under other HUD

contracts, and in turn, had subcontracted that work to other firms.  Id. at 84, ln. 24 - 85,

6

ln. 2.  Henry Adley ("Adley"), a partner at Williams, Adley, contacted financial advisors

at Kenneth Leventhal, Ernst & Young, Chemical Bank and Hamilton in preparing a

response to HUD's financial advisory services request.  Id. at 93, ln. 10-17; id. at 94, ln.

23.  According to Adley, he identified Kenneth Leventhal, Ernst & Young and Chemical

Bank because he had previously worked with each of them.  Id. at 93, ln. 10-17.  Adley

learned of Hamilton's role in the design and development of the loan sales program prior

to submitting its initial proposals because he wanted to know of the major "stakeholders"

in the loan sales process.  Id. at 93, ln. 20 - 94, ln. 12.  Williams, Adley had at least one

discussion with Hamilton employee Robert Robinson prior to submitting its revised

technical and cost proposals.  Tr. 10/31/2003 PM at 191, ln. 13-18.  Adley testified that

"after careful consideration in looking at the qualifications" of the firms, Williams, Adley

selected Hamilton as one of its teaming partners.  Id. at 95, ln. 16-17.  No one at HUD

steered Williams, Adley towards Hamilton.  Id. at ln. 1-22.  On November 2, 1994,

Williams, Adley submitted revised technical and cost proposals identifying a number of

potential subcontractors, including Hamilton.  Id. at 96, ln. 1-5; Tr. 10/29/2003 PM at 35,

ln. 15-20; id. at 47, ln. 7 - 48, ln. 2; Tr. 10/30/2003 AM at 115, ln. 14-18; Williams, Adley

Exs. 26, 27.

### 4.    HUD Awards Williams, Adley Section 8(a) Contract

On or about December 7, 1994, HUD awarded Williams, Adley a Section 8(a)

"indefinite delivery, indefinite quantity" contract.  Hamilton Ex. 10 at 2; Tr. 10/29/2003

7

PM at 39, ln. 11.  The contract defined the basic arrangement, setting out the broad base

of tasks and responsibilities that HUD required.  Tr. 10/29/2003 PM at 39, ln. 15 - 40, ln.

3.  Specific work requirements were to be defined at later dates, through statements of

work and the award of task orders, against the basic indefinite quantity contract.  Id.  The

subsequent statements of work were the subject of further negotiations between HUD and

Williams, Adley.  Id.

HUD contracting officer Annette Hancock knew Hamilton was serving as

financial advisor to HUD on the loan sales program both when Williams, Adley submitted

its revised proposal and when the Section 8(a) contract was awarded.  Tr. 10/30/2003 AM

at 110, ln. 2-8; id. at 115, ln. 19-21.  Hancock testified that she ensured that the

appropriate policies and procedures were adhered to and complied with in the award of

the Section 8(a) contract.  Id. at 109, ln. 23 - 110, ln. 1.  At the time HUD awarded the

Section 8(a) contract to Williams, Adley, Hancock understood that Williams, Adley

"would solicit services from various vendors who provide whatever those supportive

services that William, Adley needed to augment their resources."  Tr. 10/29/2003 PM at

49, ln. 24 - 50, ln. 10.  Specific subcontractors would be identified when Williams, Adley

submitted proposals for task orders identifying the team Williams, Adley thought

appropriate to perform the work.  Id. at 45, ln. 25 - 46, ln. 4.  HUD never indicated any

dissatisfaction with Williams, Adley's subcontractor selection process.  Tr. 7/19/2004 at

100, ln. 12-17.

8

### 5.    Hamilton Drafts Statements of Work for Potential Task Orders

As HUD's financial advisor under the First Financial Advisor contract, Hamilton

was tasked with helping HUD develop and design the entire loan sales program.  Tr.

11/3/2003 AM at 331, ln. 22 - 332, ln. 3.  In this role, Hamilton drafted statements of

work and task orders, including task orders for financial advisory services under the

Section 8(a) contract.  Tr. 11/3/2003 AM at 262, ln. 9-13; id. at 332, ln. 22 - 333, ln. 4.

HUD reviewed Hamilton's draft statements of work and task orders and made the final

decision as to what task orders to issue, what contract vehicles to use and what language

to include in the task orders.  Id. at 262, ln. 13-15; id. at 286, ln. 21-24; id. at 288, ln. 24-

25.  Prior to the issuance of individual task orders, Hamilton had no guarantee that it

would receive any financial advisory subcontract work under the Section 8(a) contract.

Tr. 11/3/2003 AM at 267, ln. 22 - 268, ln. 15; id. at 296, ln. 3-19; Ervin Ex. 194 at 9628-

9629.

### 6.    Williams, Adley Selects Hamilton as Subcontractor on HUD Contract

Williams, Adley selected Hamilton as the subcontractor on its financial advisory

services contract with HUD.  Tr. 10/30/2003 AM at 117, ln. 21 - 118, ln. 1; Tr. 7/19/2004

at 97, ln. 19-24.  HUD contracting personnel subsequently raised issues with regard to the

fees Williams, Adley proposed for Hamilton's work under the Section 8(a) contract, and

those fees were the subject of negotiations.  Id.  Hamilton proposed to charge HUD a

fixed percentage per month of the unpaid principal balance of the portfolio being sold for

loan sale advisory services performed as a subcontractor to Williams, Adley. Williams, Adley Ex. 27. Adley worked directly with Hancock in "negotiating and working out the details and finalizing the task orders." Tr. 7/19/2004 at 98, ln. 23 - 99, ln. 5. After the negotiations, HUD's Office of Procurements and Contracts approved all costs in each particular task order. Id. at 99, ln. 8-14. Hancock testified that, based on her independent research, she believed Hamilton's "basis points" pricing methodology was typical for the industry and appropriate under the subcontract with Williams, Adley. Tr. 10/29/2003 PM at 22, ln. 9-19; id. at 25, ln. 13-19; Tr. 10/30/2003 AM at 118, ln. 2-7.

## C.    Multifamily Note Sales

Beginning in March 1995, Hamilton conducted a series of multi-family note sales,[1] including the West of Mississippi Note Sale, held on September 18-19, 1995, see Ervin Ex. 77 at 2, ¶ 5, and the North and Central Sale, conducted on August 5-6, 1996. See id. at 5, ¶ 18.

---

[1] In March 1995, Hamilton conducted its first multi-family note sale, the Southeast Multifamily Sale. Ervin Ex. 77 at 2, ¶ 1. After this sale, Hamilton recommended that bidders have the option to set bid "floors," expressed as a function of the total unpaid principle balance owed on the mortgages. "For example, if a bidder specified a bid floor of $100 million [unpaid principal balance], but the optimization model selected that bidder as the winner of notes with a [unpaid principal balance] totaling only $90 million, that bidder would be awarded no notes. On the other hand, if that bidder was selected as the winner of notes with a total [unpaid principal balance] of $110 million, it would be awarded all of those notes." Jan. 7, 2004 Mem. at 7 n.7. Bidders, thus, "were not forced to take smaller amounts of assets than they desired." Ervin Ex. 77 at 2, ¶ 1. In August 1995, Hamilton conducted the National Performing multifamily note sale, which was the first multifamily sale in which bidders were allowed to express bid floors. Id.

1.    **West of Mississippi Note Sale**[2]

On September 18-19, 1995, bidders for the West of Mississippi mortgage loans

placed their bids, according to bid specifications set by Hamilton, including instructions

that bidders could set bid floors, expressed in terms of minimum unpaid principal

balances on the mortgages. See Jan. 7, 2004 Mem. at 9. Hamilton received 400 bids

from 73 different bidders for approximately $622 million in unpaid principal balances

worth of mortgages. Id. After the bid period closed, Coopers & Lybrand, in its role as

subcontractor, transmitted the bid card data to Bell Labs. Id.

   a.    **The Optimization Model Report**

Sol Schindler ("Schindler") was head of Bell Labs' subcontracting work for

Hamilton during the West of Mississippi sale. Jan. 7, 2004 Mem. at 9. As such,

Schindler was in charge of developing and running the optimization model. Id. Schindler

applied the computerized optimization model to the data from the bid cards on the

afternoon of September 20, 1995. Id. at 9-10. Later that afternoon, Schindler provided a

computerized report of the results to Hamilton employee Robert Robinson ("Robinson").

Id. at 10. Robinson was Hamilton's Assistant Treasurer, a member of Hamilton's Board

---

[2]In granting Hamilton's Rule 52(c) Motion for Judgment on Partial Findings with respect
to Ervin's claims arising out of the West of Mississippi Note Sale, the Court made specific
findings of fact in its January 7, 2004 Memorandum regarding the West of Mississippi Note Sale,
which are hereby incorporated by reference. See Jan. 7, 2004 Mem. No evidence adduced by
either party during the trial defense undermined the Court's January 7, 2004 findings of fact with
respect to the West of Mississippi Note Sale. To the extent that the events surrounding the West
of Mississippi note sale are relevant to Ervin's claim arising out of the subsequent North and
Central Note Sale, they are referenced here for ease of exposition.

of Directors and the principal point of contact on the West of Mississippi sale between

Hamilton and Bell Labs. Id. at 8. Accompanying the report was an e-mail from

Schindler to Robinson, stating that "[t]his looks suspicious and should be checked."

Hamilton Ex. 44. In response, Robinson immediately instructed Schindler to re-run the

optimization model. Tr. 10/31/03 PM at 151, ln. 9-18. Robinson directed that the model

used by Bell Labs calculate winning bids as a function of the unpaid principal balance

owed on the mortgages, rather than as a function of the gross revenue generated by the

bids, or "revenue model," used by Schindler for the initial run.[3] See Ervin Ex. 77 at 3, ¶

6. Unable to create an "unpaid principal balance model" in the time frame required by

Hamilton, Schindler instead adapted the revenue model to approximate an unpaid

principal balance model and re-processed the bids, according to Robinson's instructions.

Id. ¶¶ 7-8; Hamilton Ex. 45. Schindler forwarded the new results to Robinson with a

cover e-mail stating, "I changed the minimum revenue to minimum [unpaid principal

balance] by prorating as a temporary fix." Hamilton Ex. 45.

### b.     Hamilton Reports Results to HUD

---

[3]Although Hamilton introduced the "bid floor" option, expressed in terms of unpaid principal balance owed on the mortgages during the previous National Performing Multifamily Sale, "[c]orrespondence and interaction by and between Hamilton and Lucent/Bell Labs . . . refers to a floor expressed in terms of minimum revenue (the price the bidder is offering to pay)." Ervin Ex. 77 at 2, ¶ 2. Thus, the initial "revenue model," developed by Bell Labs to incorporate the bid floors did not accurately account for the fact that bid floors were actually expressed in terms of minimum unpaid principal balance. See id. at 3, ¶ 6. According to Hamilton's December 20, 1996 report to HUD, although this error was not discovered until the West of Mississippi sale, subsequent analysis revealed that the erroneous instructions "caused no impact on the National Performing MF Sale." Id. at 2, ¶ 3.

Hamilton reported the results of the West of Mississippi note auction sale, as calculated by Bell Labs' second optimization run, to HUD on Friday, September 22, 1995. Jan. 7, 2004 Mem. at 15. "Hamilton reported gross proceeds, as determined by the optimization model, of $385,196,928.49. HUD relied upon Hamilton's statements in choosing the optimal bidders on its loan sales." Id.

c.　　**The Coopers & Lybrand Fax**

About a week after Hamilton reported the West of Mississippi sale results to HUD, Michael Brocks, of Coopers & Lybrand, sent a fax to Henry Fan, of Hamilton, indicating that something appeared wrong with the optimization results. Jan. 7, 2004 Mem. at 8. Michael Brocks ("Brocks") was a certified public accountant. Id. "His primary role in the West of Mississippi sale was to establish procedures and protocols so that bids could be processed in an orderly and secure fashion." Id. Henry Fan ("Fan") earned a PhD from the Massachusetts Institute of Technology and began working for Hamilton in August of 1995. Id. The West of Mississippi sale was Fan's first note sale project work for Hamilton. Id. As Brocks recalled at trial, he:

> started thinking that I remember seeing a bid that was sizable, that stuck out in my mind during the auction [ALI #3]. And I wondered why they didn't win. I just thought they should win. So I prepared this Excel analysis which is on Page 2 of [Ervin Ex. 78] and from -- again, it appeared that ALI [#3] should have won because their bid exceeded the others by $2 million.

Tr. 10/30/03 PM at 101, ln. 25 - 102, ln. 7.

13

Brocks forwarded to Fan the Excel analysis, which compared the winning bids, as determined by Bell Labs, with ALI #3 for each of the notes covered by the ALI #3 bid. See Ervin Ex. 78 at 22652. The winning bid in Brocks' version of the optimization report yielded $2,554,001.00 less revenue than the ALI #3 bid. See id.

Fan responded to Brocks' fax by telephone. Tr. 10/30/03 PM at 107, ln. 7-8. Fan stated that while he understood what Brocks was trying to do, Brocks' calculations would have to consider the effect of bid floors and other bids to get a truly correct answer. Id. at 107, ln. 11-16. Brocks did not take any further actions regarding the West of Mississippi bid results following this conversation with Fan. Id. at 107, ln. 23 - 108, ln. 1. Brocks did not inform anyone of his fax (or its substance) other than Fan and one junior Hamilton employee.[4] Tr. 10/30/03 PM at 108, ln. 7, 22-109; Tr. 10/31/03 AM at 172, ln. 6-13.

