UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )      Civil Action No. 07-1144 (RWR)
                                    )
TOYOBO CO. LTD. et al.,             )
                                    )
        Defendants.                 )
_____ )

MEMORANDUM OPINION AND ORDER

The government filed a complaint against defendants Toyobo
Co. Ltd. and Toyobo America, Inc. (collectively "Toyobo"),
alleging violations of the False Claims Act ("FCA"), 31 U.S.C.
§§ 3729-33, as well as a common law claims for fraud and unjust
enrichment in connection with the sale of Zylon body armor.
Toyobo has moved to dismiss.  The government has sufficiently
alleged and pled with particularity its FCA presentment and false
statements claims and its common law fraud and unjust enrichment
claims.  However, the government has alleged sufficiently its FCA
conspiracy claims only as to the purported conspiracies between
Toyobo and the Zylon weavers, not as to the purported
conspiracies between Toyobo and any of the vest manufacturers.
Toyobo's motion to dismiss therefore will be granted with respect
to the government's FCA conspiracy claims as to Toyobo and the
vest manufacturers and denied in all other respects.

- 2 -

BACKGROUND

The complaint alleges the following facts.  Toyobo
manufactured the synthetic fiber "Zylon" for use in the
production of bulletproof vests.  (Compl. ¶ 17.)  Toyobo
contracted with two trading companies to distribute its Zylon
yarn to three weaving companies, which provided woven Zylon to
various vest manufacturers.  (Id. ¶¶ 20-21, 23.)  However,
"Toyobo kept complete control over access to and use of Zylon for
ballistic applications."  (Compl. ¶ 21.)  Between 1999 and 2005,
these vest manufacturers sold vests to federal agencies, both
indirectly through the Multiple Award Schedule of the General
Services Administration ("GSA") and directly.  (Id. ¶¶ 10-12,
16.)  The vest manufacturers also sold vests during this time
period to state, local, and tribal law enforcement authorities
under the Bullet Proof Vest Grant Partnership Act ("BPVGPA")
Program, under which the federal government reimbursed these
authorities for up to fifty percent of the costs of the body
armor.  (Id. ¶¶ 13-16.)  Federal agencies paid more than
$30,000,000 to purchase more than 59,000 vests through the GSA
Schedule (id. at 12), and paid more than $4,600,000 on direct
purchases of more than 9,700 vests.  (Id. ¶ 16.)  The government
reimbursed state, local, and tribal authorities at least
$9,800,000 for the purchase of at least 46,000 vests.  (Id.

- 3 -

¶ 15.)  The vest manufacturers offered five-year warranties on all vests the government purchased.  (Id. ¶¶ 12, 15-16.)

The government alleges that Toyobo's Zylon "was defective and degraded more quickly than Toyobo and the Zylon Vest Manufacturers represented."  (Id. ¶ 1.)  In 1997 and 1998, Toyobo discovered that damage during the weaving process reduced the expected strength of its Zylon fiber.  (Id. ¶¶ 22, 25.)  Internal research suggested that Zylon suffered from hydrolysis, chemical decomposition caused by exposure to water.  (Id. ¶ 51.)  Toyobo also discovered that Zylon degraded when exposed to light.  (Id. ¶¶ 30-31.)  Toyobo performed accelerated aging testing, which exposed Zylon to extreme heat and humidity for short periods of time.  These tests showed a significant drop in ballistic performance.  (Id. ¶¶ 47, 49.)  As early as 1999, a Toyobo executive stated at a meeting that "he did not think that Toyobo could make things right with Zylon and the attendees at the meeting discussed how Toyobo should not give out too much know-how about Zylon."  (Id. ¶ 39.)

In July 2001, DSM, a Zylon vest manufacturer, reported to Toyobo that a Zylon vest failed during ballistic testing, and announced that it would put on hold its introduction to market of its Zylon product.  (Id. ¶¶ 52-53.)  Although "Toyobo was deeply concerned" with the ballistic failure, it "tried to hide its concerns."  (Id. ¶ 58.)  Toyobo informed the other vest

- 4 -

manufacturers and other companies in the Zylon supply chain of
this development but assured them that "it had not found any
serious indication of Zylon strength degradation from its aging
tests using Zylon fiber[.]" (Id. ¶ 55.)  However, Toyobo
disclaimed liability "for any use of Zylon fiber." (Id.)  After
DSM's announcement, Honeywell International Corporation, a
manufacturer of vest components called Z Shields, temporarily
stopped shipping its Zylon products. (Id. ¶¶ 50, 59.)  "[B]ased
on Toyobo representations that it had not found any 'serious
indications' from Toyobo's internal testing of Zylon," Honeywell
resumed selling Z Shields. (Id. ¶ 59.)