### d.    Post-Auction Review of West of Mississippi Sale

HUD required Hamilton to submit a post-auction review of each sale, including the West of Mississippi sale. Hamilton Ex. 8 at p. C-2, ¶ 1.g. One purpose of the post-auction review was to "document what actually transpired in the [West of Mississippi] sale, and present suggestions for consideration in future sales based on the experiences of the [West of Mississippi] Sale." Hamilton Ex. 167 at H/SM 8939. The West of Mississippi sale occurred in September 1995, but Hamilton did not submit the post-

---

[4]"In addition to Fan, Brocks also sent the fax to Christine Lord, a junior Hamilton employee who sat near the fax machine in Hamilton's offices. Brocks sent Lord the fax so that she could transmit the document to Fan." See Jan. 7, 2004 Mem. at 14 n.9.

14

auction review to HUD until August 22, 1996, two weeks after the North and Central

Note Sale. <u>See</u> Hamilton Ex. 167.

When Hamilton submitted its initial post-auction review of the West of Mississippi

sale, it did not disclose the problems associated with the optimization model that required

two separate runs, the latter involving a "temporary fix." <u>See</u> Hamilton Ex. 167 at 15. In

the section entitled "Lessons Learned," Hamilton stated, "[b]oth during the [West of

Mississippi] Sale and immediately thereafter, members of the Sale Team presented ideas

for enhancing the loan sales program." <u>Id.</u> at 17. The document did not disclose the

communications between Robinson and Schindler about the need to fix the optimization

model so that it would properly calculate bid floors in future sales or the communications

between Brocks and Fan.

### 2.    The North and Central Note Sale

#### a.    Bell Labs Applies Wrong Model

Almost one year after the West of Mississippi sale, Hamilton held the North and

Central note sale on August 5-6, 1996. Ervin Ex. 77 at 4-5, ¶ 18. As in the West of

Mississippi sale, bidders in the North and Central sale were permitted to designate floors

expressed in terms of the unpaid principal balances of mortgages. <u>Id.</u> Likewise, the bids

were also analyzed by a Bell Labs' optimization model. <u>Id.</u> ¶ 41.

Subsequent to the West of Mississippi sale, Bell Labs created an unpaid principal

balance model. Tr. 7/19/2004 AM at 48, ln. 1-7. The original revenue model was not

15

destroyed, however.  Instead Bell Labs kept both models.  Id. at 49, ln. 3-13.  Robinson

left Hamilton in January 1996.  Tr. 10/31/2003 PM at 139, ln. 23-24.  Schindler suffered a

heart attack shortly after the West of Mississippi sale.  Tr. 7/19/2004 at 48, ln. 17-25.

Neither Robinson, nor Schindler were involved in the North and Central Note Sale, and

neither informed anyone at Hamilton or Bell Labs of the new model.  Id. at 49, ln. 5-9.

Robinson was not even aware that there was a new model, as he only was informed of the

temporary fix by Schindler at the time of the West of Mississippi sale and made no further

inquiries.  See Ervin Ex. 77 at 3-4, ¶¶ 7-12; Tr. 10/31/2003 PM at 155, ln. 24 - 156, ln. 5.

Hamilton provided data from the North and Central sale bids to Bell Labs with the

instructions to run the same model as was used in the West of Mississippi sale.  Tr.

7/19/2004 AM at 49, ln. 10-13.  The Bell Labs employees in charge of running the

optimization model applied the original revenue model to the North and Central sale bids.

Id.  New to the multi-family loan sales project, the Bell Labs employees were unaware of

both the temporary fix required to convert the revenue model into an unpaid principal

balance model during the West of Mississippi sale and of the subsequent creation of the

new unpaid principal balance model.  See Ervin Ex. 77 at 4, ¶¶ 17-18.  As Kevin

McMahan, a Hamilton employee in charge of investigating the multifamily mortgage

sales, testified, "they simply pulled the wrong one off the shelf and ran it."  Tr. 7/19/2004

AM at 49, ln. 5-13.

16

### b.     Hamilton Reports Results to HUD

Hamilton provided the results to Cushman & Wakefield, HUD's financial advisor

on the North and Central sale.  Ervin Ex. 77 at 5, ¶ 18; Ervin Ex. 92 at 12, ¶ 46.  HUD

awarded the mortgage loans based on the results reported by Hamilton.  Ervin Ex. 77 at 5,

¶ 19; Ervin Ex. 92 at 12, ¶ 47.  The results reported by Hamilton were $1,511,244.00 less

than optimal, however, because the revenue model was used instead of the unpaid

principal balance model.  Ervin Ex. 77 at 1.

### D.     Single Family Note Sales

### 1.     Single Family #1 Note Sale

Hamilton also conducted single family mortgage note sales on behalf of HUD,

including the Single Family #1 Note Sale, held on October 25, 1995.  Ervin Ex. 77 at 4, ¶

14; Hamilton Ex. 169.  The goals for the Single Family #1 sale were to (1) maximize

proceeds, (2) maximize negative credit subsidy, (3) reduce the HUD-held inventory; and

(4) conduct a competitive auction providing equal opportunity to large and small

investors.  Hamilton Ex. 229 at HUD/KK 496.  Shortly after the sale concluded, Hamilton

presented the Single Family #1 sale bid results to HUD.  Hamilton Ex. 228.  HUD

declined to accept the bids for all of the assets because the amount offered was below

HUD's threshold credit subsidy price, which had not been published to bidders.  Ervin

Ex. 233; Tr. 10/31/2003 PM at 165, ln. 5-23; Tr. 7/19/2004 at 30, ln. 1-6.  Had HUD

accepted the bids for all the loans in the portfolio, HUD would have been required to

receive a Congressional appropriation to make up for the shortfall.[5]  Tr. 7/20/2004 at 137,

ln. 1-5.  To avoid the appropriation, HUD accepted bids for only 9,907 (of the 14,499)

loans offered for sale, which resulted in a negative credit subsidy.  See Ervin 233; Tr.

7/19/2004 at 30, ln. 17 - 31, ln. 18.  HUD subsequently reoffered the remaining loans so

as not to forfeit all the due diligence costs and the expense of conducting a sale.  Tr.

7/19/2004 at 30, ln. 17 - 31, ln. 18.

### 2.    Single Family #1 Reoffering

On November 6, 1995, HUD reoffered the remaining loans, advising bidders that it

had established a floor price equal to 74% of the unpaid principal balance of the loans

being reoffered and reserving the right to accept or reject any and all bids if that floor

price was not met.  Ervin Ex. 233 at 2342.  HUD did not receive any adequate offers to

purchase the entire lot and was required to select from among several partial bid

packages.  Tr. 7/19/2004 at 32, ln. 7-14; Hamilton Ex. 231.  On or about November 7,

1995, Hamilton presented to HUD four potential award options for the Single Family #1

Reoffering.  Tr. 10/31/2003 PM at 173, ln. 8 - 174, ln. 21; see Hamilton Ex. 231.  For

each alternative, the slides listed: (1) the number of mortgage notes that would be sold;

---

[5]As Helen Dunlap testified, the Fair Housing Authority fund subsidized its losses with tax
dollars through credit subsidies.  Tr. 7/20/2004 at 136, ln. 20 - 137, ln. 5.  "A negative credit
subsidy is when you have a profit on the portfolio, and a positive credit subsidy is when you have
a loss on the portfolio . . . for a negative credit subsidy is [when] the government gets to
appropriate less and positive means it has to appropriate more."  Id.  Within a fiscal year, HUD
was permitted to offset positive and negative credit subsidies without the need to seek an
appropriation so long as the aggregate annual number after each sale was negative.  Id.

(2) the unpaid principal balance of the notes sold; (3) the gross proceeds to be received;

(4) the gross proceeds as a percentage of unpaid principal balance; and (5) the credit

subsidy that would be generated. Hamilton Ex. 231. None of the options was superior to

the others in all of the categories. See id. Option #1 was for 73.11% of the unpaid

principal balance of the loans being reoffered, resulting in a positive credit subsidy of

$2,295,507. Hamilton Ex. 228 at 508. Option #4 was for 76.11% of the unpaid principal

balance of the loans being reoffered, resulting in a negative credit subsidy of $645,837.

Id. at 511.

Hamilton recommended that HUD select "Option #4," the option with the highest

negative credit subsidy. Tr. 7/20/2004 at 137, ln. 6-11; id. at 193, ln. 25 - 194, ln. 2; id. at

194, ln. 14-20; Tr. 7/19/2004 at 33, ln. 19-22. Contrary to Hamilton's recommendation,

Fair Housing Authority Commissioner, Nicolas Retsinas, chose Option #1--the option

that sold the most loans and had the highest revenue, but resulted in a positive credit

subsidy. Id. at 194, ln. 3 - 195, ln. 3; id. at 137, ln. 13 - 138, ln. 11; Tr. 7/19/2004 at 33,

ln. 6-11; id. at 34, ln. 3-9; Tr. 7/21/2004 at 227, ln. 4-8; Hamilton Ex. 231. Helen Dunlap

testified that while the selection involved balancing competing policy interests, for HUD,

selling the greatest number of loans was paramount. Tr. 7/20/2004 at 138, ln. 7-8.

The winning bidders in the Single Family #1 Reoffering were a team comprised of

BlackRock Capital Finance ("BlackRock") and Goldman Sachs and Company ("Goldman

Sachs"). Hamilton had no business relationship with Goldman Sachs at the time of the

Single Family #1 Reoffering sale. Tr. 7/19/2004 at 27, ln. 10-12; Tr. 10/30/2003 PM at 123, ln. 21-22. There was at least one conversation between a Hamilton employee and a Goldman Sachs employee about the possibility of Hamilton and Goldman Sachs working together on potential new business. Tr. 10/30/2003 PM at 121-23. Hamilton employed BlackRock as a subcontractor on another loan sale, known as the Partially Assisted Loan Sale. Id. at 131, ln. 1-14; Tr. 7/19/2004 at 26, ln. 6-12; Tr. 10/30/2003 PM at 119, ln. 3-11. BlackRock did not bid on the Partially Assisted Loan Sale. Tr. 10/30/2003 PM at 131, ln. 19-23. BlackRock did bid on and win assets in other note sales, including the Single Family #1 Reoffering. Id. at 119, ln. 3-11. HUD was aware of both BlackRock's subcontract with Hamilton and the fact that BlackRock was a bidder on other loan sales, including the single family note sales. Tr. 7/21/2004 at 224, ln. 20 - 225, ln. 6; Tr. 7/19/2004 at 26, ln. 3-15; Tr. 10/30/2003 PM at 131, ln. 1-18. In light of this information, HUD discussed with Hamilton the proper steps to ensure that BlackRock did not have access to information on sales where BlackRock might have bid. Tr. 7/21/2004 at 225, ln. 7 - 226, ln. 16. Grace Huebscher testified that it was neither uncommon nor improper in the industry for a competitor to team as a subcontractor on some loan sales and bid on others. Tr. 10/30/2003 PM at 133, ln. 24 - 134, ln. 3. Hamilton did not have any other business relationships with BlackRock during the course of the Single Family #1 Reoffering. Tr. 7/19/2004 at 26, ln. 16-18.

E.     **Crosscutting Task Order**

1.     **The Second Financial Advisory Contracts**

In March 1995, HUD solicited competitive offers to acquire the services of a group of replacement financial advisors to succeed Hamilton under the first financial advisor contract. Tr. 10/29/2003 PM at 53, ln. 11 - 55, ln. 14. Contracts were awarded to multiple firms, including Hamilton and Cushman & Wakefield. Id. The second financial advisory contracts were indefinite delivery-indefinite quantity contracts. Id. at 55, ln. 13-14.

2.     **Drafting the Crosscutting Task Order**

In the early stages of the first financial advisory contract, Hamilton suggested that HUD would benefit from having a crosscutting financial advisor to look across HUD's different portfolios and help advise the agency on how to dispose of its loans. Tr. 7/20/2004 at 142, ln. 22 - 143, ln. 8; Tr. 11/3/2003 AM at 299, ln. 3-20. The idea of the crosscutting role was shared among the various HUD offices, including HUD's contracting office. Tr. 7/19/2004 at 38, ln. 1-16; see also id. at 35, ln. 7 - 36, ln. 5. The original crosscutting concept involved HUD hiring additional in-house staff to provide advice on the financial management of HUD's disparate portfolios. Ervin Ex. 22. Due to HUD's staffing shortages and the accelerating pace of the loan sales program, however, the agency chose to out source the crosscutting function. Tr. 7/20/2004 at 143-146; Tr. 7/19/2004 at 36, ln. 12-24. On January 22, 1996, HUD prepared a Form 718 Funds

Reservation and Contract authority form projecting the cost of the crosscutting task order

at $5,000,000.00 per year.  Ervin Ex. 172.