    Toyobo began to release incomplete and misleading data to
the vest manufacturers.  In July 2001, Toyobo informed the vest
manufacturers that its internal testing showed that Zylon's
strength decreased at elevated temperatures and humidity levels,
but Toyobo "failed to release other data regarding Zylon that was
in its possession that would have shown the extent to which Zylon
degraded[.]" (Id. ¶ 60.)  Toyobo released other data suggesting
that Zylon lost five percent of its strength over ten years under
foreseeable conditions and ten percent of its strength at forty
degrees Celsius and eighty percent humidity.  The government
alleges that this data conflicted with evidence in Toyobo's
possession at the time, and with data Toyobo obtained in later
testing. (Id. ¶¶ 61, 63.)  Toyobo also announced a twenty-five

- 5 -

to thirty-five percent loss of strength for Zylon "exposed to
fluorescent lamps for several weeks, but failed to state that
this 25-35% loss of Zylon strength had not occurred under extreme
conditions." (Id. ¶ 67.)  In November 2001, Toyobo released data
reflecting a "dramatic drop" in Zylon strength.  (Id. ¶ 75.)
After receiving negative feedback from other companies in the
supply chain (see, e.g., id. ¶ 77), Toyobo "notified its
'important customers' that it would withdraw its November 2001
degradation data on the grounds that it was 'statistically not
correct and not reliable.'  In January 2002, Toyobo . . .
replaced it with data that had the bad data points removed."
(Id. ¶ 83.)  During 2002 and 2003, Toyobo provided the vest
manufacturers with quarterly updates on its research "but did not
provide other 'confidential' and 'top secret' Toyobo internal
documents concerning Zylon research in its possession[.]" (Id.
¶ 87.)

    Additionally, beginning in May 1999, Toyobo discovered that
its manufacturing process produced Red Thread, "a reddish,
discolored section of Zylon fiber which has a reduced tensile
strength." (Id. ¶¶ 37, 41-42.)  Although Toyobo implemented
countermeasures designed to reduce the occurrence of Red Thread,
"the Red Thread problem re-occurred continually during Toyobo's
manufacture of Zylon." (Id. ¶ 45.)  When Hexcel, one of the
Zylon weavers, discovered Red Thread in its Zylon (id. ¶¶ 93,

- 6 -

95), Toyobo admitted that it had observed a loss of strength in Red Thread.  (Id. ¶ 99.)  Toyobo told Hexcel that "if the Red Thread was controlled and short and small in number, they would not harm the Zylon properties or its quality.  At the time Toyobo made this statement, it knew this statement was false and misleading because it could not control the [ends with Red Thread] and that they were neither short nor small in number."  (Id. ¶ 101.)  Lincoln Fabrics, another weaver, agreed to receive from Toyobo Zylon inventory knowing that it might contain Red Thread.  (Id. ¶ 124.)

Toyobo took steps to induce various participants in the Zylon supply chain to continue supplying Zylon products despite questions about its suitability for ballistic applications.  For instance, Toyobo agreed to provide Hexcel a refund if its customers stopped using Zylon.  (Id. ¶ 76.)  When Hexcel stopped weaving Zylon after it became concerned about Red Thread, Toyobo agreed to provide Hexcel with replacement Zylon fiber and $240,000 in reimbursement.  (Id. ¶¶ 102, 104, 111.)  Additionally, when Barrday, another weaver, stopped weaving Zylon when it became concerned about possible degradation, Toyobo agreed that Teijin Shoji, one of the Zylon trading companies, would retain title to all Zylon delivered to Barrday.  Teijin Shoji later retained title to all Zylon delivered to Lincoln Fabrics as well.  (Id. ¶ 84.)

- 7 -

In August 2005, the National Institute of Justice ("NIJ") issued a report detailing its own ballistics testing on Zylon vests.  The report revealed that the "bulk of the Zylon vests failed the testing[.]" (Id. ¶ 126.)  After the report issued, all vest manufacturers stopped using Zylon.  (Id.)

The government filed a complaint asserting claims against Toyobo for FCA violations involving presenting fraudulent claims (Count 1), making false statements (Count 2), and conspiracy (Count 3), and for common law fraud (Count 4) and unjust enrichment (Count 5).[1]  Toyobo has filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the government failed to plead fraud with particularity as required by Rule 9(b), failed to plead factual allegations that Toyobo presented a false claim for payment, or that Toyobo made any false statements or conspired to get the United States to pay a claim, and failed to plead factual allegations that support its fraud and unjust enrichment counts.

<u>DISCUSSION</u>

In evaluating a Rule 12(b)(6) motion, a court "'may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice.'"  <u>Trudeau v. FTC</u>, 456 F.3d 178, 183 (D.C. Cir. 2006) (quoting <u>EEOC v. St. Francis Xavier</u>

---

[1] The complaint misnumbered this Count.

- 8 -

Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997)).  A court considering a Rule 12(b)(6) challenge must accept as true any facts alleged by the plaintiff and grant all reasonable inferences drawn from those facts.  Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

Rule 9(b) applies to FCA actions.  United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 551-52 (D.C. Cir. 2002) (noting that every circuit to consider the issue has held that Rule 9(b) applies to FCA complaints).  It provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b) to "ensure that defendants have adequate notice of the charges against them to prepare a defense[,]"  United States ex rel.

McCready v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 114,
116 (D.D.C. 2003), discourage "suits brought solely for their
nuisance value" or as "frivolous accusations of moral
turpitude[,]" United States ex rel. Joseph v. Cannon, 642 F.2d
1373, 1385 (D.C. Cir. 1981), and "'protect reputations of . . .
professionals from scurrilous and baseless allegations of
fraud[.]'" Id. at 1385 n.103 (alteration in original) (quoting
Felton v. Walston & Co., Inc., 508 F.2d 577, 581 (2d Cir. 1974)).