Fair Housing Authority Comptroller, Kathy Rock, created a first draft of the

crosscutting task order after reviewing old task orders, soliciting input from other HUD

employees and receiving input from Hamilton's Fair Housing Authority project manager

Kevin McMahan.  Tr. 7/21/2004 at 228, ln. 1-10.  Rock then circulated her draft to

various HUD staff members.  Id. at ln. 11-23.  After receiving comments,

Rock submitted the final draft to HUD's Office of Procurements and Contracts to issue

the appropriate requests for proposals.  Id. at 229, ln. 1-7.

### 3.    Evaluation of Crosscutting Task Order Technical Proposals

In February 1996, HUD sent requests for proposals to Hamilton, Cushman &

Wakefield, First Boston and Ernst & Young, each of whom had been awarded separate

financial advisory contracts through a competitive bid process.  Id. at 230, ln. 15-18;

Ervin Ex. 262.  Two of the financial advisors, Hamilton and Cushman & Wakefield,

submitted proposals.  Tr. 10/29/2003 PM at 58, ln. 18-22, id. at 59, ln. 19-24.  Hamilton

bid a fixed basis point price of $20,842,000.00 over two years.  Hamilton Ex. 7.

Cushman & Wakefield bid a fixed basis point price of $8,258,000.00 over two years.

Ervin Ex. 258 at 10832.

HUD convened a Technical Evaluation Panel to review the submissions.  Ervin

Ex. 133 at HUD 075 00768.  The panel determined that Hamilton's proposal was

22

technically stronger than Cushman & Wakefield's proposal and unanimously recommended awarding the task order to Hamilton in its March 22, 1996 report. Tr. 7/21/2004 at 232, ln. 4-10; Ervin Ex. 133 at HUD 075 00768 - 075 00772. Upon further questioning by contract officer Hancock, Rock testified that she informed Hancock that Cushman & Wakefield's proposal was technically unacceptable because it appeared to be in response to a solicitation for financial advisory work on a single sale, rather than a proposal to manage the overall program. Tr. 7/21/2004 at 233, ln. 16-25; id. at 236, ln. 24 - 237, ln. 10. Hancock subsequently asked the Panel to review its findings and "be clear what characterization you would give each firm's proposal as it relates to whether or not their proposal is an acceptable one or not." Tr. 10/29/2003 PM at 62, ln. 18 - 63, ln. 1. The Panel submitted a revised report to Hancock, dated April 25, 1996, stating that the Cushman & Wakefield proposal was technically unacceptable and explaining the Panel's rationale. Id. at 63, ln. 2-10; Ervin Ex. 134 at HUD 075 00764 - 075 00765. Hancock accepted the panel's recommendation and passed it on to her supervisor for review. Tr. 10/29/2003 PM at 73, ln. 7-16. HUD's Office of the Inspector General also met with Panel members, including Rock, to discuss the panel's recommendation and basis for Hamilton's selection. Tr. 7/21/2004 at 235, ln. 3-12.

### 4.    Award of Crosscutting Task Order to Hamilton

Hancock subsequently met with Hamilton representatives to discuss clarifications and revisions to the scope of work in advance of HUD issuing the Crosscutting Task

23

Order.  Tr. 7/19/2004 at 40, ln. 18 - 41, ln. 8; Tr. 11/3/2003 AM at 336, ln. 19-21; Ervin

Ex. 142.  During the meeting, the group discussed price, the specific language of the task

order, and how Hamilton would develop a project plan.  Tr. 11/3/2003 AM at 336, ln. 22 -

337, ln. 1.  After the meeting, Hamilton employee Kevin McMahan e-mailed Hancock a

black-lined revised statement of work for the crosscutting task order based on the

discussions during the meeting.  Tr. 7/19/2004 at 43, ln. 15 - 44, ln. 13; Ervin Ex. 142.

HUD's Office of Procurements and Contract incorporated the changes and issued the task

order to Hamilton on or about April 25, 1996.  Hamilton Ex. 7.  The task order provided

that Hamilton would be paid $20,842,000.00 over two years, to be paid in monthly

installments of $868,417.00.  Id.

**F.      Original Source**

**1.      Ervin's *Qui Tam* and *Bivens* Actions**

On June 6, 1996, Ervin filed in the instant *qui tam* action a Complaint naming

Hamilton as a defendant based, *inter alia*, on allegations surrounding the West of

Mississippi sale.[6]  Specifically, Ervin alleged that Hamilton misapplied a defective

optimization model.  Hamilton Ex. 3 ¶ 13.  Ervin alleged that the computer "optimization

model" contained major flaws that resulted in an unfair advantage to certain bidders--

bidders who were ultimately improperly awarded mortgages under the note sales.  See

_____

[6]Ervin also filed a *Bivens* complaint on June 5, 1996.  The *Bivens* complaint alleged fraud
in connection with procurements on which Ervin had bid or attempted to bid.  See *Bivens* Compl.
¶¶ 239-41, 311-12, 543-45.

24

Ervin's Orig. Compl. ¶ 80 [Dkt. No. 1]. Ervin's original *qui tam* complaint also alleged

corruption in the award of the crosscutting task order, including the improper rejection of

Cushman & Wakefield's lower bid on erroneous grounds of technical unacceptability. Id.

¶¶ 101-04. The *Bivens* complaint alleged fraud in connection with procurements Ervin

had bid on or attempted to bid on or had participated in indirectly; specifically,

Hamilton's procurement of HUD contracts and financial advisory work, including the

Williams, Adley 8(a) contract, the first financial advisory contract and the crosscutting

task order. See *Bivens* Compl. ¶¶ 239-41, 311-12, 543-45. As part of its required

disclosures in connection with the *qui tam* case, Ervin provided the Government with

information related to the crosscutting task order and Hamilton's subcontracts with

Williams, Adley. See Ervin's Written Discl. of Mat. Evid.

At trial, the HUD Inspector General witnesses, Rudolph Joseph Haban and Judith

Hetherton, each stated that their investigations of the allegations in Ervin's *qui tam*

complaint and in the *Bivens* action occurred only after Ervin supplied the government

with copies of the lawsuits and related documents. See Tr. 11/3/03 PM at 219, ln. 2-7,

257, ln. 5-10, 268, ln. 5-19. Hamilton does not dispute that the government investigated

allegations against Hamilton only after the filing of Ervin's lawsuits. See Compl.,

Hamilton Sec. Group, et al. v. Ervin & Assocs., D.C. Superior Court Civ. Action No. 99-

0003864 (June 4, 1999) at 6, ¶ 22 ("In August 1996, the HUD Office of the Inspector

25

General opened civil and criminal investigations, ostensibly in response to various of Ervin's allegations.").

### 2.    The Coopers & Lybrand Fax

During discovery in the *qui tam* and *Bivens* actions, Ervin obtained a copy of the fax from Brocks to Fan, dated September 25, 1995, and provided this fax to the government on June 23, 1998. See Tr. 11/3/03 PM at 220, ln. 18-19. Prior to receiving it from Ervin, the government did not question either Brocks or Fan about Brocks's fax. See Tr. 11/3/2003 PM at 222, ln. 3 - 225, ln. 21; Hamilton Exs. 169, 200.

### 3.    The Manhattan Project

On or about October 24, 1996, after Ervin filed its original *qui tam* and *Bivens* complaints and the government began its investigation of Hamilton, a Hamilton employee, Rick Wolfe, discovered an inconsistency between the terms of the National Performing Multifamily Sale bid package and the formula Bell Labs used to optimize the results in that and subsequent note sales. Ervin Ex. 77 at 2-3, ¶¶ 2-4, 18. On November 11, 1996, an article appeared in the U.S. News and World Report criticizing Hamilton's conduct of the note sales.[7] See Hamilton Ex. 126.[8]

---

[7]There is pending before the Court Civil Action No. 99-CV-1698 (LFO), an action by Hamilton against Ervin charging that Ervin was the source of these published reports and that Ervin tortuously interfered with Hamilton's contract with HUD.

[8]At the conclusion of Ervin's case in chief, the Court indicated that the record would be left open " for the specific purpose of reserving judgment on the admissibility of documents that you cite in your proposed finding." Tr. 11/3/2003 PM at 282, ln. 13-15. Accordingly, the Court now admits the following documents over Hamilton's objection: Hamilton Exs. 26, 126 and 167

26

In November 1996, Hamilton assembled a team, nicknamed the "Manhattan Project," to investigate the optimization results reported to HUD in the multifamily note sales. Tr. 7/19/2004 AM at 45, ln. 2-13. Robinson was not part of the Manhattan Project team because he was no longer a Hamilton employee. Id. at 74, ln. 12-17. Manhattan Project team members Michael Dietz and Kevin McMahon interviewed Robinson about his involvement in the West of Mississippi sale. Id. at 74, ln. 24 - 75, ln. 11.

The Manhattan Project team asked Bell Labs to re-run optimization computations regarding the National Performing sale, the West of Mississippi sale, and the North and Central sale. Ervin Ex. 77 at 5, ¶ 21. On December 20, 1996, Hamilton submitted a report to HUD officials Nicolas Retsinas and Kathy Rock, entitled "Report on Optimization." Ervin Ex. 77. In the Report on Optimization, Hamilton explained that a discrepancy in the floor bid instructions conveyed to Bell Labs by Hamilton caused the West of Mississippi sale to generate revenue that was $2,372,307 less than optimal and the North and Central sale to generate revenue that was $1,511,244 less than optimal.[9] Id. at 1; Tr. 10/31/03 AM at 194, ln. 10-17. The Report on Optimization did not reveal to HUD that Brocks had identified to Fan a potential problem with the optimization results after the West of Mississippi sale. Tr. 10/31/03 AM at 200, ln. 9-14; Ervin Ex. 77.

---

and Ervin Ex. 92.

[9]According to the optimization report, "the erroneous instructions caused no impact on the National Performing MF Sale." Ervin Ex. 77 at 2, ¶ 3.

4.    **HUD Terminates Hamilton's Contract**

On October 17, 1997, Nicolas Retsinas requested that HUD's Office of

Procurement and Contracts terminate Hamilton's contract and take all appropriate actions

to recover from Hamilton the lost revenue caused by Hamilton's errors on the West of

Mississippi and North and Central sales. See Hamilton Ex. 26. Upon learning of

Hamilton's errors in the West of Mississippi and North and Central sales, HUD's

contracting officer Annette Hancock consulted with her superiors and legal counsel and

subsequently terminated Hamilton's contract. Tr. 10/30/03 AM at 97, ln. 4-20.

## II.    CONCLUSIONS OF LAW

The False Claims Act, 31 U.S.C. § 3729 *et seq*. ("the Act") authorizes damages for

"reverse false claims." A reverse false claim may be sustained against one who

"knowingly makes, uses, or causes to be made or used, a false record or statement to

conceal, avoid, or decrease an obligation to pay or transmit money or property to the

government." 31 U.S.C. § 3729(a)(7). Generally, in order to prevail on a reverse false

claim, a relator must sustain its burden of proving by a preponderance the following eight

elements:

(1)    the Relator is the original source; and the Defendant

(2)    Knowingly

(3)    Made, Used, or Caused to be Made or Used; a

(4)    Record or statement that was

(5)    False

(6)    To a material fact;  that

(7)    Damages were suffered by the United States through the concealment, avoidance, or decrease of an obligation to pay or transmit money or property to the Government; and that

(8)    the Defendant was the direct cause of the damages.

See John Boese, Sample Jury Instructions in a Qui Tam Case, App. F., p. F-30 (collecting cases).

The parties agree that seven of the elements apply to this case.  They disagree, however, as to the whether materiality is a required element.  Ervin argues that "[m]ateriality is not a required element" in a False Claims Act action.  Ervin's Pr. Find./Concl. at 36-38 [Dkt. No. 405].  The Court rejects this argument.  The great weight of case law holds that the materiality of a false record or statement is an element of False Claims Act liability.  See, e.g., United States v. Data Translation, Inc., 984 F.2d 1256, 1267 (1st Cir. 1992) (holding that a false statement that is not material does not support liability under the post-1986 False Claims Act); Tyger Constr. Co. v. United States, 28 Fed. Cl. 35, 55 (Fed. Cl. 1993) (holding that "the FCA covers only those false statements that are material"); United States v. Intervest Corp., 67 F. Supp. 2d 637, 646 (S.D. Miss. 1999) (stating that "the False Claims Act imposes a materiality requirement").  But see United States ex rel. Roby v. Boeing Co., 184 F.R.D. 107, 112 (S.D. Ohio 1998) (holding without explanation that in light of the Supreme Court's

29

decision in <u>United States v. Wells</u>, 519 U.S. 482 (1997), there is no separate materiality requirement under the False Claims Act).

The Supreme Court, in two recent opinions, established a three-part test for determining whether materiality is an element of a federal statute. <u>See</u> <u>Neder v. United States</u>, 527 U.S. 1 (1999); <u>United States v. Wells</u>, 519 U.S. 482 (1997). If Congress has not explicitly legislated materiality as an element of the offense materiality can be inferred, provided that the common law at the time the statute was enacted demonstrates a well-settled meaning of a term used by Congress for which materiality was an element. <u>Neder</u>, 527 U.S. at 21-22. If a term used by Congress had a well-settled meaning which included materiality, the court presumes that Congress intended to incorporate materiality. <u>Id.</u> The Congressional presumption may be rebutted if the text or structure of the statute demonstrates that implying a materiality requirement is inconsistent with the language of the statute. <u>Id.</u> at 23-24. Although instructive, neither of these decisions specifically addressed the materiality requirement under the False Claims Act.