Rule 9(b) does not abrogate Rule 8, and must be read in
light of Rule 8's requirement that allegations be simple,
concise, and direct, and short and plain statements of each
claim.  Joseph, 642 F.2d at 1386; see also United States ex rel.
Pogue v. Diabetes Treatment Ctrs. of Am., Inc., 238 F. Supp. 2d
258, 269 (D.D.C. 2002) ("While . . . Rule 9(b) requires more
particularity than Rule 8, . . . Rule 9(b) does not completely
vitiate the liberality of Rule 8.").  In an FCA action, Rule 9(b)
requires that the pleader "'state the time, place and content of
the false misrepresentations, the fact misrepresented and what
was retained or given up as a consequence of the fraud[,]' . . .
[and] individuals allegedly involved in the fraud." United
States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389
F.3d 1251, 1256 (D.C. Cir. 2004) (quoting Kowal v. MCI
Communic'ns Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994)).  "In
sum, although Rule 9(b) does not require plaintiffs to allege

- 10 -

every fact pertaining to every instance of fraud when a scheme
spans several years, defendants must be able to 'defend against
the charge and not just deny that they have done anything
wrong.'" Id. at 1259 (quoting United States ex rel. Lee v.
SmithKline Beecham, Inc., 245 F.3d 1048, 1052 (9th Cir. 2001));
accord McCready, 251 F. Supp. 2d at 116 (reasoning that a court
"'should hesitate to dismiss a complaint under Rule 9(b) if the
court is satisfied (1) that the defendant has been made aware of
the particular circumstances for which she will have to prepare a
defense at trial, and (2) that plaintiff has substantial
prediscovery evidence of those facts'" (quoting Harrison v.
Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir.
1999))).

I.   PRESENTING FALSE CLAIMS

     The FCA created a cause of action against anyone who
"knowingly presents, or causes to be presented, to an officer or
employee of the United States Government . . . a false or
fraudulent claim for payment or approval[.]"  31 U.S.C.
§ 3729(a)(1) (2000).[2]  See also United States ex rel. Siewick v.

_____

     [2] Congress amended the FCA in the Fraud Enforcement and
Recovery Act of 2009 ("FERA"), altering slightly the language in
the presentment provision.  The amendment of the presentment
provision took "effect on the date of enactment of this Act and
shall apply to conduct on or after the date of enactment[.]"
P.L. 111-21, § 4 at 1625.  Since the alleged conduct here
occurred before 2009, the provision as amended in 2009 does not
apply here, and references in this opinion to § 3729(a)(1) are to
the pre-amendment version.

- 11 -

Jamieson Sci. & Eng'g, Inc., 214 F.3d 1372, 1374 (D.C. Cir.
2000).  "[T]he elements of section 3729(a)(1) are (1) the
defendant submitted a claim to the government, (2) the claim was
false, and (3) the defendant knew the claim was false."  United
States ex rel. Harris v. Bernad, 275 F. Supp. 2d 1, 6 (D.D.C.
2003).  Liability will attach to a claim for payment submitted to
a grantee of the government if "upon presentment of the claim[,]"
the government "reimburses the grantee for funds that the grantee
has already disbursed to the claimant."  United States ex rel.
Totten v. Bombardier Corp., 380 F.3d 488, 493 (D.C. Cir. 2004);
see also 31 U.S.C. § 3729(c) (2000).  A subcontractor may be
liable under § 3729(a)(1) even when it did not itself present any
false claims to the government if it engaged in a fraudulent
scheme that induced the government to pay claims submitted by the
contractor.  See United States ex rel. Westrick v. Second Chance
Body Armor, Inc., 685 F. Supp. 2d 129, 136 (D.D.C. 2010); Poque,
238 F. Supp. 2d at 266 ("An argument that the presentation of the
claims was the work of another is unavailing as a means to avoid
liability under [§ 3729(a)(1)].").

    A.   Falsity

    A claim may be false under the FCA if it is either factually
or legally false.  United States v. Sci. Applications Int'l
Corp., 555 F. Supp. 2d 40, 49 (D.D.C. 2008).  A claim can be
"factually false if it invoices for services that were not

- 12 -

rendered" or incorrectly describes goods or services provided.
United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,
498 F. Supp. 2d 25, 64 (D.D.C. 2007).  Alternatively, a claim is
legally false if it contains an express false certification --
that is, "a claim that falsely certifies compliance with a
particular statute, regulation or contractual terms, where
compliance is a prerequisite for payment."  Id. (internal
quotations marks omitted).  A claim also may be legally false
under an implied certification theory.  Id.  One way to plead a
false claim under this theory is to plead "that the contractor
withheld information about its noncompliance with material
contractual requirements."  United States v. Sci. Applications
Int'l Corp., 626 F.3d 1257, 1269 (D.C. Cir. 2010).  A contractual
requirement can be considered material if "both parties to the
contract understood that payment was conditional on compliance
with the requirement at issue."  Id.; see also United States v.
TDC Mgmt. Corp., Inc., 288 F.3d 421, 426 (D.C. Cir. 2002) (noting
that withholding "'information critical to the decision to pay'"
is a false claim (quoting Ab-Tech Constr., Inc. v. United States,
31 Fed. Cl. 429, 434 (Fed. Cl. 1994))).  Another way to plead an
implied certification claim is to plead that the government would
not have paid funds to a party had it known of a violation of a
law or regulation, and "the claim submitted for those funds
contained an implied certification of compliance with the law or

regulation and was fraudulent." <u>United States ex rel. Barrett v.</u>
<u>Columbia/HCA Healthcare Corp.</u>, 251 F. Supp. 2d 28, 33 (D.D.C.
2003).