The Southern District of Texas, in <u>United States ex rel. Wilkins v. North Am. Constr. Corp.</u>, 173 F. Supp. 2d 601 (S.D. Tex. 2001), conducted an exhaustive analysis of the False Claims Act in light of <u>Wells</u> and <u>Neder</u>. <u>See</u> <u>Wilkins</u>, 173 F. Supp. 2d at 618-30. The court concluded that materiality is an element of a civil False Claims Act action.

30

>The meaning of the terms used in the relevant provisions supports the conclusion that "false or fraudulent claim" includes an implicit requirement of materiality under the FCA. Although a "false claim" is not identical to a "fraudulent claim," neither the statute, its legislative history, nor the case law supports a reading that dispenses with a showing of materiality for one but requires it for the other. Liability for both a "false claim" and a "fraudulent claim" implicitly requires a showing that what makes the claim either false or fraudulent is material to the asserted claim of entitlement to receive money or property from the government."

Id. at 630. The court observed that "[t]he False Claims Act is a statutory cause of action intended from its inception to combat fraud against the government." Id. at 619. The court further stated that "[t]he common law definitions of 'false,' 'fraudulent' and 'claim' and the manner in which 'false claim' was used in common law jurisprudence are consistent with implicitly including materiality as an element of the FCA." Id. at 628. The court included reverse false claims under Section 3729(a)(7) because Congress intended that section to treat "an individual who makes a material misrepresentation to avoid paying money owed to the Government . . . as if he submitted a false claim to receive money." Id. at 630 (quoting S. Rep. no. 99-345, at 18). The Court is persuaded by the Wilkins Court's well reasoned analysis.

The Court, thus, proceeds to analyze whether Ervin sustained its burden on the eight requisite elements for each of the four remaining claims.

A.    **The North and Central Note Sale**

1.    **Original Source**

By statute, there is no jurisdiction over a *qui tam* action "based upon the public disclosure of allegations or transactions . . . unless . . . the person bringing the action is an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  The Act defines "original source" as an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action.  31 U.S.C. § 3730(e)(4)(B). "Direct knowledge" is knowledge  " 'marked by the absence of intervening agency.' " United States ex rel. Alexander v. Dyncorp, Inc., 924 F. Supp. 292, 300 (D.D.C. 1996) (citation omitted).  "Independent" means that the relator's knowledge is not dependent on public disclosures.  Id.  These jurisdictional requirements serve to ensure that the Act's rewards are available only where, at the time the *qui tam* claims were filed, the federal government was not already "on the trail" of the alleged wrongdoing.  See United States ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir. 1995) (citing United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 655 (D.C. Cir. 1994)).

The Court's May 1, 2003 Order[10] reviewed the three requirements as applied to the facts alleged and concluded "that Ervin's pleadings reflect compliance with the

---

[10]United States ex rel. Ervin & Assoc., Inc. v. Hamilton Sec. Group, Inc., 332 F.Supp.2d 1 (D.D.C. 2003) [hereinafter, "May 1, 2003 Order"].

jurisdictional requirements of § 3730(e)(4), sufficient to withstand the present motion to dismiss [Ervin's] claims."  During trial, it remained incumbent upon Ervin to demonstrate that the original source requirements are satisfied.

### a.    D.C. Circuit Law

This Circuit has adopted a two-part test to assess the qualification of a *qui tam* relator under § 3730(e)(4).  The reviewing court must first determine whether the "allegations or transactions" that form the basis for the suit were publicly disclosed "in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media."  31 U.S.C. § 3730(e)(4)(A).  If the answer to that question is affirmative, the court will continue with the "original source" inquiry.  See Springfield Terminal Ry. Co., 14 F.3d at 651.  This court's May 1, 2003 Order concluded that Ervin's allegations are "based upon" publicly disclosed information; thus, the key inquiry is whether Ervin is the "original source."

As mentioned above, in order to qualify as an "original source," Ervin must have demonstrated at trial that it had "direct" and "independent" knowledge of the fraud, and that it "voluntarily" provided information to the United States.

### I.    Direct Knowledge

A relator has "direct knowledge" of any information gleaned from direct observation and analysis, as that information was acquired without any "intervening

33

agency." <u>Alexander</u>, 924 F. Supp. at 300. Courts have allowed a plaintiff to proceed with

a *qui tam* suit based on information uncovered during an investigation undertaken by that

same plaintiff. For example, in <u>Springfield Terminal Ry. Co.</u>, the D.C. Circuit held that

the plaintiff qualified as an original source when it obtained essential information through

"its own efforts and experience, which . . . included personal knowledge of the []

proceedings and interviews with individuals and businesses identified in the [] records."

14 F.3d at 657. Similarly, Ervin's investigation of the alleged impropriety involving the

note sales was facilitated by its prior experience with HUD and its expertise in housing

matters. <u>See also</u> <u>Cooper ex rel. United States v. Blue Cross & Blue Shield of Fla., Inc.</u>,

19 F.3d 562, 568 (11th Cir. 1994) (finding "direct knowledge" when relator acquired

information through three years of his own research prior to public disclosure); <u>United</u>

<u>States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.</u>, 944 F.2d

1149, 1161 (3d Cir. 1991) (stating that plaintiffs may qualify as relators if their

information results from their own investigations); <u>Lamers v. City of Green Bay</u>, 998 F.

Supp. 971, 983 (E.D. Wisc. 1998) (noting that "an 'investigation' undertaken at the

relator's own initiative may form the basis for a *qui tam* action.").

　　　Ervin maintains that it satisfies the "direct knowledge" requirement because,

through personal observation and analysis, and through its own research and investigation,

it acquired knowledge of Hamilton's fraudulent conduct. Ervin's uncontroverted

contention that its own investigatory efforts led to the filing of the *qui tam* and *Bivens*

actions was buttressed by the testimony of the HUD Inspector General witnesses, both of whom admitted that their investigation of Hamilton stemmed from the allegations in Ervin's *qui tam* and *Bivens* complaints. See Tr. 11/3/03 PM at 219, ¶¶ 2-7, 257, ¶¶ 5-10, 268, ¶¶ 5-19; see also Compl., Hamilton Sec. Group, et al. v. Ervin & Associates, D.C. Superior Court Civ. Action No. 99-0003864 (June 4, 1999) at 6, ¶ 22.

### ii.    Independent Knowledge

There remains the question of whether the evidence introduced at trial showed that the allegations in the Second Amended Complaint were based on knowledge "independent" of any public disclosures. Typically, the jurisdictional bar applies where the publicly disclosed information " 'could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing. . . .' " Springfield Terminal Ry. Co., 14 F.3d at 654 (quoting United Sates ex rel. Joseph v. Cannon, 642, F.2d 1373, 1377 (D.C. Cir. 1981)). As the D.C. Circuit stated in United States ex rel. Findley v. FPC Baron Employees' Club, 105 F.3d 675 (D.C. Cir. 1997), "the public disclosure bar [] limits *qui tam* jurisdiction to those cases in which the relator played a role in exposing a fraud of which the public was previously unaware." Id. at 678. This Circuit has recognized, however, that Congress has not specified "by mathematical formulae the quantum or centrality of nonpublic information that must be in the hands of the *qui tam* relator in order for suits to proceed." Springfield Terminal Ry. Co., 14 F.3d at 653. The "direct and independent knowledge"

35

requirement "refers to direct and independent knowledge of *any* essential element of the underlying fraud transaction. . .." Id. at 657 (emphasis in original).

To be sure, between Ervin's June 1996 filing of its original *qui tam* complaint, and its filing of the Second Amended Complaint in September 1999, Ervin, Hamilton, and HUD OIG were all investigating possible errors or impropriety involving the optimization model. During this time period, Ervin continued its investigation of the note sales by conducting its own research, including several FOIA requests. Some of these requests piggy-backed upon other disclosures that had been made: for example, after more specific allegations of bid-rigging were made in a newspaper article that ran in The Washington Times on October 20, 1997, Ervin directed a FOIA request to HUD, requesting documents and other information referenced in the article. See May 1, 2003 Mem. at 13. It appears that at least some of the allegations in the Second Amended Complaint were supported by information that was publicly disclosed.

Ervin argues, however, that it is entitled to proceed as a relator based on the allegations in its original *qui tam* complaint, which it argues were "independent" of any public disclosures. Ervin's original complaint alleged that Hamilton had acted improperly by misapplying a flawed optimization model, and by misleading the public about the fairness of the auctions. Orig. Compl. at ¶¶ 13, 79-85 [Dkt. No. 1]. The Written Disclosure of Material Evidence Pursuant to 31 U.S.C. § 3730(B)(2), which was filed with the original complaint, explains that the allegations regarding the optimization model were

36

supported by a "[c]opy of the mathematical formula for the optimization model [and by] Ervin's analysis of the optimization model." Ervin's Written Discl. of Mat. Evid. at 3. Other allegations in the original complaint were similarly supported by individual sources, documentary evidence, and Ervin's analysis. Id. To the extent that Ervin may have relied on facially innocuous documents obtained under FOIA, such "disclosures" do not necessarily bar *qui tam* jurisdiction. As the D.C. Circuit explained in Springfield,

> [k]nowledge of the allegedly misrepresented state of affairs – which does not necessarily entail knowledge of the fact of misrepresentation – is *always* in the possession of the government. . . . Publication of the facially valid [documents], already in the government's pocket, cannot by itself be sufficient to defeat *qui tam* jurisdiction. Indeed, the entire *qui tam* regime is premised on the idea that the government's knowledge of misrepresented claims against the federal fisc (without knowledge that they are misrepresented) does not in itself translate into effective enforcement of the laws against fraud.

14 F.3d at 656 (emphasis in original). Therefore, although the government had physical possession of some of these documents and turned them over pursuant to FOIA requests, Ervin's own analysis and research brought the allegedly fraudulent activity to the government's attention. In other words, Ervin's original complaint contained essential elements of the allegedly fraudulent transaction – it identified the alleged perpetrator, and the scheme in general terms. Although Ervin may have enhanced its case with subsequent public disclosures, its original complaint set the government "on

the trail," prompting an investigation of possible improprieties involving the auctions.[11]

Fine, 70 F.3d at 571.

### iii.    Voluntarily Provided

In order to qualify as an "original source," a relator must have "voluntarily provided the information to the government before filing an action . . . ." 31 U.S.C. § 3730(e)(4)(B). Senator Grassley, one of the authors of the 1986 Amendments, described the purpose of § 3730(e)(4)(B)'s disclosure requirement as follows:

> In the definition of 'original source,' the requirement that the individual 'voluntarily' informed the Government . . . is meant to preclude the ability of an individual to sue under the *qui tam* section of the False Claims Act when his suit is based solely on public information and the individual was a source of the allegations only because the individual was subpoenaed to come forward. However, those persons who have been contacted or questioned by the Government . . . and cooperated by providing information which later led to a public disclosure would be considered to have 'voluntarily' informed the Government . . . and therefore considered eligible *qui tam* relators.

132 Cong. Rec. 20536 (1986).

---

[11]United States ex rel. Barajas v. Northrop Corp., 5 F.3d 407, 411 (9th Cir. 1993), held that a party "is 'an original source' with respect to a proposed amendment if he played some part, whether direct or indirect, in the public disclosure of the allegations that are the subject of the proposed amendments." In so holding, the Barajas court scrutinized the language and history of § 3730(e)(4)(A). Notably, the court emphasized that the Act refers to "*an* original source." Id. at 410 (quoting 31 U.S.C. § 3730(e)(4)(A)) (emphasis added). The use of the word "an," the court observed, "suggest[s] there may be more than one original source eligible to bring suit . . .." Id. The reasoning espoused by the Barajas court supports Ervin's contention that even if it was just one of several sources, this finding would support jurisdiction in this case. Although United States ex rel. Detrick v. Daniel F. Young, Inc., 909 F. Supp. 1010 (E.D. Va. 1995), expressed some doubt about the "trigger" theory articulated in Barajas, it acknowledged that "the Rules do not require the complainant to have direct and independent knowledge of everything in his complaint in order to qualify as a relator." Id. at 1021.

Ervin argues that it "provided the information to the government long before it filed its amended complaint and long before any alleged public disclosures." Ervin's Mem. in Opp. to Motion to Dismiss at 18 n.12. [Dkt. No. 140]. Ervin notes that "[t]he United States was served both with the original complaint and a Written Disclosure of Material Evidence in June 1996." Id. In fact, Attachment 1 to Ervin's Second Amended Complaint details the information that Ervin provided before filing the amended complaint. The record indicates that Ervin cooperated with the government (without need for a subpoena) and provided the government with information as it became available. See Tr. 11/3/03 PM at 219, ln. 2-7, 220, ln. 18-19, 257, ln. 5-10, 268, ln. 5-19. The Court concludes that because Ervin presented evidence sufficient to prove that it had direct and independent knowledge of the fraud alleged, and that it provided that information voluntarily to the United States, that it satisfied the jurisdictional requirements of § 3730(e)(4).