Here, the government alleges that it believed it was
purchasing vests that met a five-year warranty against defects
(<u>see</u> Compl. ¶¶ 12, 15-16), and that Toyobo failed to disclose or
selectively disclosed information to vest manufacturers that
revealed that the vests were defective and that cast doubt on the
vests' ability to satisfy the warranty. (<u>See id.</u> ¶¶ 22, 30, 37,
41, 49, 55-56, 59-61, 77-83, 87, 101.) Because the government
does not allege in its complaint that any of the companies that
Toyobo supplied with Zylon invoiced for services not rendered or
described incorrectly the goods that they provided to the
government, the government has not pled that Toyobo caused any
factually false claims to be submitted to the government. Nor
has the government pled an express false certification claim,
since the complaint does not allege that any of the relevant
contracts contained express provisions requiring five-year
warranties against defects. Additionally, the government has not
pled an implied certification claim. The complaint does not
allege facts that support an inference that either the government
or Toyobo understood to be a condition of payment the requirement
that the vests satisfy a five-year warranty by remaining fit for
use as body armor for five years. <u>Cf.</u> <u>United States v. Honeywell</u>

- 14 -

Int'l Inc., Civil Action No. 08-961 (RWR), 2011 WL 2672624, at
*4-5 (D.D.C. July 8, 2011) (holding that the allegation that "had
the United States known of the defective nature of the Z Shield
Vests it would not have purchased them for use in the ballistic
protection of law enforcement officers" sufficient to support the
inference that the implied requirement that the vests satisfy
their five-year warranty was material).  Nor does the complaint
allege that "the government would not have honored the claim
presented to it if it were aware of the violation" of the
requirement that the vests be certified by the NIJ.  See Barrett,
251 F. Supp. 2d at 33.

    B.   Fraudulent Inducement

    Even in the absence of allegations that the claims
themselves were false, however, claims alleged to have been
submitted under a contract procured by fraud can be actionable.
See United States ex rel. Bettis v. Odebrecht Contractors of
Cal., Inc., 393 F.3d 1321, 1326 (D.C. Cir. 2005).  Congress
intended that "'each and every claim submitted under a contract
. . . or other agreement which was originally obtained by means
of false statements or other corrupt or fraudulent conduct . . .
constitutes a false claim" under § 3729(a).  Id. (quoting S. Rep.
No. 99-345, at 9 (1986)).  In United States ex rel. Schwedt v.
Planning Research Corp., 59 F.3d 196, 197 (D.C. Cir. 1995), the
defendant contracted to design software for an agency within the

- 15 -

Department of Labor.  The court of appeals noted that the plaintiff could have pled a § 3729(a)(1) claim by alleging that the defendant "made an initial misrepresentation about its capability to perform the contract in order to induce the government to enter into the contract[,] and . . . this original misrepresentation tainted every subsequent claim made in relation to the contract[.]"  Id. at 199.

The government's complaint here alleges -- just as the court in Schwedt hypothesized that a complaint could -- that Toyobo's misrepresentations about Zylon's accelerated deterioration induced the vest manufacturers to sell Zylon vests to the government.  (See Compl. ¶ 23 (alleging that Toyobo "forward[ed] . . . technical information to the weavers and the body armor manufacturers"); ¶ 39 (alleging that Toyobo executives met to discuss Zylon and the attendees "discussed how Toyobo should not give out too much know-how about Zylon"); ¶ 41 (alleging that Toyobo misled the vest manufacturers about the date of the appearance of Red Thread in its Zylon); ¶ 55 (alleging that after DSM put the introduction of Zylon products on hold, "Toyobo assured the body armor manufacturers and the weavers that it had not found any serious indication of Zylon strength degradation from its aging tests using Zylon fiber, but stated that it assumed no liability for any use of Zylon fiber"); ¶ 60 (alleging that while Toyobo admitted in a letter to the vest manufacturers

- 16 -

that Zylon strength deteriorated at elevated temperatures and
humidity levels, Toyobo failed to release data in its possession
that showed the true extent of the degradation and that Toyobo's
manufacturing process was not functioning properly); ¶ 67
(alleging that Toyobo omitted from report on Zylon degradation in
extreme conditions data reflecting degradation in non-extreme
conditions).)  These misrepresentations tainted all of the vest
manufacturers' claims for payment from the government, as the
government has alleged that "the Zylon fiber [Toyobo] sold for
use in Zylon body armor was defective and degraded more quickly
than Toyobo and the Zylon Vest Manufacturers represented[,]" and
"[a]s a result . . . , the United States paid for defective Zylon
body armor."  (Id. ¶ 1.)  Thus, the complaint states a
§ 3729(a)(1) claim under a fraudulent inducement theory.  See
Honeywell, 2011 WL 2672624, at *6; Westrick, 685 F. Supp. 2d at
137 (holding that government pled sufficiently an FCA claim by
alleging that defendant's misrepresentations about Zylon
degradation induced the government to pay claims for payment).
The government has set out in detail the time, place, and content
of the false representations and identified individuals allegedly
involved in the fraud, such that its allegations satisfy the
requirements of Rule 9(b).