**2.    "Knowingly" (Scienter Requirement)**

To prove that Hamilton "knowingly" presented a false or fraudulent claim, Ervin must establish that Hamilton

(1)    ha[d] actual knowledge of the information;

(2)    act[ed] in deliberate ignorance of the truth or falsity of the information; or

(3)    act[ed] in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b).  Concerning the North and Central sale, Ervin argues that

Hamilton and its subcontractors[12] "act[ed] with reckless disregard of the truth or falsity

of the . . . North/Central Sale Optimization Results."  Ervin's Pr. Find./Concl. at 32

(Nov. 12, 2003) [Dkt. No. 405].

The "reckless disregard" prong of the definition for the term "knowingly" as

used in the False Claims Act, 31 U.S.C. 3729 *et seq.*, was enacted in a 1986 amendment

to the federal statutory code.  As described by what appears to be the only congressional

report accompanying the bill:

> S. 1562 defines this obligation as to make such inquiry as would be reasonable
> and prudent to conduct under the circumstances to ascertain the true and
> accurate basis of the claim. Only those who act in gross negligence of this duty
> will be found liable under the False Claims Act.
>
> ***
>
> the constructive knowledge definition attempts to reach what has become
> known as the ostrich type situation where an individual has 'buried his head in
> the sand' and failed to make simple inquiries which would alert him that false
> claims are being submitted. While the Committee intends that at least some
> inquiry be made, the inquiry need only be 'reasonable and prudent under the
> circumstances', which clearly recognizes a limited duty to inquire as opposed to
> a burdensome obligation.

S. Rep. 99-345, at 20, 1986 U.S.C.C.A.N. 5266, 5285 (internal quotation marks omitted).

---

[12]In False Claims Act actions, statements of the subcontractor, when submitted by the general contractor, may serve as a basis for liability against the general contractor.  See, e.g., Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 793 (4th Cir. 1999) ("[W]here the prime contractor allegedly knows that a material certification by a subcontractor was false, we find as a matter of law that the prime contractor has adopted the subcontractor's certification by submitting it to the government."); see also United States ex. rel. Roby v. The Boeing Co., 73 F. Supp. 2d. 897, 904 n.11 (S. D. Ohio 1999).

Reckless disregard, as used in the False Claims Act, "lies on a continuum between gross

negligence and intentional harm." United States v. Krizek, 111 F.3d 934, 941 (D.C. Cir.

1997) (internal citation omitted) (emphasis added). As the D.C. Circuit noted in Krizek,

> the best reading of the Act defines reckless disregard as an extension of gross
> negligence. Section 3729(b)(2) of the Act provides liability for false statements
> made with deliberate ignorance. If the reckless disregard standard of section
> 3729(b)(3) served merely as a substitute for willful misconduct--to prevent the
> defendant from "deliberately blind[ing] himself to the consequences of his tortious
> action"--section (b)(3) would be redundant since section (b)(2) already covers such
> struthious conduct. Moreover, as the statute explicitly states that specific intent is
> not required it is logical to conclude that reckless disregard in this context is not a
> "lesser form of intent," but an extreme version of ordinary negligence.

Id. at 942; see also id. at 943 (upholding district court's application of standard as

expressed as "gross negligence plus"); accord United States ex rel. Aakus v. Dyncorp, 136

F.3d 676, 682 (10th Cir. 1998); UMC Elecs. Co. v. United States, 43 Fed. Cl. 776, 792

n.15 (Fed. Cl. 1999).

In its January 7, 2004 Order, the Court denied Hamilton's motion for partial

judgment with respect to Count IX, related to the North and Central note sale. The Court

stated that "[t]hat transaction occurred arguably after Hamilton should have known enough

about all of the errors and problems with the West of Mississippi sale to place the burden

on Hamilton to demonstrate that the error's replication is not actionable gross negligence

in the extreme." Jan. 7, 2004 Order. Hamilton failed to present any evidence to rebut

Ervin's prima facie showing of gross negligence with respect to the North and Central

sale. Hamilton argues that the problems with the North and Central sale were due solely to

41

a "failure to have adequate backup lines of communication." Hamilton's Mod. Pr. Find./Concl. at 30 [Dkt. No. 446]. The standard of reckless disregard, however, was designed to address the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered. Crane Helicopter Servs., Inc. v. United States, 45 Fed.Cl. 410, 433 (Fed. Cl. 1999). Thus, "the statute covers not just those who set out to defraud the government, but also those who ignore the obvious warning signs." Id. Hamilton, in the exercise of prudent judgment, or even judgment short of reckless disregard, should have capitalized on the knowledge of the key employees involved in the West of Mississippi sale to prevent the same optimization errors from re-occurring during the North and Central sale.

In United States ex rel. Compton v. Midwest Specialists, Inc., 142 F.3d 296 (6th Cir. 1998), the United States Court of Appeals for the Sixth Circuit held that a supplier "knowingly" made a false claim to the government, where the supplier delivered goods to the government knowing the goods had not been tested and without knowing de facto whether the goods otherwise conformed to specifications. Id. at 303-04. Analogously, here Hamilton "knowingly" made a false claim to the government, where it delivered the results of the North and Central optimization sale to the government, knowing that it had not consulted the key players involved in the previous sale to ensure that any problems with the West of Mississippi sale were resolved prior to the North and Central sale and without knowing de facto whether the optimization model otherwise conformed to HUD's

42

specifications.   See also Larry D. Barnes, Inc. v. United States, 45 Fed. Appx. 907, 914

(Fed. Cir. 2002) (holding that contractor's submission of an ordinary change order claim

was reckless under the FCA because the contractor failed to verify the claim's underlying

assumptions); United States v. Cabrera-Diaz, 106 F. Supp. 2d 234, 238-39 (D. Puerto Rico

2000) (holding that defendant's billing secretary's failure to document time charges for

anesthesiology services before submitting Medicare reimbursement claims was reckless

under the FCA); Krizek, 111 F.3d at 942 (holding that physician's "shodd[y]

recordkeeping," which led to inflated Medicare reimbursement claims, was reckless under

§ 3729(b)).

　　　Ervin presented evidence that, during the West of Mississippi sale, both a Hamilton

employee (Robinson) and an employee of Hamilton's sub-contractor, Bell Labs

(Schindler), discovered an error in the optimization model used in multifamily sales.

Ervin Ex. 77 at 2-3, ¶¶ 5-6.  Robinson made no effort subsequent to the West of

Mississippi sale, however, to ensure that the problem with the optimization model was

permanently rectified.  Tr. 10/31/2003 PM at 155, ln. 24 - 156, ln. 5.  Robinson did not

contact Schindler, or anyone else at Bell Labs, to determine if an unpaid principal balance

model was created for subsequent sales.  Id.  Similarly, Robinson failed to inform any

other Hamilton employees or HUD, of the nature of the problem with the West of

Mississippi sale or the need to ensure that Bell Labs corrected the West of Mississippi

optimization errors before the next mutifamily note sale.  Tr. 7/19/2004 AM at 75, ln. 1-7.

Hamilton, although required to prepare and submit a post-auction review report to HUD,

failed to debrief Robinson, Hamilton's principal point of contact with Bell Labs, or

Schindler, the individual responsible for preparing the optimization analysis, after the

West of Mississippi sale. As Kevin McMahon testified, he learned about Robinson's

knowledge of the West of Mississippi problems and the need to fix the optimization model

only during an interview of Robinson during the Manhattan Project investigation. Tr.

7/19/2004 AM at 49, ln. 5-13; 75, ln. 6-7. Thus, in the post-auction review report issued

to HUD, Hamilton made no mention of the need to modify the optimization model and re-

run the model during the West of Mississippi sale. See Hamilton Ex. 167.

Likewise, although as Hamilton points out, Schindler did create a permanent upaid

principle balance model, Schindler did not discard the original revenue model. See Tr.

7/19/2004 AM at 49, ln. 3-13. Nor did Schindler inform anyone at Bell Labs of the

problems with the West of Mississippi optimization model or the creation of the unpaid

principal balance model to permanently rectify the problem. See id. Furthermore,

Schindler never followed up with Robinson, or anyone else at Hamilton, to inform them of

the new model or ensure that the new model accurately reflected Hamilton's

requirements.[13]  Ervin Ex. 77 at 4, ¶ 12.

---

[13]Schindler suffered a heart attack shortly after the West of Mississippi sale but returned
to work at Bell Labs, albeit in a different division, prior to the North and Central sale. Tr.
7/19/2004 AM at 48, ln. 23 - 49, ln. 2.  He was not debriefed by Hamilton or Bell Labs
concerning the West of Mississippi sale. Id. at 49, ln. 5-13.

As evidenced by his fax to Henry Fan shortly after the West of Mississippi sale, Michael Brocks was also aware of at least a potential problem with the optimization analysis. See Ervin Ex. 78. Although Brocks was ultimately persuaded that his excel analysis may not have accurately calculated the optimal bids, neither Brocks initial misgivings, nor the existence of his fax to Fan were disclosed prior to the North and Central sale. As with Robinson and Schindler, Brocks was not debriefed after the West of Mississippi sale as part of the post-auction review process. See Tr. 10/31/2003 AM at 223, ln. 17 - 224, ln. 4.

As Ervin demonstrated, there was no evidence of any communication between the West of Mississippi and North and Central note sales teams regarding the optimization problems during the West of Mississippi sale, despite the fact that Hamilton not only had the opportunity, but was required, to perform and submit a written summary of a post-auction review of the West of Mississippi sale. Hamilton Ex. 8 at C-2, ¶ 1.g. One of the purposes of the post-auction review was to use the "Lessons Learned" on the West of Mississippi sale to improve future sales. Hamilton Ex. 167 at 8. Hamilton, thus, "failed to make simple inquiries which would [have] alert[ed]" Hamilton that there was a problem with the optimization model prior to the North and Central sale. See Covington v. Sisters of the Third Order of St. Dominic of Hanford, 1995 WL 418311, at *4 (9th Cir. July 13, 1995). This clearly constituted "gross negligence plus."

      3.      **"Makes, Uses, or Causes to be Made or Used" a "Record or Statement"**

Not all false records or statements are actionable under the False Claims Act. "Rather, there must be a claim 'for payment or approval.' " See United States ex rel. Bettis v. Odebrecht Contractors of California, Inc., 297 F. Supp. 2d. 272, 278 (D.D.C. 2004) (internal citations omitted). As a result, only actions which cause the government to pay out money where it is not due, or actions which deprive the government of money it is lawfully owed, are considered claims within the meaning of the False Claims Act. Id. (noting that under the remedial nature of the statute, "a submission need not be an actual invoice to be a 'claim' or a 'statement' . . .").

It is undisputed that Hamilton submitted a record or statement to HUD, in the form of the North and Central note sale auction's "optimized" results report. See Ervin Ex. 77 at 5, ¶ 18. Hamilton stipulated to this fact in its suit against the government, arising out of the same factual circumstances as this case. See Ervin Ex. 92 at 12, ¶¶ 46-47 ("On or about August 6, 7 or 8, 1996, [Bell Labs] reported the results of its running of the optimization model to Hamilton, which in turn provided them to Cushman & Wakefield, the Financial Advisor for the North /Central Sale, which in turn provided them to HUD. . . . HUD awarded the mortgages based upon the bid results [provided by Hamilton].").[14] HUD relied on the report in selecting the winning bidders in the North and Central sale. See Ervin Ex. 77 at 5, ¶ 19; Ervin Ex. 92 at 12, ¶47. In other words,

---

[14] "Although a judicial admission is binding only in the case in which it was made, a court may consider a judicial admission as evidence in another case." In re United Mine Workers of Am. Employee Benefit Plans Litig., 782 F. Supp. 658, 674 (D.D.C. 1992).

HUD relied on Hamilton's representations that this was the optimal mix of bidders maximizing the number of loans sold and revenue to HUD.

### 4.    Falsity

A relator must establish that the record or statement submitted to HUD was false. 31 U.S.C. § 3729(a)(1); see, e.g., United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d 258, 265 (D.D.C. Dec. 18, 2002) ("False Claims Act liability attaches to one who 'causes to be presented' a false claim.").

Here, although purporting to submit a report to HUD of the bidders in the North and Central sale whose bids maximized the number of loans sold and proceeds to HUD, Hamilton submitted a false record to HUD in so far as it contained a list of bidders whose bids did not meet the stated criteria.  Hamilton admitted as much in its December 20, 1996 Memorandum to HUD, stating that, due to an error in the optimization process, the results of the North and Central sale produced revenue that was $1,511,244.00 less than optimal.  Ervin Ex. 77 at 1.  According to a declaration by Kathy Rock, the Government Technical Monitor on HUD's contract with Hamilton, in support of HUD's motion for summary judgment in a Freedom of Information Act suit arising out of the multifamily note sales,[15]

---

[15]Hawthorn Mgmt. Servs., Inc. v. Dep't of Hous. & Urban Dev., 1997 U.S. Dist. LEXIS 21491 (D. Conn. Dec. 18, 1997).