    Toyobo argues that the government has misconstrued the
relevant warranty as one that guaranteed service for five years

- 17 -

and that the vest manufacturers warranted only that they would replace or repair a defective shield within five years of its retail purchase.  (Defs.' Mem. of P. & A. in Supp. of Their Mot. to Dismiss ("Defs.' Mem.") at 17-18.)  Toyobo cites in support of its argument two "exemplar" warranties that it claims demonstrate that the vest manufacturers did not guarantee future performance of their products.  (Id. at 18 n.15; Lyle Decl., Exs. 12-13.) This argument has no bearing on the government's fraudulent inducement theory, which hinges not on the vests' inability to satisfy a five-year warranty but rather on Toyobo's attempts to prevent the vest manufacturers and the government from learning that Zylon fiber degraded more quickly than Toyobo represented it would.  Even if the scope of the relevant warranties had some bearing on the government's fraudulent inducement theory, these warranties are not attached to the complaint and need not be considered in assessing whether the complaint adequately pleads a cause of action.  See St. Francis Xavier Parochial Sch., 117 F.3d at 624 n.3 (refusing to consider materials not attached to the pleadings when reviewing district court ruling on a motion to dismiss).  Toyobo's argument raises questions of fact that are more appropriately resolved after discovery closes, such as the scope of these warranties and whether the vest manufacturers issued warranties with comparable language upon every sale, given that Toyobo admittedly refers to the warranties as examples.  See

Honeywell, 2011 WL 2672624, at *5.  Thus, these factual issues
will not be resolved at the motion to dismiss stage of the
litigation, where the plaintiff's factual allegations are
accepted as true.[3]

Toyobo also cites an admission from the NIJ warning law
enforcement agencies that warranties from the manufacturers of
bullet-proof vests do not reflect the anticipated service life of
the product.  (Def.'s Mem. at 18-19 and n.17 (citing Nat'l Inst.
of Justice, Selection & Application Guide to Personal Body Armor,
NIJ Guide 100-01 (Nov. 2001)).)  Here again Toyobo raises a
factual issue that is not resolved appropriately on a motion to
dismiss.  The argument also has no bearing on the government's
fraudulent inducement theory, which does not rest on the
anticipated service life of the vests.

C.   Causation

For a plaintiff to allege a cause of action under
§ 3729(a)(1)'s "causes to be presented" prong, it must allege
that the defendant's conduct was "at least a substantial factor
in causing, if not the but-for cause of, submission of false

---

[3] While Toyobo argues that claims for vests reimbursed under
the BPVGPA cannot be false because the vests met the BPVGPA
requirement to be certified according to the NIJ Standard (Defs.'
Mem. at 12), this argument applies only to implied false
certifications of compliance with a law or regulation.  It has no
bearing on whether the government has stated a claim under the
theory that Toyobo fraudulently induced vest manufacturers into
submitting to the government claims for payment.

- 19 -

claims."[4] <u>Miller v. Holzmann</u>, 563 F. Supp. 2d 54, 119 n.95
(D.D.C. 2008), <u>vacated in part and remanded on other grounds by</u>
<u>United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.</u>,
608 F.3d 871 (D.C. Cir. 2010).  The government has alleged that
Toyobo marketed Zylon to the vest manufacturers, and that Toyobo
induced with the prospect of refunds, rebates, and reimbursements
vest manufacturers and other companies in the Zylon supply chain
to continue producing Zylon products -- and selling them to the
government -- when questions arose about Zylon's suitability for
ballistics applications.[5]  (Compl. ¶¶ 20, 35, 76, 84, 86, 102,
104, 111).  These allegations amply satisfy the causation
requirement.

---

[4] Toyobo's argument that the government has not alleged that
Toyobo caused the vest manufacturers to place five-year
warranties on their vests (Defs.' Mem. at 22) has no impact on
whether the government has satisfied the causation requirement.
The relevant inquiry is whether Toyobo caused the manufacturers
to present to the government claims for payment.  The five-year
warranty bears no relation to these claims for payment.  To the
extent that the existence of a five-year warranty is relevant at
all, it bears only on the falsity of the claims submitted to the
government.  However, the government has stated a fraudulent
inducement claim regardless of whether the vests carried a five-
year warranty.

[5] Although the government has alleged that vest
manufacturers had some knowledge about Zylon degradation, the
complaint nonetheless states an FCA claim against Toyobo by
alleging that it withheld and misrepresented data that would have
provided a more complete picture of Zylon's unsuitability as a
ballistic material.