> HUD used an optimization model to determine the combination of individual bids
> and pool bids that maximized both the number of loans sold and the proceeds to
> HUD and the federal taxpayers.
>
> HUD's financial advisor scanned the bid cards it received and then transmitted
> the bids in electronic format to [Bell Labs], which created and maintains the
> optimization model. [Bell Labs] ran the bids through the optimization model and
> *submitted a report of the results to HUD the identities of the bidders whose bids*
> *would maximize both the number of loans sold and the proceeds to HUD* and the
> federal taxpayers and the prices they paid for loans or pools of loans.

Hawthorn, 1997 U.S. Dist. LEXIS 21491 at *5-6 (quoting initial declaration of Kathy

Rock) (emphasis added); see Tr. 7/21/2004 AM at 276, ln. 16 - 277, ln. 16.

> Subsequently, Rock submitted a supplemental declaration stating that,
>
> [Hamilton] has advised HUD that, because of an error in the instructions that
> [Hamilton] provided to [Bell Labs] for the optimization model, the results of the
> optimization as reported to and accepted by HUD did not fully maximize the
> proceeds to HUD for this sale . . . The error in the North and Central sale,
> therefore, resulted in decreased proceeds to HUD of $1,511,244 or 2/10ths of one
> percent.

Hawthorn, 1997 U.S. Dist. LEXIS 21491 at *8 (quoting Kathy Rock's supplemental

Declaration). Thus, the uncontroverted evidence is clear that Hamilton's Report on

Optimization for the North and Central sale was a false representation of the optimal

bidders.

### 5.    Materiality

As discussed above, the False Claims Act imposes liability only for *material*

misrepresentations. United States v. TDC Mgm't Corp., 288 F.3d 421, 426 (D.C. Cir.

2002); United States ex rel. Barrett v. Columbia/HCA Health Care Corp., 251 F.Supp.2d

28, 33 (D.D.C. 2003) (citing United States ex rel. Berge v. Bd. of Trs. of the Univ. of

Ala., 104 F.3d 1453, 1459 (4th Cir. 1997)).   For a violation to give rise to false claims

liability under this theory, compliance with the presented claim must have been so

important to the contract that the government would not have honored the submission for

payment on the claim if it were aware of the violation.  TDC Mgm't Corp., 288 F.3d at

426 (holding the defendant liable for omitting information "indicating that it was acting

in a manner that was contrary to the core terms of the Program.").

      Here, HUD announced in its solicitation package for the North and Central sale

that "[b]ids will be evaluated in a manner that optimizes the gross proceeds to FHA from

the sale of the Mortgage Loans collectively."  Hamilton Ex. 161 at H/SM 13630; see also

id. at H/SM 13722.  HUD was required to adhere to the valuation scheme set forth in the

solicitation package.  See Multimax, Inc. v. Fed. Aviation Admin., 231 F.3d 882 (D.C.

Cir. 2000).  HUD relied on Hamilton to manage the North and Central sale in accordance

with the specifications in the bid package and to present HUD with a list of bidders that

optimized the gross proceeds to HUD.  Hamilton submitted a list of bidders to HUD that

it specifically claimed represented the bidders in the North and Central sale whose bids

maximized the number of loans sold and proceeds to HUD.  See Ervin Ex. 77 at 1;

Hawthorn, 1997 U.S. Dist. LEXIS 21491 at *5-6 (quoting initial declaration of Kathy

Rock).  HUD made its determinations with respect to the winning bids based on

Hamilton's representations, i.e. that the list of bidders represented bids that, if accepted,

would maximize proceeds to HUD.  Ervin Ex. 77.  As Hamilton subsequently revealed,

however, Hamilton's list of bidders did not meet the stated criteria.  Id. at 1.

Hamilton argues that the optimization errors in the North and Central sale

amounted to only 0.2% of total revenue and thus, are not material.  Hamilton Mod. Pr.

Find./Concl. at 25-26 [Dkt. No. 446].  Materiality, however, is not determined with

reference to dollars or percentages of an overall transaction.  Rather, "the materiality of a

false statement turns on 'whether the false statement has a natural tendency to influence

action or is capable of influencing agency action.' "  United States ex rel. Berge v. Trs.

of Univ. of Ala., 104 F.3d 1453, 1460 (4th Cir. 1997) (internal citation omitted); see

Hays v. Hoffman, 325 F.3d 982, 992 (8th Cir. 2003) (noting that false claim material if it

was "capable of influencing the government's payment decision").  Ervin established at

trial that Hamilton's false optimization results in the North and Central note sales not

only had a tendency to, but actually did, influence HUD's decision as to who was

awarded the North and Central loans.  See Ervin Ex. 92 at 12, ¶ 47.

Furthermore, Ervin presented strong evidence that HUD would not have accepted

the erroneous result, foregoing $1,511,244.00 in additional revenue, if HUD had been

aware of the optimization error prior to awarding the loans.  Upon learning of the

optimization error, HUD actually sued Hamilton for the lost revenue.  HUD's

contracting officer, Annette Hancock, testified that after she received the December 20,

1996 report from Hamilton, detailing the optimization errors, she terminated Hamilton's

50

contract and asserted a damage claim against Hamilton for the losses due to the

optimization errors in the West of Mississippi and North and Central sales.  Tr. 10/30/03

AM at 97, ¶¶ 4-20.

Thus, Hamilton's false statement, *i.e.* its report to HUD of the optimal bids that

were not in fact "optimal," was material for purposes of Ervin's False Claims Act claim.

### 6.    Damages were Suffered by the United States Through the Concealment, Avoidance, or Decrease of an Obligation to Pay or Transmit Money or Property to the Government[16]

---

[16]On the eve of its trial defense, Hamilton moved for summary judgment on Count IX of the Second Amended Complaint (related to the North and Central Note Sale), on the grounds that Hamilton was under no contractual obligation to use an optimization model with a "UPB-based bid floor" or to "maximize sales proceeds while still meeting all criteria . . . ." Hamilton's Mot. for Sum. Judg. Brief at 4-5 [Dkt. No. 438].  Hamilton's motion relies on the holding by the United States Court of Federal Claims, in a parallel proceeding between Hamilton and the United States, that neither "the 18505 Contract, nor Task Order 1 concerning the North/ Central sale, required or imposed any legal duty on Hamilton to run an optimization model utilizing bid floors to yield HUD maximum sales proceeds." Id. at Ex. A (Hamilton Sec. Advisory Servs. v. United States, 98-169C (Fed. Ct. Cl. June 12, 2004) (Braden, J.) Mem. Opin. and Final Order Denying Def's. Mot. for Recon. at 2).  Hamilton specifically argues that it cannot be subject to False Claims Act liability because it was under no specific, legal duty to employ an unpaid principal balance model and maximize sales proceeds to HUD.  Furthermore, Hamilton contends that to find False Claims Act liability predicated on the North and Central sale would be inconsistent with Judge Braden's holding that Hamilton had no contractual duty to run an optimization model utilizing bid floors to yield HUD maximum sales proceeds.

Hamilton misconstrues Ervin's claim.  In fact, Count IX does not depend on the existence of an underlying contractual obligation.  Hamilton falsely represented to the United States that the results of the North and Central sale were "optimal," that is, the results maximized the revenue to the United States.  As the Court recognized in its January 7, 2004 Memorandum, Ervin's North and Central claim is based on Hamilton's false representation that:

> the [North and Central] sale presents facts distinct from the West of Mississippi note sale, specifically greater evidence of reckless disregard of the falsity of the representation that the results reported to HUD were "optimal."

Jan. 7, 2004 Mem. at 17, n.11.  At trial, HUD Controller, Kathy Rock, confirmed that Hamilton presented a slate of bids that was represented to be the maximum proceeds to HUD.  Tr.

a.    **Obligation**

The parties clash over whether there was an "obligation to pay or transmit money

or property to the government" within the meaning of section 3729(a)(7).  Central to the

dispute is whether the Loan Sale Agreement ("LSA") between the highest bidder and

HUD created an "obligation" under section 3729(a)(7).  In United States v. Pemco

Aeroplex, Inc., 195 F.3d 1234 (11th Cir. 1999), the United States brought a "reverse

false claim" action against an aircraft maintenance contractor, alleging that the contractor

knowingly misidentified aircraft wings on an inventory schedule before purchasing them

for scrap value from the United States.  Id. at 1235.  The defendant argued that it was

under no pre-existing "obligation to return or pay for the wings at the time it submitted the

inventory schedule."  Id. at 1237.  Thus, according to the defendant, the submission of the

inventory schedule was merely an offer to purchase the excess wings; it did not establish

_____

7/21/2004 at 277. Hamilton does not dispute that it represented the North and Central sale
results as "optimal." Thus, it is this false representation, not a breach of a contractual obligation,
that forms the basis of Hamilton's False Claims Act liability. See, e.g., United States ex rel.
Schwedt v. Planning Research Corp., 59 F.3d 196 (D.C. Cir. 1995) (holding that plaintiff could
pursue False Claims Act claims based on contractor's false progress reports even though the
court rejected plaintiff's argument that defendant violated contract specifications); United States
v. TDC Mgmt. Corp., Inc., 24 F.3d 292, 296 (D.C. Cir. 1994) (holding that although submitting
inaccurate monthly progress reports to government did not breach the underlying contract, this
did not preclude the Government from pursuing a False Claims Act suit based on information
omitted from those same progress reports).
    Moreover, there is no risk of inconsistent results:  this Court's holding that, under the
circumstances and based on admissions and witness statements, there was an "obligation" under
the False Claims Act, is not in conflict with the Court of Claim's holding that the Contract
language itself did not give rise to a requirement that Hamilton run an optimization model
utilizing bid floors to yield HUD maximum sales proceeds.  Accordingly, Hamilton's motion for
summary judgment lacks merit and is denied.

either an obligation to purchase or the specific purchase price. Id. ("[T]his offer created

only a contingent obligation to purchase--dependent on the government's inspection of the

property and acceptance of [defendant's] offer."). In reversing the district court's

dismissal for failure to state a claim, the United States Court of Appeals for the Eleventh

Circuit held that the government sufficiently alleged that the defendant had an obligation

to account for the full value of any excess government property by returning that property

or otherwise disposing of it in accordance with the government's instructions. Id.

Submitting the inventory form was simply part of fulfilling the pre-existing obligation. Id.

Likewise, here, under the terms of the LSA, a bidder was required and obligated to

submit a full deposit to HUD, and proceed to closing, if its bid was accepted. Hamilton

Ex. 161. At the moment that the bidder submitted its bid package to HUD containing an

executed LSA, it was legally obligated to complete the sale. Id. at H/SM 13634, 13725-

13727. The LSAs were executed prior to the sales, thus, an "obligation" to pay the amount

identified in each bid was present at the time the results were reported to HUD. Id. at

H/SM 13713.

Hamilton argues that the LSAs created no liability to the government on behalf of

any bidder, unless and until HUD selected that bidder as the winner. The LSAs stated, for

example, that "[a]ll evaluations and determinations made by HUD as to which bid(s)

optimizes the sale proceeds to HUD from the sale of Mortgage Loan(s) shall be in HUD's

sole and absolute discretion" and that "HUD reserves the right to accept or reject any and

all bids made in connection with the Auction, including the Bidder's Bid." Hamilton Ex.

161 at H/SM 13723. As stated in the Court's September 20, 2003 Order, however,

Hamilton concedes that correcting the optimization errors would have resulted in the

selection of winning bidders generating an additional $1,511,244 in the North and Central

sale. Sept. 22, 2003 Order at 6 [Dkt. No. 325]. Furthermore, HUD did not actually have

total discretion to knowingly award loans on terms other than those announced in the

solicitation package, *i.e.,* accept bids that did not optimize the gross proceeds to the Fair

Housing Authority. Hamilton Ex. 161. Under the section entitled "Bid Evaluation," the

North and Central Package advised bidders: "Bids will be evaluated in a manner that

optimizes the gross proceeds to FHA from the sale of the Mortgage Loans collectively."

Id. at H/SM 13630; see also id. at H/SM 13722. HUD was required to adhere to the

evaluation scheme set forth in the solicitation document. See Multimax, Inc. v. Fed.

Aviation Admin., 231 F.3d 882 (D.C. Cir. 2000). Although HUD had some discretion to

reject bids, it would have been unlawful for HUD to knowingly award loans to other than

the optimal mix of bidders as announced in the evaluation criteria.

     **b.**     **Damages / Causation**

     Hamilton's Manhattan Project team concluded that the results reported in August

1996 to HUD for the North Central sale were $1,511,244.00 less than optimal. See Tr.

10/31/2003 AM at 194, ln. 14-17; Ervin' Ex. 77 at 18 ("North and Central MF Sale: The

sale produced revenue of $621,674,221 and the Lucent/Bell Labs result generated using

the [unpaid principal balance] floor is $623,185,465. The difference is $1,511,244 or 2/10ths of one percent."). HUD only realized value from the sales if the sales closed. As Judge Braden noted in her opinion covering the same factual terrain, "[a]ll of the wining bidders in the North/Central sale closed." Hamilton Sec. Advisory Servs., Inc. v. United States, NO. 98-169C, 60 Fed. Cl. 144, 153 n.7 (Fed.Cl. Mar 25, 2004). The Court finds that Ervin has proved by a preponderance of the evidence that the damages caused by the Hamilton's, and its subcontractor's, extreme gross negligence are $1,511,244.00.