- 20 -

II. FALSE STATEMENTS

The FCA also creates a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2000).[6] Section 3729(a)(2) attaches FCA liability to a defendant who prepares in support of a claim a statement it knows to be a misrepresentation, even if that defendant did not actually submit either the claims or the statement to the government. Totten, 380 F.3d at 501 (noting that "(a)(2) is complementary to (a)(1), designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval"); see also Harris, 275 F. Supp. 2d at 6 (noting that "the main purpose of section 3729(a)(2) is to remove any defense that the defendants themselves did not submit false claims to the

---

[6] FERA amended § 3729(a)(2). The amended provision, 31 U.S.C.A. § 3729(a)(1)(B) (West 2011), creates a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" FERA provided for § 3729(a)(1)(B)'s retroactive application "to all claims under the False Claims Act . . . that are pending on or after" June 7, 2008. P.L. 111-21, § 4 at 1625. The word "claims," as it applies in the relevant provision, refers to "a defendant's request for payment" and not to "civil actions for FCA violations." United States v. Sci. Applications Int'l Corp., 653 F. Supp. 2d 87, 107 (D.D.C. 2009) vacated in part and remanded on other grounds by Sci. Applications Int'l Corp., 626 F.3d 1257. Because the complaint does not allege that any requests for payment were pending after August 2005, the unamended false statements provision applies.

government"). To prove a violation of the false statements provision, "a plaintiff must show that (1) the defendant created a record and used this record to get the government[] to pay its claim, (2) the record was false, and (3) the defendants knew that the record was false."[7] <u>Harris</u>, 275 F. Supp. 2d at 6.

Toyobo argues that its "statements were immaterial to the United States' decision to purchase Zylon vests" as "evidenced by the fact that the United States . . . continued to purchase vests until 2005, well after it was presented with all of the information regarding degradation of Zylon." (Defs.' Mem. at 21 (emphasis omitted).) Although the false statements provision as amended by the Fraud Enforcement and Recovery Act of 2009 contains by its plain text a materiality requirement,[8] <u>see</u> 31 U.S.C. § 3729(a)(1)(B) (West 2011), the unamended version

---

[7] Although Toyobo argues that "the United States has failed to show that Toyobo 'knowingly caused' any . . . false statement to be presented to the United States" (Defs.' Mem. at 22), § 3729(a)(2) does not require a plaintiff to prove that a defendant caused a false statement to be presented to the United States. Merely making a false statement is sufficient to violate this provision. To the extent that § 3729(a)(2) contains any causation requirement, that requirement applies to getting the government to pay a claim for payment, and the defendants do not dispute that the government has alleged sufficiently that Toyobo's false statements were a substantial factor in getting the government to pay the vest manufacturers' claims for payment.

[8] "A false statement is material if it 'has a natural tendency to influence agency action or is capable of influencing agency action.'" <u>United States ex rel. Faqo v. M&T Mort. Corp.</u>, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (quoting <u>United States ex rel. Berge v. Bd. of Trs. of Univ. of Ala.</u>, 104 F.3d 1453, 1460 (4th Cir. 1997)).

- 22 -

applicable to the government's claims here contains no such
requirement.  Rather, "a plaintiff asserting a § 3729(a)(2) claim
must prove that the defendant intended that the false record or
statement be material to the Government's decision to pay or
approve the false claim."  Allison Engine Co., Inc. v. United
States ex rel. Sanders, 553 U.S. 662, 665 (2008).  The inquiry is
not one of objective materiality but rather of the intent of the
defendant who made the false statements.  "[A] subcontractor
violates § 3729(a)(2) if the subcontractor submits a false
statement to the prime contractor intending for the statement to
be used by the prime contractor to get the government to pay its
claim."  Id. at 671.  Allison Engine interpreted the provision to
make a defendant "'answerable for . . . the natural, ordinary and
reasonable consequences of his conduct'" but not more.  Id. at
672 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 470
(2006)).  The government has alleged adequately that the natural
consequences of Toyobo misrepresenting and concealing unfavorable
data about Zylon's degradation was to cause the vest
manufacturers to submit to the government false claims for
payment.  See Honeywell, 2011 WL 2672624, at *8.

Even if the unamended § 3729(a)(2) could be construed to
contain a materiality requirement, the government has alleged in
its complaint that Toyobo's false statements influenced its
payment decisions.  (See Compl. ¶ 1 ("As a result of Toyobo's

. . . representations, the United States paid for defective Zylon body armor"). Nowhere in the complaint does the government allege that it possessed all available information and data regarding Zylon degradation prior to 2005. Whether sufficient information about Zylon degradation was in the public domain before the government decided to stop purchasing Zylon vests is a question of fact inappropriate for resolution at the pre-discovery motion to dismiss stage.