Accordingly, based on the record evidence, and for the reasons discussed above, the Court concludes that Ervin has carried its burden of proving by a preponderance of the evidence the requisite elements of a False Claims Act with respect to Count IX, related to the North and Central note sale, and that the "the amount of damages which the Government [has] sustain[ed] for this claim" is $1,511,244 – the difference between the amount actually collected by the United States from the bidders named as the winners in the North and Central note sale auction and the amount that would have been collected by the United States but for the extreme gross negligence of Hamilton and its subcontractor that led to the errors associated with the North and Central Note Sale.

### 7.    Damages Assessed Against Hamilton

The question thus arises as to the amount of damages owed by Hamilton. 31 U.S.C. § 3729(a)(7) provides that a person who knowingly makes, uses, or causes to be made or

used, a false record or statement to conceal, avoid, or decrease an obligation to pay or

transmit money or property to the Government,

> is liable to the United States Government for a civil penalty of
> not less than $5,000 and not more than $10,000,[17] plus 3 times
> the amount of damages which the Government sustains because
> of the act of that person, except that if the court finds that--
>
> (A) the person committing the violation of this subsection
> furnished officials of the United States responsible for
> investigating false claims violations with all information known
> to such person about the violation within 30 days after the date
> on which the defendant first obtained the information;
> (B) such person fully cooperated with any Government
> investigation of such violation; *and*
> (C) at the time such person furnished the United States with the
> information about the violation, no criminal prosecution, civil
> action, or administrative action had commenced under this title
> with respect to such violation, and the person did not have
> actual knowledge of the existence of an investigation into such
> violation;
>
> the court may assess not less than 2 times the amount of
> damages which the Government sustains because of the act of
> the person. A person violating this subsection shall also be
> liable to the United States Government for the costs of a civil
> action brought to recover any such penalty or damages.

31 U.S.C. § 3729(a)(7) (emphasis added). Hamilton contends that it satisfied all three

requirements to reduce the award from treble damages to double damages under the

statute. See Hamilton Mem. Regarding Proper Penalty at 4 [Dkt. No. 454]. According to

---

[17]On August 30, 1999, the Department of Justice published a final rule increasing the
penalties to a minimum of $5,500 and a maximum of $11,000. 28 C.F.R. § 85.3(9) (2000). The
final rule applies only to violations occurring after September 29, 1999 and, therefore, does not
apply here.

the trial record, however, although Hamilton did eventually furnish the results of the

Manhattan Project investigation to HUD officials, it did not disclose all information

regarding the errors on the North and Central sale within 30 days after Hamilton first

learned of those errors.  See 31 U.S.C. § 3729(a)(7)(A).  Michael Brocks testified that

Hamilton employee Rick Wolfe discovered an error in the optimization model in October

1996.  Tr. 10/31/2003 AM at 189, ln. 16-23; see also Tr. 11/3/2003 AM at 307, ln. 4-12;

Ervin Ex. 77 at 5, ¶ 20.  Tests were conducted by Bell Labs shortly thereafter to confirm

that the optimization model employed during the North and Central sale did not actually

yield "optimized" results.  Ervin Ex. 77 at 5, ¶ 21.  This was not disclosed to HUD

officials until December 5, 1996.  Ervin Ex. 77 at 5, ¶ 21.

Furthermore, although there is evidence that Hamilton cooperated with the

Government investigation of the multifamily note sales, see Tr. 7/19/2004 AM at 81, ln.

2-9; Hamilton Exs. 168, 169, 200, Hamilton did not disclose the North Central problems

to the HUD Office of Inspector General or Department of Justice, despite being aware

that the Government was conducting an investigation into the note sales at the same time

Hamilton conducted its Manhattan Project investigation.  See Tr. 11/3/2003 PM at 258,

ln. 6-14; Tr. 7/19/2004 AM at 81, ln. 2-9.  As the Supreme Court made clear in Vermont

Agency of Nat'l Res. v. United States, 529 U.S. 765 (2000), the statutory reduction from

treble to double damages only applies in "some of those (presumably few) cases

involving defendants who provide information concerning the violation before they have

knowledge that an investigation is underway." Id. at 786 n.16 (parenthetical in original).

Accordingly, the amount of damages is trebled, under 31 U.S.C. § 3729(a), to

$4,533,732.00.

With respect to the civil penalty, the penalty may attach to each instance in which a

party "knowingly . . . causes to be made or used a . . . fraudulent claim paid or approved

by the Government." 31 U.S.C. § 3729(a)(2). The False Claims Act defines a claim as:

> any request or demand, whether under a contract or otherwise, for
> money or property which is made to a contractor, grantee, or other
> recipient if the United States Government provides any portion of the
> money or property which is requested or demanded, or if the
> Government will reimburse such contractor, grantee, or other recipient
> for any portion of the money or property which is requested or
> demanded.

31 U.S.C. § 3729(c). While the Court may assign multiple penalties, each penalty must

be attached to an identifiable demand for payment or claim made. See United States v.

Krizek, 111 F.3d 934, 938 (D.C. Cir. 1997). The parties agree, and the Court concurs,

that Hamilton is subject to one civil penalty in this case. See Joint Suppl. Brief of United

States and Ervin at 1 [Dkt. No. 455]; Hamilton's Mem. Regarding Proper Penalty at 6

[Dkt. No. 454]. Because the Court finds liability for the North and Central note sale

predicated on a lesser degree of scienter--namely reckless disregard, rather than "actual

knowledge," or "deliberate ignorance," 31 U.S.C. § 3729(b)--the Court assesses a civil

penalty of $5,000.00. Thus, the total damage award assessed against Hamilton is

$4,538,732.00.

58

**8.    Division of Damage Award Between Ervin and the United States**

Under 31 U.S.C. § 3729(d)(2), where the Government elects not to intervene in a

False Claims Act action, the relator is entitled to an amount "not less than 25 percent and

not more than 30 percent" of the proceeds.  Ervin and the Department of Justice have

stipulated and agreed that Ervin will receive 29% of the damages and fines collected by

the United States pursuant to this Court's judgment, exclusive of Ervin's attorney's fees

and costs.  See Joint Suppl. Brief of United States and Ervin at 2 [Dkt. No. 455]; Suppl.

Report by United States at 1 [Dkt. No. 460].  Accordingly, the Court awards Ervin 29% of

the damages assessed against Hamilton, totaling $1,316,232.28.  The Court awards the

Government the remaining 71% of the damages assessed against Hamilton, totaling

$3,222,499.72.

**B.    Single Family Note Sale #1 Reoffering and Williams, Adley Section 8(a)
Contract**

As detailed above, the test for False Claims Act liability is whether there was a

false or fraudulent claim, record, or statement, made with the requisite scienter, that was

material, and that caused the government to pay out monies or to forfeit monies due.  31

U.S.C. §§ 3729(a)(1), (a)(2), (a)(7).

**1.    False Claim, Statement or Record**

Thus, the False Claims Act attaches liability not to fraudulent activity but to false

claims, statements or records resulting from that activity.  See United States ex rel. Totten

v. Bombardier Corp., 286 F.3d 542, 551 (D.C. Cir. 2002).  To prove a False Claims Act

allegation, therefore, a relator must produce evidence that the defendant actually submitted false demands for payment or submitted false records or statements in order to get a false claim paid. See United States ex rel. Ortega v. Columbia Healthcare, Inc., 240 F.Supp.2d 8, 18 (D.D.C. 2003). It is not enough " 'to describe a private scheme in detail but then to allege simply and without any stated reasons for his belief that claims requesting illegal payments must have been submitted.' " United States ex rel. Aflatooni v. Kitsap Physicians Servs., 314 F.3d 995, 1002 (9th Cir. 2002) (citation omitted).

With respect to the Single Family Note Sale #1 Reoffering, Ervin's claim centers on the allegation that Hamilton recommended to HUD that it award assets to the bidders identified in Option #1, rather than those in Option #4. Ervin alleges that the latter option would have resulted in greater revenue to HUD in the form of a negative credit subsidy. Ervin Pretrial Statement at 5. Ervin maintains that, in making this recommendation, Hamilton sought to influence the outcome of the Single Family #1 Note Sale Reoffering in favor of BlackRock and Goldman Sachs, because of Hamilton's pre-existing relationship with both companies. Id. The uncontroverted trial evidence, however, clearly indicates that Hamilton recommended Option #4. It was HUD's Commissioner, Nicolas Retsinas who, contrary to Hamilton's recommendation, made an "active and clear" decision to select the option that sold the most loans, Option #1. Tr. 7.20.2004 at 137, ln. 14-20.

In light of the evidence that Hamilton, in fact, recommended Option #4, Ervin alternatively argues that Hamilton's submission of Option #1 as one of the four potential

60

options for HUD's consideration constituted a false record because it did not meet the

predetermined threshold price of 74% of the unpaid principal balance of the loans being

reoffered. Ervin's Mod. Pr. Find./Concl. at 41 [filed under seal, not yet docketed]. Again,

Ervin maintains that Hamilton included Option #1 in order to influence the selection in

favor of BlackRock and Goldman Sachs. The lynchpin of this claim is completely

undermined by the uncontroverted evidence that Hamilton recommended Option #4, not

Option #1. Furthermore, according to HUD's stated criteria in the bid package for the

Single Family #1 Reoffering, HUD reserved the right to accept or reject any and all bids if

the 74% floor price (in terms of unpaid principal balance) was not met. Ervin Ex. 233 at

2341-2342. HUD did not indicate that it would definitely reject any bids that did not meet

the 74% threshold. In fact, as Hamilton was well aware, HUD had multiple goals for the

single family note sales: (1) maximize proceeds, (2) maximize negative credit subsidy, (3)

reduce the HUD-held inventory; and (4) conduct a competitive auction providing equal

opportunity to large and small investors. Hamilton Ex. 229 at HUD/KK 496. Out of all

the options presented, Option #1 sold the most loans and generated the highest gross

proceeds, which met two of the stated goals for the single family note sales. See Hamilton

Ex. 228 at HUD/KK 508-511. Hamilton presented detailed briefing slides of all four

options, clearly indicating to HUD that Option #1 resulted in a positive credit subsidy. See

Hamilton Ex. 231. There was no credible evidence presented at trial that Hamilton acted

improperly in submitting the four options to HUD or otherwise sought to influence the

selection process in favor of Option #1.

### 2.    Conflict of Interest

A government contractor's failure to disclose an organizational conflict of interest

constitutes a false claim under the False Claims Act.  Harrison v. Westinghouse Savannah

River Co., 352 F.3d 908, 916-17 (4th Cir. 2003); see also United States ex rel. Cantekin v.

Univ. of Pittsburgh, 192 F.3d 402, 414-15 (3rd Cir. 1999).

HUD's first Financial Advisor contract with Hamilton defined an organizational

conflict of interest as, among other things, "a situation in which the nature of work under a

Government contract and a Contractor's organizational, financial, contractual or other

interests are such that . . . [t]he Contractor's objectivity in performing the contract work

may be impaired."  Hamilton Ex. 8 at I-1 (quoting 48 C.F.R. 2452.209-72(a)).  Ervin

maintains that Hamilton failed to disclose organizational conflicts of interest with respect

to its Hamilton's relationships with both BlackRock and Goldman Sachs.  See Ervin's

Mod. Pr. Find./Concl. at 42 [filed under seal, not yet docketed].  Specifically, Ervin claims

that Hamilton did not disclose to HUD that Hamilton corresponded with Goldman Sachs

concerning the possibility of working on potential new business prior to the Single Family

#1 Reoffering.  Id. at 41-42.  Ervin further claims that Hamilton was also pursuing other

business deals with BlackRock at the time of the Single Family #1 Reoffering.  Id.

Contrary to Ervin's contentions, however, Hamilton did not fail to disclose any

organizational conflicts of interest.  HUD was fully aware of BlackRock's subcontract

with Hamilton on the Partially Assisted Note Sale.  In fact, the record indicates that HUD

and Hamilton specifically discussed steps to make sure BlackRock did not have access to

information on any sales on which it might be a bidder.  At the time of the Single Family

#1 Reoffering, this was the only business relationship between Hamilton and BlackRock

established at trial.  Moreover, Hamilton did not have any existing business relationship

with Goldman Sachs at the time of the Single Family Reoffering.  Ervin presented

evidence of only one conversation between a Hamilton employee and a Goldman Sach's

employee concerning the possibility of working on potential new business.  Tr. 10/30/2003

PM at 121-23.  This falls far short of evidencing a relationship that might have impaired

Hamilton's objectivity.  Accordingly, Ervin's claim that Hamilton filed a false conflict of

interest certification is without merit.

Ervin, thus, failed to satisfy its burden at trial to establish by a preponderance of the

evidence that Hamilton submitted a false claim, statement or record in connection with the

Single Family Note Sale #1 Reoffering.

**C.    Williams Adley 8(a) Contract**

As with the Single Family Note Sale #1 Reoffering, Ervin failed to prove that

Hamilton submitted a false claim, statement or record to HUD with respect to the

Williams, Adley Section 8(a) Contract.  Counts XIII and XIV of the Second Amended

Complaint allege that Hamilton solicited and received a "kickback" of guaranteed

63

subcontracting work from Williams, Adley and that Hamilton and Williams, Adley submitted exaggerated pricing estimates for task orders under the contract. Sec. Am. Compl. ¶¶ 198-203. Ervin claims that Hamilton and Williams, Adley formed a secret exclusive subcontracting agreement and that Hamilton manipulated the Section 8(a) procurement process to avoid competing for loan sale advisory work. Tr. 10/29/2003 AM at 23, ln. 2-5.