III. CONSPIRACY TO DEFRAUD

Anyone who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid" may be subject to 31 U.S.C. § 3729(a)(3) (2000) liability.[9] The FCA does not define a conspiracy, but courts have held that general civil conspiracy principles apply to FCA conspiracy claims. See, e.g., Westrick, 685 F. Supp. 2d at 140; United States ex rel. Durcholz v. FKW Inc., 189 F.3d 542, 545 n.3 (7th Cir. 1999). To state a claim under the FCA for conspiracy, the government must plead that the defendant "conspired with one or more persons to have a fraudulent claim paid by the United States, . . . that one or more of the conspirators performed any act to have such a claim

_____

[9] Congress also amended this provision in FERA. The amended provision imposes liability on anyone who "conspires to commit a violation" of any substantive section of § 3729(a). 31 U.S.C. § 3729(a)(1)(C). However, this provision does not apply retroactively, P.L. 111-21, § 4 at 1625, and the claim will be analyzed under the unamended statute.

- 24 -

paid by the United States, and . . . that the United States
suffered damages as a result of the claim."[10]   <u>United States v.
Bouchey</u>, 860 F. Supp. 890, 893 (D.D.C. 1994).  To state a claim
under the FCA for conspiracy, a plaintiff must plead that the
alleged conspirators agreed to make use of a false record or
statement to achieve the end of getting the government to pay a
claim.[11]   <u>See</u> <u>Allison Engine</u>, 553 U.S. at 665.

   Toyobo argues that the government's allegations "do not
indicate any agreement between Toyobo and any other party to
conspire to defraud the United States."  (Defs.' Mem. at 27.)
The government responds that it has pled adequately that Toyobo
"entered into agreements with numerous companies participating in
the chain of Zylon vest production[.]"  (U.S. Br. in Opp'n to
Defs.' Mot. to Dismiss at 33.)  While the paragraphs of the
complaint to which the government cites refer to meetings between
Toyobo and vest manufacturers (<u>see, e.g.</u>, Compl. ¶¶ 105, 112),

---

   [10] While there is disagreement among courts and commentators
as to whether damages are a necessary element of a Section (a)(3)
claim, <u>compare</u> <u>United States ex rel. Finney v. Nextwave Telecom,
Inc.</u>, 337 B.R. 479, 489 (S.D.N.Y. 2006) <u>with</u> John T. Boese, <u>Civil
False Claims and Qui Tam Actions</u> 2-29 n.62 (3d ed. 2006), here
damages are clearly alleged because the government paid the
claims at issue.

   [11] The government argues that such an intent requirement is
inconsistent with § 3729(b), which provides that "no proof of
specific intent to defraud is required."  However, § 3729(b)
applies only to the terms "knowing" and "knowingly," which appear
in § 3729(a)(1) and (a)(2), but not in (a)(3).  Section 3729(b)
therefore does not limit the showing of intent necessary to state
a claim for conspiracy under the unamended § 3729(a)(3).

- 25 -

the complaint is devoid of factual allegations that support the inference that Toyobo and the vest manufacturers entered into any agreements for the purpose of getting the government to pay a claim.  The government's allegations that the vest manufacturers were aware by mid-2001 that Zylon was defective (Compl. ¶¶ 54-55) yet continued to sell Zylon vests through 2005 are insufficient to aver that Toyobo and the vest manufacturers agreed to anything.  Moreover, the notion that Toyobo conspired with the vest manufacturers is inconsistent with the government's allegations that Toyobo misrepresented the extent and severity of Zylon's degradation to the vest manufacturers to induce them to continue to sell their vests to the government.  (See Compl. ¶¶ 85, 87, 105, 112, 135(a)(1).)  See also supra I(B).  Thus, Toyobo's motion to dismiss will be granted with respect to the government's FCA conspiracy claim as to Toyobo and the vest manufacturers.  See United States ex rel. Amin v. George Washington Univ., 26 F. Supp. 2d 162, 165 (D.D.C. 1998) (citing the complaint's failure to "identify any agreement between the parties to defraud the government or to engage in any act that could constitute an attempt to defraud the government" (emphasis omitted)); Corsello v. Lincare, Inc., 428 F.3d 1008, 1014 (11th Cir. 2005) (rejecting a plaintiff's conspiracy claim where he failed to provide specific allegations of an agreement or overt act).

- 26 -

However, the government's allegations are sufficient to state a claim under the FCA for conspiracy with respect to Toyobo and its weavers.  The government alleges that Hexcel sought for Toyobo to indemnify it if Hexcel's customers stopped using Zylon and that Toyobo and Hexcel agreed that Toyobo would provide a refund to Hexcel in such an event.  (Compl. ¶ 76.)  Toyobo also agreed to provide Hexcel with replacement Zylon fiber and $240,000 in reimbursement in an attempt to restart Hexcel's weaving after Hexcel became concerned about Red Thread.  (Id. ¶¶ 102, 104, 111.)  Additionally, Toyobo and Barrday agreed that Teijin Shoji would retain title to Zylon delivered to Barrday to weave, and the parties entered into this arrangement to get Barrday to resume weaving Zylon.  (Id. ¶ 84.)  Finally, Lincoln fabrics agreed to receive from Toyobo Zylon inventory knowing that it might contain Red Thread.  (Id. ¶ 124.)  The government has pled throughout its complaint that the purpose of all of these agreements was to convince the weavers to continue weaving Zylon despite questions about its ballistic suitability.  Because the vest manufacturers could not produce vests without woven Zylon, these allegations are sufficient to satisfy the requirement that the agreements had the purpose of getting claims paid by the government.  The detailed allegations about the meetings between Toyobo and the weavers fulfills the requirements for an FCA conspiracy claim under Rule 9(b) at the motion to

dismiss stage in the litigation.  See Westrick, 685 F. Supp. 2d
at 141 (finding sufficient allegations of an FCA conspiracy where
the government claimed that defendants agreed not to warn
customers about Zylon degradation).[12]