Ervin presented no evidence, however, that Hamilton and Williams, Adley conspired to evade procurement regulations. Nor did Ervin present any evidence that Hamilton failed to properly perform the financial advisory work under the subcontract according to the government's standards. HUD contracting officer Hancock testified that she ensured the appropriate policies and procedures were adhered to and complied with in the award of the Section 8(a) contract. Tr. 10/30/2003 AM at 109, ln. 23 - 110, ln.1. Hancock knew Hamilton was serving as financial advisor on the loans sales both when Williams, Adley submitted its November 2, 1994 proposal naming Hamilton as a potential subcontractor and when the Section 8(a) contract was awarded. Tr. 10/30/2003 AM at 110, ln. 2-8; id. at 115, ln. 19-21; Williams, Adley Ex. 27. Issues were raised with regard to the fees Williams, Adley proposed for Hamilton's work under the Section 8(a) contract, and those fees were the subject of negotiations. Tr. 10/30/2003 AM at 117, ln. 21 - 118, ln.1; Williams, Adley Exs. 72, 95. Hancock testified that when she reviewed the file and signed the award, she was satisfied that the proposed prices were appropriate. Tr.

10/30/2003 AM at 118, ln. 2-7.  Ervin adduced no evidence to the contrary.  Thus, Ervin's

allegations regarding the Section 8(a) contract do not state a coherent theory of how HUD

was fraudulently induced to pay or forego money.  See Harrison v. Westinghouse

Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999) (holding that payment or forfeiture

of funds by the government in reliance on a material false statement is an essential element

of false claims liability); see also Aflatooni, 314 F.3d at 1002.

Ervin, thus, failed to satisfy its burden at trial to establish by a preponderance of the

evidence that Hamilton submitted a false claim, statement or record in connection with the

Williams, Adley Section 8(a) Contract.

**D.    Crosscutting Contract**

**1.    Conspiracy to Rig Competition for Crosscutting Task Order**

To prove a False Claims Act allegation, a relator must produce evidence that the

defendant actually submitted false demands for payment, or submitted false records or

statements in order to get a false claim paid.  See United States ex rel. Ortega v. Columbia

Healthcare, Inc., 240 F.Supp.2d 8, 18 (D.D.C. 2003).  As the Court previously observed,

however, " '[c]laims for payment submitted to the government pursuant to a fraudulently

obtained contract violate the FCA, even if the claims themselves do not contain false

statements.' "  Sept. 22, 2003 Order at 9 [Dkt. No. 325] (quoting United States ex rel.

Alexander v. Dyncorp, Inc., 924 F. Supp. 292, 298 (D.D.C. 1996)).

Counts XV and XVI of the Second Amended Complaint, allege that Hamilton provided a "kickback" in the form of a promise of future employment to Fair Housing Authority Controller, Kathy Rock in exchange for rigging the competition for the Crosscutting Task Order in favor of Hamilton. See Ervin's Sec. Am. Compl.; Tr. 10/29/2003 AM at 23, ln. 16-20. Ervin, however, failed to present sufficient evidence at trial of any collusive relationship between Rock and Hamilton. Rock was only one member of the Technical Evaluation Panel that recommended Hamilton be awarded the Crosscutting Task Order. Tr. 7/21/2004 at 40, ln. 18- 41, ln. 8. The Panel determined that the only other bidder, Cushman and Wakefield's proposal for the Crosscutting Task Order was technically unacceptable. Tr. 10/29/2003 PM at 63, ln. 2-10; Ervin Ex. 134. Ervin did not call any of the other Panel members as witnesses and introduced no evidence to suggest any undue influence on the Panel by Rock. Ervin also failed to produce any evidence of the job offer Hamilton allegedly made or promised to Rock.

Furthermore, a review of the actual evidence presented reveals that the award of the Crosscutting Task Order was scrutinized in advance, not only by Fair Housing Authority Program Staff but by the Office of the Inspector General and the Office of Procurements and Contracts. Ervin Exs. 133, 134, 139; Tr. 7/21/2004 at 233, ln. 16-20; Tr. 10/29/2003 PM at 73, ln. 7-16; Tr. 7/19/2004 at 40, ln. 18 - 41, ln. 8; Tr. 11/3/2003 AM at 130, ln. 16- 21. In fact, HUD contracting officer Annette Hancock testified that there was no evidence that the competition for the Crosscutting Task Order was rigged or slanted in Hamilton's

66

favor or that members of the Panel were under any influence or pressure to find

Hamilton's offer superior to that of Cushman & Wakefield's. Tr. 10/20/2003 AM at 137,

ln. 2-10. Ervin failed to present sufficient evidence to controvert Hancock's testimony.

Moreover, Ervin presented no evidence that Hamilton did not perform its work on the task

order fully and satisfactorily.

Thus, Ervin failed to establish that Hamilton colluded with Kathy Rock or that

Hamilton otherwise fraudulently obtained the Crosscutting Task Order or submitted any

false claim with respect to its performance under the task order.

### 2.    Failure to Disclose Conflict of Interest

#### a.    Duty to Disclose Conflict of Interest

Failure to disclose a conflict of interest may constitute of false claim for purposes

of False Claims Act liability. See United States ex rel. Cantekin v. Univ. of Pittsburgh,

192 F.3d 402, 414-15 (3rd Cir. 1999). A defendant, however, incurs False Claims Act

liability for failure to disclose information only where the defendant had a legal obligation

to disclose the omitted information. United States ex rel. Berge v. Board of Trustees of

the University of Alabama, 104 F.3d 1453, 1459 (4th Cir. 1997).

Unable to establish any collusive relationship between Hamilton and Rock, Ervin

now maintains that Hamilton submitted a false claim by falsely certifying that it did not

have an unfair competitive advantage in bidding on the Crosscutting Task Order.

Specifically, Ervin claims that a conflict of interest arose when Hamilton bid on the

Crosscutting Task Order after one of Hamilton's employees submitted input on the task

order to Rock, who was tasked with drafting the task order. See Ervin's Mod. Pr.

Find./Concl. at 34-35 [filed under seal, not yet docketed]. Ervin cites Federal Acquisition

Regulation ("FAR") § 9.505-2(b)(1) as the basis for its claim, which excludes certain

government contractors from bidding on contracts where they participated in the drafting

of the statement of work. Section 9.505-2(b)(1) states that

> If a contractor prepares, or assists in preparing, a work statement to be
> used in competitively acquiring a system or services - or provides material
> leading directly, predictably, and without delay to such a work statement -
> that contractor may not supply the system, major components of the
> system, or services . . . .

48 C.F.R. § 9.505-2(b)(1). Sections 9.505-2(b)(1)(ii) and (b)(3), however, specifically

excepts certain government contractors from the prohibitions of Section 9.505-2(b)(1) --

specifically, contractors who have participated in the development and design work of the

contract under which the work statement was drafted. See id. at § 9.505-2(b)(1)(ii) and

(b)(3). The language of the provision plainly contemplates the situation where a firm

wishes to compete for a contract for a system or services based on that firm's earlier

development and design work. The rationale for allowing development and design

contractors to participate in this manner is stated in Section 9.505-2(a)(3):

> In development work, it is normal to select firms that have done the
> most advanced work in the field. These firms can be expected to
> design and develop around their own prior knowledge. Development
> contractors can frequently start production earlier and more
> knowledgably than firms that did not participate in the development,
> and this can affect the time and quality of production, both of which

68

> are important to the Government. In many instances the Government
> may have financed the development. Thus, while the development
> contractor has a competitive advantage, it is an unavoidable one that
> is not considered unfair; hence no prohibition should be imposed.

48 C.F.R. § 9.505-2(a)(3). Thus, the competitive advantages afforded the contractor in

such situations are not prohibited as unfair because they are both unavoidable and

advantageous to the government.

The record is undisputed that Hamilton, as HUD's financial advisor, served as a

development and design contractor for HUD's loan sales program. Tr. 10/31/2003 PM at

259, ln. 3-14 ("[Hamilton] provided advice to HUD in connection with developing a loan

sale program."); id. at 331, ln. 22 - 332, ln. 3 ("Was Hamilton asked to develop and

design the whole loan sales program? Yes, I believe they were."); Tr. 7/20/2004 at 122,

ln. 16-22 ("The initial role was to design . . ."); Tr. 11/3/2003 AM at 331, ln. 22 - 332, ln.

3. In this capacity, Hamilton advised HUD on how to deal with its portfolio and

developed strategies for a successful loan sales program. Early on in its first financial

advisor contract, Hamilton advised HUD that it needed a crosscutting financial advisor

who could look across HUD's different portfolio's and help advise the agency on how to

dispose of its loans. Tr. 11/3/2003 AM at 299, ln. 3-20. HUD eventually procured the

services of a crosscutting financial advisor under the second financial advisor contract.

Tr. 10/29/2003 PM at 55, ln. 15 - 56, ln. 3. As a development and design contractor,

Hamilton was permitted to and successfully did compete for the Crosscutting Task Order.

Thus, there was no conflict of interest based on a violation of FAR 9.505-2(b)(2),

and Ervin failed to present sufficient evidence that Hamilton otherwise failed to disclose a conflict of interest with respect to the Crosscutting Task Order. Accordingly, Ervin failed to establish by a preponderance of the evidence that Hamilton submitted a false claim, record or statement for purposes of False Claims Act liability.

**b.     Damages**

Under the False Claims Act, damages must be proven with reasonable certainty. Thus, a relator must establish both that the fact of the damages is certain and that the amount of damages can be reasonably computed. See John T. Boese, Civil False Claims and Qui Tam Actions, Appendix F: Sample Jury Instructions (2) in a Reverse False Claim Case. In United States ex rel. Harrison v. Westinghouse Savannah River Co., 352, F.3d 908 (4th Cir. 2003), the Fourth Circuit explained that damages are properly measured "by the amount of money the government paid by reason of the false statement above what it would have paid absent the false statement." Id. at 922.

The relator in Harrison had alleged that the defendant submitted a false claim by failing to disclose an organizational conflict of interest by its subcontractor. Id. According to the Court,

> the district court properly required the plaintiff to prove damages by showing how much more the government paid [the defendant's subcontractor] to perform the subcontract than it would have paid another firm absent the false no-[organizational conflict of interest] certification. Although [the defendant] ran afoul of the fair bidding requirements, there was no evidence adduced at trial suggesting that [the defendant's subcontractor] failed to perform the work that it was required to perform

70

under the subcontract or that the government did not receive the benefit of the work performed.

Id. Thus, absent any evidence of a lower bid by a viable candidate, or evidence that the contractor had not satisfactorily performed its work under the contract, the Court of Appeals affirmed the trial court's finding of no damages for the FCA violation.

_____Likewise, even if Ervin established that Hamilton submitted a false claim, record or statement to HUD by violating FAR 9.505-2(b)(2) or otherwise failing to disclose a conflict of interest, it failed to prove actual damages with reasonable certainty. Ervin claims that damages on its Crosscutting Task Order claim should be measured as the difference between the price of Hamilton's bid and the bid submitted by Cushman and Wakefield. As in Harrison, this measure of damages is inappropriate because, according to the evidence presented at trial, Cushman and Wakefield's bid was rejected by the Panel as technically unacceptable. Furthermore, Ervin presented no evidence that Hamilton did not fully perform its duties to the satisfaction of the government under the Crosscutting Task Order.

Ervin, thus, failed to prove any actual damages, as required to sustain a False Claims Act claim.

**E.      Counts X, XI, and XII of Ervin's Second Amended Complaint**

Ervin failed to present evidence at trial with respect to Counts X, XI and XII of its Seconded Amended Complaint. Accordingly, Counts X, XI and XII are dismissed.

### III.    CONCLUSION

To recap, for the reasons discussed above I conclude that: (1) Ervin has carried its burden of proving by a preponderance of the evidence the requisite elements of a False Claims Act with respect to Count IX, related to the North and Central note sale; (2)  the "the amount of damages which the Government [has] sustain[ed] for this claim" under 31 U.S.C. § 3729 is $1,511,244.00; (3) the total damage award assessed against Hamilton, including penalties, is $4,538,732.00; (4) Ervin is entitled to 29% of this award under 31 U.S.C. § 3729(d)(2), totaling $1,316,232.28, and the United States is entitled to the remaining $3,222,499.72; (4) Ervin has failed to establish liability under the False Claims Act with respect to Count II (related to the Single Family Offering), Counts XIII and XIV (related to the Williams, Adley 8(a) contract), and Counts XV and XVI (related to the cross-cutting contract); (5) Ervin failed to present evidence at trial with respect to Counts X, XI, XII, which are accordingly dismissed; and (6) Hamilton's Motion for Summary Judgment on Count IX of the Second Amended Complaint is dismissed.

An Accompanying Order and Judgment will issue consistent with this Memorandum.

DATED:  January 25, 2005

Louis F. Oberdorfer
UNITED STATES DISTRICT JUDGE

72