IV.  COMMON LAW FRAUD

A plaintiff in an FCA action may plead -- if not ultimately
recover upon -- alternative common law theories.  See Fed. R.
Civ. P. 8(d)(3); see also United States ex rel. Purcell v. MWI
Corp., 254 F. Supp. 2d 69, 79 (D.D.C. 2003).  A successful claim
for common law fraud requires "(1) a false representation (2) in
reference to a material fact (3) made with knowledge of its
falsity (4) and with the intent to deceive (5) with action taken
in reliance upon the representation."  Pence v. United States,
316 U.S. 332, 338 (1942).  Nondisclosure may form the basis of a
common law fraud claim, Witherspoon v. Philip Morris Inc., 964 F.
Supp. 455, 459 (D.D.C. 1997), particularly -- but not exclusively
-- where a party has a duty to disclose material information.
See Daisley v. Riggs Bank, N.A., 372 F. Supp. 2d 61, 78 (D.D.C.
2005); Sage v. Broad. Publ'ns, Inc., 997 F. Supp. 49, 52 (D.D.C.
1998).  The government has alleged that Toyobo failed to disclose

---

[12] The government's allegations with respect to any
agreement between Toyobo and Second Chance are not at issue in
this case.  (See Compl. ¶ 1 ("This lawsuit expressly excludes any
claims for defective Zylon body armor sold to the United States
and to state, local, and tribal law enforcement agencies by
Second Chance Body Armor, Inc., which are the subject of a
separate False Claims Act qui tam lawsuit[.]").)

- 28 -

or affirmatively misrepresented evidence of, among other things, the material fact of Zylon's degradation. (Compl. ¶¶ 20, 55, 59-60, 66-67, 79, 83, 87, 96, 112-13.) Moreover, the government has alleged that Toyobo had knowledge of the misrepresentation of its data (id. ¶¶ 1, 22, 25, 56, 87, 140) and intended to deceive the government. (Id. ¶ 142.) The government relied upon Toyobo's misrepresentations. (Id. ¶¶ 1, 143.) These allegations are sufficient to state a claim for common law fraud. See Westrick, 685 F. Supp. 2d at 141.

V.   UNJUST ENRICHMENT

To state a claim for unjust enrichment, a plaintiff must allege that a benefit was conferred upon a defendant, the defendant accepted the benefit, and it would be unjust for the defendant not to pay the plaintiff the value of the benefit. Miller v. Holzmann, Civil Action No. 95-1231 (RCL), 2007 WL 710134, at *7 (D.D.C. Mar. 6, 2007). "[U]njust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next." 4934, Inc. v. D.C. Dep't of Employment Servs., 605 A.2d 50, 56 (D.C. 1992); see also In re Lorazepam & Clorazepate Antitrust Litig., 295 F. Supp. 2d 30, 51 (D.D.C. 2003). In re Lorazepam, 295 F. Supp. 2d at 51, refused to dismiss a claim for unjust enrichment brought by a group of plaintiffs, including insurance companies,

against drug manufacturers for payments made to reimburse
subscribers for prescriptions.  The court held that the theory of
unjust enrichment could apply to indirect payments because the
plaintiffs had properly alleged the defendants' enrichment to the
plaintiffs' own detriment and not just to the detriment of the
plaintiffs' subscribers.  Id.

Toyobo argues that the government has not stated an unjust
enrichment claim because "any benefit conferred by the United
States was conferred on the Vest Manufacturers -- either directly
or indirectly -- not Toyobo."  (Defs.' Mem. at 33.)  However, the
government alleges that "the United States paid for defective
bulletproof vests made of Zylon due to false statements and
omissions by Toyobo" and that Toyobo "received money, . . .
indirectly, to which they were not entitled."  (Compl. ¶¶ 147,
149.)  Toyobo does not dispute that it retained all the monies
from its sales to the vest manufacturers, and the government
amply has stated a claim for unjust enrichment.  See Honeywell,
2011 WL 2672624, at *9.  Whether Toyobo actually performed its
contract in full, such that the government received the benefit
of its bargain, is a question of fact that is inappropriate for
resolution at the motion to dismiss stage.

CONCLUSION AND ORDER

The government has stated FCA presentment and false
statements claims and common law fraud and unjust enrichment

- 30 -

claims, and it has pled its fraud allegations with respect to
these claims with sufficient particularity to meet the standards
articulated under Rule 9(b).  The government has also stated an
FCA conspiracy claim as between Toyobo and the Zylon weavers, but
not as between Toyobo and any of the vest manufacturers.
Accordingly, it is hereby

ORDERED that Toyobo's motion [14] to dismiss be, and hereby
is, GRANTED with respect to the government's FCA conspiracy
claims as between Toyobo and the vest manufacturers and DENIED in
all other respects.

SIGNED this 2nd day of September, 2011.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge